UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ——————————————— x | | |
| ROYAL PARK INVESTMENTS SA/NV, Individually and on Behalf of All Others Similarly Situated, | : : : : | Civil Action No. 14-cv-06502-GHW <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | : : | <u>AMENDED CLASS ACTION COMPLAINT</u> AND ALTERNATIVE VERIFIED |
| vs. | : : : | DERIVATIVE ACTION FOR BREACH OF THE TRUST INDENTURE ACT, BREACH OF CONTRACT, BREACH OF TRUST AND |
| THE BANK OF NEW YORK MELLON, as Trustee, | : : : | VIOLATION OF THE STREIT ACT |
| Defendant. | : : : | <u>DEMAND FOR JURY TRIAL</u> |
| ——————————————— x | | |

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF THE ACTION ..................................................................................1

II. JURISDICTION AND VENUE ...............................................................................14

III. PARTIES ...............................................................................................................14

IV. FACTUAL ALLEGATIONS ..................................................................................17

    A.    The Securitization Process for the Mortgage Loans ...............................17

    B.    BNY Mellon's Duties as Trustee for the Covered Trusts.......................21

        1.    BNY Mellon's Duty to Enforce the Warrantors' Obligations to
            Cure, Substitute or Repurchase Mortgage Loans that Breached
            Their R&Ws.................................................................................22

        2.    BNY Mellon's Duties upon the Occurrence of an Event of Default .........24

        3.    BNY Mellon's Heightened Duty to Prudently Protect Plaintiff's
            and the Class's Interests as Though They Were BNY Mellon's
            Own Interests During an Event of Default .................................................27

        4.    BNY Mellon's Duty of Trust to Avoid Conflicts of Interest with
            Plaintiff and the Class .................................................................28

        5.    BNY Mellon's Duties and Obligations Under the TIA .............................28

        6.    BNY Mellon's Duties and Obligations Under the Streit Act ...................30

    C.    The Covered Trusts Suffer from Serious Defects Because BNY Mellon
        Failed to Perform the Duties Required of It Under the Governing
        Agreements, the TIA, the Streit Act and Common Law.........................30

        1.    BNY Mellon Discovered No Later than April 2011 that the
            Covered Trusts' Warrantors Breached Their R&Ws, Thus
            Triggering BNY Mellon's Duty to Enforce the R&W Claims
            Under the Governing Agreements, TIA and Streit Act .............................31

            a.    Prior to April 2011, BNY Mellon Knew that the
                Warrantors' R&Ws Were False ....................................................32

            b.    By April 13, 2011, BNY Mellon Absolutely Knew that the
                Warrantors Had Breached Their Representations and
                Warranties Concerning the Mortgage Loans in the Covered
                Trusts.................................................................................35

1011938_1

c.      Specific Claims Made About the Mortgage Loans in the Specific Covered Trusts at Issue Herein Caused BNY Mellon to Discover Breaches of the Warrantors' R&Ws ..............50

d.      BNY Mellon Also Learned of the Warrantors' R&W Breaches from Borrowers' Bankruptcies ......................................51

2.      BNY Mellon Had Actual Knowledge of Events of Default No Later than April 13, 2011, Thus Triggering Its Duties to Act Under the Governing Agreements, the TIA and the Streit Act ...........................57

a.      Shortly After the Covered Trusts Were Formed, BNY Mellon Became Aware of Widespread Loan Servicing Abuses that Likely Affected the Covered Trusts ...........................59

b.      By October 2010, BNY Mellon Knew the Master Servicers/Servicers Were Committing Events of Default with Respect to the Mortgage Loans in the Covered Trusts ..........66

c.      By April 13, 2011, BNY Mellon Absolutely Knew that the Covered Trusts' Master Servicers and Servicers Had Committed Events of Default with Respect to the Mortgage Loans in the Covered Trusts ...........................................68

d.      BNY Mellon Knew of Specific Events of Default that Were Occurring with Respect to the Specific Mortgage Loans in the Specific Covered Trusts ...........................................73

e.      After April 2011, BNY Mellon Also Had Actual Knowledge that the Master Servicers and Servicers Were Continuing to Commit the Same and New Events of Default with Respect to the Mortgage Loans in the Covered Trusts ...........................................77

f.      BNY Mellon Also Knew that Successor Master Servicer/Servicer Ocwen Was Committing Events of Default ...........................................78

3.      BNY Mellon Had Actual Knowledge of "Defaults" Committed by Itself, the Warrantors, the Master Servicers, the Servicers and the Issuers No Later than April 13, 2011, Thus Triggering Its Duties to Act Under the TIA ...................................................................82

4.      BNY Mellon Has Conflicts of Interest with Plaintiff and the Class and Has Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself ......................................................85

D.      BNY Mellon Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA, the Streit Act and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA, the Streit Act and Common Law .................................................................87

1.      BNY Mellon Failed to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Defective, Breaching Mortgage Loans as Required by the Governing Agreements, the TIA and the Streit Act ....................................................................................88

2.      BNY Mellon Failed to Perform Its Duties with Respect to Events of Default as Required by the Governing Agreements, the TIA and the Streit Act ..............................................................89

3.      BNY Mellon Failed to Exercise All of Its Rights and Duties Under the Governing Agreements as a Prudent Person Would, as Required by the Governing Agreements, the TIA and the Streit Act ........92

4.      BNY Mellon Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class .............................................................92

E.      Plaintiff and the Class Have Suffered Significant Damages Due to BNY Mellon's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA and the Streit Act ..........................................93

F.      Plaintiff May Sue BNY Mellon as Trustee ..........................................95

V.      CLASS ACTION ALLEGATIONS ........................................................96

VI.     DERIVATIVE ACTION ALLEGATIONS ...............................................99

COUNT I ................................................................................................101

Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq.* (As to the ECR 2005-2 and GSCC 2006-1 Covered Trusts Only) ....................................101

COUNT II ...............................................................................................103

Breach of Contract (As to Each of the Covered Trusts) .................................103

COUNT III ................................................................................................................105

    Breach of Trust (As to Each of the Covered Trusts) .......................................105

COUNT IV ...............................................................................................................106

    Violation of the Streit Act, N.Y. Real Prop. Law §124, *et seq.* (As to Each of the
        Covered Trusts) ..............................................................................................106

PRAYER FOR RELIEF ..........................................................................................107

JURY DEMAND ......................................................................................................108

1.     Plaintiff Royal Park Investments SA/NV ("plaintiff" or "RPI") alleges the following based on information and belief and upon the investigation of plaintiff's counsel (except as to the allegations pertaining to plaintiff, which are based on personal knowledge), which included an investigation and review of information concerning defendant The Bank of New York Mellon ("BNY Mellon" or "defendant"), a review and analysis of information and data concerning the "Covered Trusts" at issue herein, the "Mortgage Loans" within the Covered Trusts at issue herein, the "Warrantors" and originators of the Mortgage Loans, and the "Master Servicers" and "Servicers" of the Mortgage Loans, as well as interviews and consultations with experts, consultants and others knowledgeable in the field of "residential mortgage-backed securities" ("RMBS"). Plaintiff and plaintiff's counsel believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.     SUMMARY OF THE ACTION

2.     Plaintiff brings this action on its own behalf and on behalf of a class of all RMBS investors in the following five substantially similar RMBS trusts for which defendant BNY Mellon serves as Trustee (collectively, the "Covered Trusts"):

| Covered Trust Name | Hereinafter Referred to as: |
|---|---|
| 1.   Encore Credit Receivables Trust 2005-2 | ECR 2005-2 |
| 2.   GSC Capital Corp. Mortgage Trust 2006-1 | GSCC 2006-1 |
| 3.   NovaStar Mortgage Funding Trust, Series 2006-3 | NHEL 2006-3 |
| 4.   Nationstar Home Equity Loan Trust 2007-C | NSTR 2007-C |
| 5.   Structured Asset Mortgage Investments II Trust 2006-AR4 | SAMI 2006-AR4 |

3.     Alternatively, plaintiff brings this action derivatively in the right and for the benefit of the Covered Trusts against defendant BNY Mellon.

4.     Plaintiff sues BNY Mellon for violating the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §77aaa, *et seq.*, for two of the Covered Trusts which are "Indenture" trusts, *i.e.*, the ECR

2005-2 and GSCC 2006-1 Covered Trusts (the "Indenture Trusts").[1]  In addition, plaintiff sues BNY

Mellon for breach of contract and breach of trust in connection with all five of the Covered Trusts.

Plaintiff also sues BNY Mellon for violations of the Streit Act, N.Y. Real Prop. Law §124 *et seq.*

Plaintiff and the class are beneficiaries of the Covered Trusts, which hold residential "Mortgage

Loans."[2]  Plaintiff and the class own RMBS "certificates" in the Covered Trusts, which are

essentially bonds granting plaintiff and the class the right to receive monthly principal and interest

payments generated by the Mortgage Loans.

5.     As the Trustee for the Covered Trusts, BNY Mellon owed plaintiff and the class

certain contractual duties and obligations with respect to all of the Covered Trusts.  BNY Mellon

also owed plaintiff and the class the duty to avoid conflicts of interest under common law.  BNY

Mellon further owed plaintiff and the Class certain duties under the Streit Act.  BNY Mellon also

owed plaintiff and the class certain duties under the TIA with respect to the two "Indenture Trusts."

BNY Mellon's contractual duties and obligations are contained within the Covered Trusts'

"Governing Agreements," called "Pooling and Servicing Agreements" ("PSAs"), or "Indentures"

(with respect to the Indenture Trusts), and other agreements related thereto, such as "Mortgage Loan

Purchase Agreements" ("MLPAs"), "Sale and Servicing Agreements" ("SSAs") and "Servicing

Agreements" ("SAs").  A copy of one of the Governing Agreements, the PSA for the NSTR 2007-C

---

[1]     Claims under the TIA were limited to Indenture Trusts very recently by the Second Circuit in *Ret. Bd. of the Policemen's Annuity and Benefit Fund v. The Bank of New York Mellon*, 775 F.3d 154 (2d Cir. Dec. 23, 2014).  This decision, however, currently has pending requests for rehearing and rehearing *en banc*.  Should the Second Circuit grant the requests for rehearing or rehearing *en banc*, and reverse its decision, plaintiff reserves its rights to amend to allege that the TIA applies to all of the Covered Trusts.

[2]     Each of the Covered Trusts held thousands of residential mortgage loans that were transferred to them.  These mortgage loans transferred to the Covered Trusts are referred to herein as the "Mortgage Loans."  Between 95% and 100% of the Mortgage Loans in the Covered Trusts were first lien loans.

1011938_1

Covered Trust (the "NSTR 2007-C PSA"), is attached hereto as Exhibit A. All of the Governing Agreements for the other Covered Trusts are substantially similar to the Governing Agreement for the NSTR 2007-C Covered Trust, and are incorporated herein by reference as if set forth fully herein.

6.     The purpose of having Trustees, such as BNY Mellon, for the Covered Trusts is to ensure that there is at least one independent party to the Governing Agreements that – unlike plaintiff and the class – does not face collective action, informational, or other limitations, thereby allowing the Trustee to effectively protect the interests of plaintiff and the class, and administer the Covered Trusts for their benefit.

7.     The Governing Agreements effectuate this purpose by granting BNY Mellon certain rights and obligating it to exercise those rights for the benefit of plaintiff, the class and the Covered Trusts. For example, the Governing Agreements contain or reference representations and warranties ("R&Ws") from certain entities that aggregated the Mortgage Loans that were ultimately sold and transferred to the Covered Trusts. The transferring entities were: (1) the "Sellers" or "Sponsors" of the Mortgage Loans and the Covered Trust securitizations (the "Loan Sellers/Sponsors");[3] and/or (2) the Mortgage Loans' originators or other entities that aggregated and sold Mortgage Loans that were ultimately transferred to the Covered Trusts ("Other Transferors") (the Loan Sellers/Sponsors and Other Transferors are collectively referred to herein as the "Warrantors"). The Warrantors' R&Ws attested to the credit quality and characteristics of the Mortgage Loans.[4] If it turned out that any

---

[3]    Typically, the Loan Sellers/Sponsors aggregated the Mortgage Loans and sold them to the Covered Trusts' "Depositors" for ultimate transfer to BNY Mellon and the Covered Trusts.

[4]    As discussed more fully *infra*, the Warrantors' R&Ws attested to the credit characteristics of the Mortgage Loans and vouched for the accuracy of the data they provided about the Mortgage Loans. Among other things, these R&Ws promised that the Mortgage Loans were originated pursuant to all applicable laws, were further originated in accordance with specific underwriting guidelines, were

Mortgage Loan was in breach of the Warrantors' R&Ws, the offending Warrantor was required to cure the breach, or substitute a new loan for, or repurchase, the defective Mortgage Loan.

8.  The Governing Agreements, the TIA and the Streit Act require BNY Mellon – upon discovery of a breach of any R&W – to promptly provide notice of the breach to the offending Warrantor and the other parties to the Governing Agreements.  If the breach is not timely cured, the Governing Agreements, TIA and Streit Act further require BNY Mellon to enforce the breaching Warrantor's obligation to either substitute or repurchase any defective Mortgage Loans.

9.  The veracity and accuracy of the R&Ws by the Warrantors were extremely important to both investors and the credit rating agencies that rated the RMBS because they conveyed information concerning the quality of the Mortgage Loans, and thus the level of risk of investing in the Covered Trusts' RMBS.  The credit rating agencies relied on and assessed the quality of the Covered Trusts' Mortgage Loans and RMBS and issued the RMBS credit ratings – nearly all of which were high "investment grade" credit ratings – based on the Warrantors' R&Ws about the Mortgage Loans.  In fact, the credit rating agencies *required* that such R&Ws be made by the Warrantors as a pre-condition to providing credit ratings for the RMBS.  Given the critical importance of the Warrantors' R&Ws, the Governing Agreements obligated the Warrantors to timely cure, substitute or repurchase any Mortgage Loan that materially breached any of their R&Ws.  In other words, the R&Ws served as insurance to plaintiff, the class and the Covered Trusts that the Mortgage Loans would be as the Warrantors represented.  Importantly, if they were not, BNY Mellon was required by the Governing Agreements to make them so, by enforcing the Warrantors'

---

free of fraud and misrepresentation, and were otherwise as represented in the offering documents used to sell the Covered Trusts' RMBS to investors.

obligations to cure any breaches or substitute new, non-breaching loans for defective Mortgage Loans, or repurchase the defective Mortgage Loans.

10.     As alleged more fully below, by no later than April 13, 2011, BNY Mellon "discovered," as that term is used in the Governing Agreements, that the Warrantors had breached their R&Ws as to thousands of Mortgage Loans within the Covered Trusts. However, despite BNY Mellon's discovery and knowledge of the breaches, BNY Mellon failed to notify the breaching Warrantors and other parties to the Governing Agreements of the breaches. Nor did BNY Mellon enforce the Warrantors' obligations to cure, substitute or repurchase the breaching Mortgage Loans, including many Mortgage Loans that were so obviously defective that they had already been foreclosed on, liquidated and/or written off as losses long before April 2011. BNY Mellon's failure to comply with its duties under the Governing Agreements to enforce the Warrantors' obligations to remedy defective Mortgage Loans has resulted in hundreds of millions of dollars of damages to plaintiff, the class and the Covered Trusts. Moreover, BNY Mellon engaged in multiple additional breaches of its continuing duties to enforce the Warrantors' obligations under the Governing Agreements by continuing to refuse to act after learning of the breaches, as well as after learning of new breaches, causing the claims against the Warrantors to be lost to the statutes of limitations. BNY Mellon's failure to act also violated the TIA and the Streit Act, as they required BNY Mellon to perform the foregoing duties mandated by the Governing Agreements. Moreover, under the TIA, BNY Mellon was further required to give plaintiff and the class notice of the Warrantors' defaults/breaches with respect to the Indenture Trusts, which BNY Mellon also failed to do.

11.     In addition to BNY Mellon's obligations to enforce the R&W claims against the Warrantors, BNY Mellon also owed other critical duties to plaintiff, the class and the Covered Trusts under the Governing Agreements, TIA and Streit Act. The Governing Agreements require BNY

Mellon to take steps to protect plaintiff, the class and the Covered Trusts whenever it becomes aware of loan servicing failures by the Covered Trusts' "Master Servicers" or "Servicers" that amount to "Events of Default" under the Governing Agreements. To explain, the Governing Agreements designated certain entities to be the Master Servicers and/or Servicers of the Mortgage Loans within the Covered Trusts (these Master Servicers and Servicers are sometimes collectively referred to herein as "Master Servicers/Servicers"). The Master Servicers/Servicers are responsible under the Governing Agreements to ensure that the Mortgage Loans within the Covered Trusts are being properly and legally serviced for the benefit of plaintiff and the class. An "Event of Default" occurs under the Governing Agreements whenever a Master Servicer or Servicer (as applicable) fails to ensure the Mortgage Loans are being legally, prudently and properly serviced.[5] The Master Servicers/Servicers also commit an Event of Default whenever they discover breaches of the Warrantors' R&Ws and fail to promptly give notice of those breaches to BNY Mellon.

12. Under the Governing Agreements, the TIA and the Streit Act, BNY Mellon is required to act quickly whenever it becomes aware of an Event of Default by the Master Servicers/Servicers. First, BNY Mellon is required to notify the offending Master Servicer or Servicer of its Event of Default and demand that it be cured. Moreover, BNY Mellon is also required to promptly give notice of uncured Events of Default to plaintiff and the class, so that they

---

[5]   This included, *inter alia*, ensuring the prompt collection of payments from borrowers and remittance of the same to the Covered Trusts; ensuring the proper and legal sending of statements and delinquency and other notices to borrowers who were late on their payments; ensuring the proper maintenance and reporting of accurate information regarding the Mortgage Loans; ensuring the proper and legal modification of Mortgage Loans when permitted and as necessary; ensuring the proper and legal institution and prosecution of foreclosure proceedings, when and as necessary, on behalf of BNY Mellon as Trustee; and properly maintaining the Covered Trusts' "REO" properties (properties the Covered Trusts owned). In short, the Governing Agreements require the Master Servicers/Servicers to do whatever a "prudent" Master Servicer/Servicer would customarily do to ensure the proper servicing and administration of the Mortgage Loans in accordance with law, for the benefit of plaintiff and the class.

- 6 -

can mobilize and direct BNY Mellon on how to deal with the Events of Default.[6] Finally, BNY Mellon is allowed to take additional steps to protect plaintiff and the class if an Event of Default is not cured, including terminating the offending Master Servicer or Servicer, replacing it, or taking over its duties in certain circumstances.

13.     Importantly, under the Governing Agreements, the TIA and the Streit Act, the occurrence of an Event of Default that is known to BNY Mellon dramatically increases BNY Mellon's duties to plaintiff and the class.  The occurrence of any Event of Default ***requires BNY Mellon to protect plaintiff and the class by exercising all of the rights and powers vested in BNY Mellon by the Governing Agreements, <u>as a reasonably prudent person would</u> under the circumstances, and to act as if BNY Mellon is protecting its own interests***.  Essentially, when an Event of Default occurs, BNY Mellon is required to act as a fiduciary for plaintiff and the class and take all prudent actions to protect them as if BNY Mellon is protecting its own interests.  Moreover, under the TIA, BNY Mellon's duty was even broader.  With respect to the two Indenture Trusts, which are subject to the TIA, BNY Mellon was required to act as a fiduciary, *i.e.*, prudently, during any "default" – that is, any failure by any party to the Governing Agreements to perform its obligations.

14.     It was critically important that BNY Mellon act when it became aware of Events of Default (and "defaults" under the TIA) because the proper servicing of the Mortgage Loans and the reporting of Warrantor R&W breaches to BNY Mellon was vital to: (1) the ongoing financial viability of the Covered Trusts; (2) ensuring the Covered Trusts had sufficient cash flows to pay

---

[6]     With respect to the two Indenture Trusts – the ECR 2005-2 and GSCC 2006-1 Covered Trusts – which are subject to the TIA, BNY Mellon's duties were even broader.  The TIA requires BNY Mellon to notify plaintiff and the class of not only Events of Default, but also of ***any*** "defaults," *i.e.*, any failure by any party to the Governing Agreements to fulfill its duties under the Governing Agreements.

- 7 -

expenses and to fund payments to plaintiff and the class; (3) avoiding and minimizing any losses to plaintiff, the class and the Covered Trusts from defaults, delinquencies or foreclosures of the Mortgage Loans or Warrantor R&W breaches; and (4) maintaining the credit ratings and market values of plaintiff's and the class's RMBS. Because of this, the Governing Agreements, TIA and Streit Act, require BNY Mellon to act as essentially a fiduciary for plaintiff and the class whenever it becomes aware of an Event of Default by a Master Servicer or Servicer.

15. As alleged more fully below, BNY Mellon obtained actual knowledge of widespread, rampant Events of Default by the Covered Trusts' Master Servicers and Servicers (and "defaults" by them and other parties to the Governing Agreements) no later than April 13, 2011. By April 2011, there was no doubt that BNY Mellon had actual knowledge that the Master Servicers and Servicers were engaging in numerous, widespread, improper and/or illegal foreclosure practices with respect to the Mortgage Loans in the Covered Trusts that were Events of Default. In fact, BNY Mellon even appears to have actively participated in the misconduct, including the making of false statements, the filing of false and illegal affidavits in foreclosure actions, and the participation in other improper or illegal loan servicing misconduct with the Master Servicers/Servicers, all of which were "defaults" and Events of Default. In addition, by April 2011, BNY Mellon also had actual knowledge that the Master Servicers/Servicers knew of widespread breaches of the Warrantors' R&Ws but had not reported those to BNY Mellon, which were also "defaults" and Events of Default. These Events of Default triggered BNY Mellon's fiduciary-like duties under the Governing Agreements, the TIA and the Streit Act to take action and protect plaintiff and the class as a prudent person would. However, BNY Mellon failed to do the things required of it by the Governing Agreements, the TIA and the Streit Act, and further allowed the Events of Default to go on unchecked, thereby engaging in multiple additional breaches of its duties under the Governing Agreements, the TIA and the Streit

Act. In fact, despite its knowledge of these Events of Default, and numerous new, additional Events of Default that have occurred repeatedly and continuously *after* April 2011, BNY Mellon has continued to fail to act, let alone act prudently, and thus has engaged in multiple additional breaches of its duties under the Governing Agreements, the TIA and the Streit Act, as the Covered Trusts continue to suffer from pervasive Events of Default (and "defaults" under the TIA).

16.      BNY Mellon's multiple breaches and failures to act have resulted in defective Mortgage Loans that breached their R&Ws not being replaced or repurchased by the Warrantors, and also Mortgage Loans being improperly, imprudently and illegally serviced, causing massive damages to plaintiff, the class and the Covered Trusts. BNY Mellon's failures to properly act with respect to the Master Servicers' and Servicers' Events of Default (and their and others' "defaults") have resulted in, *inter alia*: (1) failures to have Mortgage Loans in breach of the Warrantors' R&Ws replaced or repurchased; (2) numerous foreclosures of the Mortgage Loans being denied, invalidated and/or improperly delayed, substantially driving up the Covered Trusts' expenses and losses; (3) numerous Mortgage Loan delinquencies being allowed to stretch on interminably without payments being remitted to the Covered Trusts, while the Master Servicers and Servicers continuously add improper and excessive fees and charges to such Mortgage Loans, which are paid to the Master Servicers and Servicers from the Covered Trusts; (4) numerous Mortgage Loans being modified or foreclosed, or not being modified or foreclosed, in a manner that financially benefitted the Master Servicers'/Servicers' financial interests but not plaintiff's and the class's financial interests, in violation of the Governing Agreements; (5) the Master Servicers and Servicers entering into numerous settlements with governmental regulatory authorities because of their Events of Default wherein the Master Servicers and Servicers were required as part of the settlements to modify and reduce mortgage loan balances and provide other borrower concessions, which in some cases caused

- 9 -

additional losses to plaintiff, the class and the Covered Trusts; and (6) various and numerous other illegal and improper servicing misconduct alleged herein amounting to Events of Default (and "defaults" under the TIA) that caused millions of dollars in damages to plaintiff, the class and the Covered Trusts.

17. As previously alleged, these uncured Events of Default require BNY Mellon to use a heightened "prudent person" duty of care of a fiduciary, and to exercise all of its rights and powers under the Governing Agreements for the benefit of the plaintiff and the class. ***This heightened duty of care does not apply only to the Master Servicers'/Servicers' Events of Default, however; it also applies to all of the Warrantors that had breached their R&Ws***. Thus, BNY Mellon was also required to enforce the R&W claims against the Warrantors as a prudent person would, and seek to fully recover for those claims as though BNY Mellon was seeking to recover for itself.[7]

18. BNY Mellon, however, ignored these duties and obligations owed to plaintiff, the class and the Covered Trusts under the Governing Agreements, the TIA and the Streit Act, and did not exercise its rights and powers under the Governing Agreements, or exercise the degree of care and skill required of a prudent person in the conduct of his/her own affairs. As a result, BNY Mellon breached the Governing Agreements and violated the TIA and Streit Act, and caused plaintiff, the class and the Covered Trusts to suffer hundreds of millions of dollars in damages from the loss and non-prosecution of the R&W claims against the Warrantors (which are now time barred), and has further caused millions of dollars in additional damages resulting from the Master Servicers'/Servicers' uncured loan servicing Events of Default, and other defaults, which continue

---

[7]     Moreover, under the TIA, BNY Mellon was required to act "prudently" upon the occurrence of any "default," not just an Event of Default as to the two Indenture Trusts (the ECR 2005-2 and GSCC 2006-1 Covered Trusts). This included the Warrantors' breaches/defaults, any defaults by BNY Mellon itself, any Master Servicer/Servicer defaults that did not amount to an Event of Default, and any defaults by the Indenture Trusts.

unabated.  Plaintiff, the class and the Covered Trusts are entitled to recover damages caused by these breaches of the Governing Agreements by BNY Mellon, and for its violations of the TIA and Streit Act.

19.    BNY Mellon's failure to act also breached its common law "duty of trust" owed to plaintiff and the class.  Under this extra-contractual, common law duty, BNY Mellon was required to avoid conflicts of interest with plaintiff and the class.  BNY Mellon's failure to act as required under the Governing Agreements, TIA and Streit Act was a result of the fact that BNY Mellon had fundamental conflicts of interest with plaintiff and the class.

20.    To explain, BNY Mellon had ongoing and prospective business relationships with the loan originators, Warrantors, Master Servicers and Servicers to the Covered Trusts (and the entities related to them).  These were the decision-makers that selected RMBS trustees for RMBS trusts, and they had selected BNY Mellon to be the Trustee of the Covered Trusts, as well as the Trustee for hundreds, if not thousands, of other RMBS trusts.  BNY Mellon derived significant RMBS trustee business from such relationships, and it desired to continue profiting therefrom.  Thus, BNY Mellon did not want to disrupt its business relationships with these entities, or anger them, by seeking to enforce R&W claims against the Warrantors or declaring Events of Default against the Master Servicers/Servicers, or declaring any defaults, as it would endanger BNY Mellon's RMBS trustee business and the income derived therefrom, as well as future prospects for such financial gain.

21.    Because of this conflict of interest between BNY Mellon, plaintiff and the class, BNY Mellon decided to refrain from discharging its duties under the Governing Agreements, TIA and Streit Act, and therefore refused to protect the Covered Trusts or plaintiff's and the class's interests therein.  Instead, BNY Mellon protected and advanced its own economic interests at the expense of plaintiff and the class by refusing to act.

22.     By deliberately refusing to act as required by the Governing Agreements, the TIA and the Streit Act, BNY Mellon put its own interests ahead of plaintiff's and the class's and benefitted therefrom, breaching its common law duty of trust to plaintiff and the class.  Moreover, BNY Mellon has engaged in multiple additional breaches of its duty of trust by continuing to put its interests ahead of those of plaintiff and the class by continuing to refuse to perform its duties under the Governing Agreements.

23.     Numerous media reports and RMBS experts have confirmed these conflicts of interest.  For example, in December 2010, law professor Kurt Eggert appeared before the U.S. Senate's Banking, Housing and Urban Affairs Committee and testified that ***RMBS trustees like BNY Mellon were not likely to be of "much help for investors," because "a trustee may derive much of its income from" those that set up the trusts and appoint the trustees***.  In addition, an article in the *Yale Journal of Regulation* stated: "***[T]here is often a very close relationship between the servicer and the trustee; many originators and servicers have a 'pet' or 'pocket' trustee that they use for most of their deals***."  Moreover, *The New York Times* specifically identified BNY Mellon in a June 16, 2013 article and reported the following:

> ***[W]hen mortgages soured, trustees declined to pursue available remedies for investors, such as pushing a [Warrantor] to buy back loans that did not meet quality standards . . . because trustees are hired by the big banks that package and sell the securities[.]  [Therefore] their allegiances are divided.  Sure, investors are paying the fees, but if a trustee wants to be hired by sellers of securities in the future, being combative on problematic loan pools may be unwise***.

The article concluded that "***they [RMBS trustees like BNY Mellon] are a dog that could have barked but didn't***."  *The New York Times* article also pointed out that BNY Mellon was the trustee for hundreds of "Countrywide" RMBS trusts, thus establishing that BNY Mellon was a "pocket" trustee for Countrywide.  This is relevant to this case because Countrywide entities are Warrantors and Master Servicers/Servicers for a majority of the Covered Trusts herein, and BNY Mellon did

- 12 -

virtually nothing to protect plaintiff and the class and instead protected Countrywide by failing to call defaults or Events of Default against it and by failing to enforce Countrywide's breaches of its R&Ws.

24.     BNY Mellon also had another conflict of interest with plaintiff and the class. As alleged *infra* at ¶¶124 and 165, BNY Mellon was not only aware of the Master Servicers'/Servicers' loan servicing defaults and Events of Default, it was either acquiescing in or actively participating in such defaults and Events of Default, and thus had another reason not to provide notice of such defaults and Events of Defaults or cure them. To do so would have exposed BNY Mellon's participation in the defaults and Events of Default.

25.     As a result of BNY Mellon's failures to act with respect to Master Servicer/Servicer loan servicing defaults and Events of Default, the Mortgage Loans have experienced numerous illegal, invalid and improper foreclosures causing lengthy and expensive delays and delinquencies, the imposition of excessive and improper Master Servicer/Servicer fees, and the disposition of Mortgage Loans that financially benefitted the Master Servicers/Servicers, but negatively impacted the interests of plaintiff and the class. As a further result of BNY Mellon's failures to enforce the R&W claims (and the Master Servicers'/Servicers' Events of Default of failing to notify BNY Mellon of Warrantor R&W breaches) and other defaults, the Covered Trusts were full of defective Mortgage Loans and have therefore experienced historically unprecedented numbers of defaults, delinquencies, foreclosures, liquidations and losses.

26.     BNY Mellon's failures to act as required by the Governing Agreements, TIA and Streit Act have caused plaintiff, the class and the Covered Trusts to suffer over $1.1 billion in damages, caused failures and shortages in the payment of principal and interest to plaintiff and the class, and caused steep declines in the value of plaintiff's and the class's RMBS. Indeed, due to

- 13 -

BNY Mellon's inaction, *all of RPI's RMBS in the Covered Trusts are now completely worthless*. Accordingly, BNY Mellon is liable to plaintiff and the class for damages caused by its breaches of the Governing Agreements and duty of trust, and its violations of the TIA and Streit Act.

## II.   JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action with respect to the ECR 2005-2 and GSCC 2006-1 Covered Trusts pursuant to 28 U.S.C. §1331 for violations of the TIA and supplemental jurisdiction over the breach of contract and breach of trust claims. The Court also has diversity jurisdiction over all of the claims as to all of the Covered Trusts alleged herein pursuant to 28 U.S.C. §1332(a).

28.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), as BNY Mellon's principal place of business is within this District and BNY Mellon's contacts with this District are sufficient to confer personal jurisdiction over it here.

## III.   PARTIES

29.     Plaintiff RPI is a limited liability company incorporated under the laws of Belgium, with its principal place of business in Brussels, Belgium. RPI acquired RMBS in each of the Covered Trusts on or about the dates indicated below, and has continuously held such RMBS since then:

| Covered Trusts | Tranche/Class | Initial Face Amount of Certificate | Date Acquired |
|---|---|---|---|
| ECR 2005-2 | M6 | $ 5,000,000 | May 12, 2009 |
| GSCC 2006-1 | A2 | $ 10,000,000 | May 12, 2009 |
| NHEL 2006-3 | M3 | $ 2,500,000 | February 12, 2010 |
|  | M4 | $ 2,500,000 | February 12, 2010 |
| NSTR 2007-C | M5 | $ 4,000,000 | May 6, 2010 |
| SAMI 2006-AR4 | 2A3 | $ 5,000,000 | May 6, 2010 |
|  | 4A3 | $ 4,800,000 | May 6, 2010 |

30.     All of the foregoing RMBS were initially rated as "investment grade" by the credit ratings agencies. However, because of BNY Mellon's failures to act as alleged herein, each of the foregoing RMBS are now total or near total losses, having been completely written down to the point that they are worthless or nearly worthless, and each RMBS is now in default.

31.     With respect to the above RMBS which RPI acquired on or about May 12, 2009, RPI acquired such RMBS from the initial purchasers of such RMBS, and the initial purchasers acquired such RMBS at or about the time the RMBS were offered to the investing public in 2005, 2006 and 2007. These initial purchasers, when they transferred such RMBS to RPI on or about May 12, 2009, also transferred all right, title and interest in such RMBS to RPI, including all litigation rights and claims the initial purchasers had, such as the initial purchasers' claims against BNY Mellon asserted in this action. As to the remaining RMBS that were acquired by RPI in 2010, these RMBS were originally included within collateralized debt obligations ("CDOs") in which RPI acquired interests on or about May 12, 2009 from the initial purchasers. RPI was assigned all right, title and interest (including litigation and claim rights) the initial purchasers had in the interests in these CDOs at that time. Subsequently, the CDOs were liquidated in 2010 and RPI acquired the RMBS within the CDOs along with all rights, title and interest in such RMBS. Given that the CDOs were *liquidated in full*, and thus the CDOs were selling *all* rights and interests in the RMBS within them, RPI also obtained all litigation rights and claims that the CDOs' initial purchasers had in the RMBS. Furthermore, pursuant to New York General Obligations Law §13-107, RPI obtained all the rights and causes of action against BNY Mellon held by all of the previous holders of RPI's RMBS.

32.     Plaintiff is a "Certificateholder" or "Owner" as those terms were intended to be understood in the Governing Agreements.

33.     There are numerous provisions throughout the Governing Agreements which make clear that the terms "Certificateholder" and "Owner" were intended to include beneficial owners such as plaintiff and the members of the class.

34.     For example, each of the Governing Agreements expressly state that BNY Mellon is holding the trust assets (*i.e.*, the Mortgage Loans and the rights attendant thereto) for the benefit of "Certificateholders" or "Owners," which is intended to refer to RMBS investors such as plaintiff and the class.

35.     Further, each of the Governing Agreements refer to adverse events and breaches of the applicable R&Ws that would "materially and adversely affect" the "***Owners***," as well as the duties of the Trustee, Depositor and/or Servicer when such events occur.  These references to "Certificateholders," or "Owners," are not referring to the DTC, Cede & Co. or others that are the clearing agencies and/or custodians of most of the RMBS certificates, as the DTC, Cede & Co. and others have no interest in the RMBS certificates and therefore there could be no adverse events or breaches of R&Ws that would ***at all*** affect DTC, Cede & Co. or the other entities, much less "materially and adversely" impact their rights.

36.     Each of the Governing Agreements also envisions that beneficial owners such as plaintiff and the class could take action with respect to any rights purportedly given to Certificateholders under the terms of the Governing Agreements.  *See, e.g.*, NSTR 2007-C PSA §11.03(a).  Pursuant to these provisions, it was expressly intended that plaintiff would step into the shoes of a Certificateholder for purposes of enforcing the terms of the Governing Agreements.

37.     Defendant BNY Mellon, which was formerly known as The Bank of New York, is a banking corporation organized under the laws of the state of New York, with its principal place of business in this District.  In July 2007, The Bank of New York merged with Mellon Financial

- 16 -

Corporation creating The Bank of New York Mellon Corporation as the surviving entity. Defendant BNY Mellon is a wholly-owned subsidiary of The Bank of New York Mellon Corporation. BNY Mellon is one of the market leaders in the RMBS trustee business, as it serves as trustee for hundreds, if not thousands, of RMBS trusts, including the Covered Trusts. BNY Mellon has served as the Trustee for three of the five Covered Trusts – the ECR 2005-2, GSCC 2006-1 and NSTR 2007-C Covered Trusts – since they were formed in 2005, 2006 and 2007, respectfully. BNY Mellon succeeded JPMorgan Chase Bank and J.P. Morgan Trust Company as Trustee to the NHEL 2006-3 Covered Trust in or about October 2006 and has served as Trustee continuously since then. In addition, BNY Mellon succeeded JPMorgan Chase Bank as Trustee to the SAMI 2006-AR4 Covered Trust in or about October 2006 and has served continuously as Trustee since then.

## IV. FACTUAL ALLEGATIONS

### A. The Securitization Process for the Mortgage Loans

38.     The Warrantors that sold the Mortgage Loans that were transferred into the Covered Trusts engaged in a nearly identical securitization process that was repeated thousands of times by them and others during 2005 through 2007, the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts. Investor demand for RMBS was skyrocketing during this period, and the Warrantors and other RMBS securitizers were hard pressed to meet that demand. RMBS securitizations proliferated during the period from 2005 through 2007 and were extremely profitable for all involved in their sale. Hundreds of billions of dollars of RMBS were packaged and sold to the investing public during this period, and billions of dollars in profit were pocketed by the Warrantors, Master Servicers/Servicers and other securitizers. BNY Mellon also profited handsomely, and continues to profit, from the explosion in RMBS trusts caused by the

1011938_1

skyrocketing sales, as it is an RMBS Trustee to hundreds, if not thousands, of RMBS trusts, including the Covered Trusts.

39. RMBS securitizations involve the conversion of thousands of illiquid residential mortgage loans like the Mortgage Loans into bond-like instruments – the RMBS certificates at issue herein – which trade over the counter in capital markets.

40. The first step in creating RMBS is the "origination" of mortgage loans, that is, the lending of money to borrowers to purchase residences. The Mortgage Loans that were ultimately transferred to the Covered Trusts were usually originated by lenders and then were purchased by the Loan Sellers/Sponsors, or originated by the Loan Sellers/Sponsors themselves, or originated or purchased by the Other Transferors.

41. Typically, after aggregating the Mortgage Loans, the Loan Sellers/Sponsors and Other Transferors then grouped the Mortgage Loans into large pools, which they then sold and transferred to the Covered Trusts' "Depositors" for ultimate transfer to the Covered Trusts and BNY Mellon as Trustee. Usually, the Depositors were shell companies related to the Loan Sellers/Sponsors and/or Master Servicers/Servicers. These sales from the Loan Sellers/Sponsors to the Depositors were typically accomplished via agreements called "Mortgage Loan Purchase Agreements," or similarly titled agreements (collectively, the "MLPAs"). In the case of the Other Transferors, they entered into similar agreements with either the Loan Sellers/Sponsors or the Depositors, and the Mortgage Loans were ultimately transferred to the Covered Trusts (the "Other Transfer Agreements").

42. The Governing Agreements refer to and incorporate the MLPAs and, when relevant, the Other Transfer Agreements. In the Governing Agreements, the respective Loan Sellers/Sponsors and Other Transferors: (i) make numerous R&Ws concerning the credit quality and characteristics of

- 18 -

the Mortgage Loans and vouch for the accuracy of all data they provide about the Mortgage Loans; (ii) promise to cure, substitute or repurchase Mortgage Loans that do not comply with those R&Ws; and (iii) usually expressly state that the Trustee will ultimately have the right to enforce the R&Ws against the Loan Sellers/Sponsors and Other Transferors. The R&Ws by the Loan Sellers/Sponsors and Other Transferors (together, the "Warrantors"), and the remedies for breaches thereof, are referenced in the Governing Agreements. The rights to enforce those R&Ws are assigned to the Trustee for the benefit of the RMBS investors, *i.e.*, plaintiff and the class.

43.     After the Mortgage Loans are sold by and transferred from the Warrantors to the Covered Trusts' Depositors, the Depositors then transfer the Mortgage Loans, along with the rights to enforce the Warrantors' R&Ws, to the Trustee for the benefit of plaintiff and the class, and in exchange, the Trustee transfers the RMBS – which are typically called RMBS "certificates" – to the Depositors.

44.     The Depositors then sell the RMBS certificates to securities underwriters, in many cases another entity related to the Loan Sellers/Sponsors, Depositors and Master Servicers/Servicers. The Depositors remit the money from those underwriter sales to the Loan Sellers/Sponsors. Meanwhile, the securities underwriter markets and sells the RMBS certificates to investors such as plaintiff and the class and retains a portion of the purchase price as its fee.

45.     After the Covered Trusts' RMBS are sold to investors, the Mortgage Loans must be serviced. Thus, the Governing Agreements designate certain entities to be the Master Servicers and/or Servicers of the Mortgage Loans and require that they service the Mortgage Loans legally and with the same degree of skill and care as "***prudent***" mortgage lenders would exercise or use under the circumstances in the conduct of their own affairs. Whenever a Master Servicer/Servicer fails to ensure the "prudent" servicing of the Mortgage Loans an Event of Default occurs, and the Trustee is

- 19 -

required to take certain actions to protect plaintiff and the class when it becomes aware of the default.

46.     Plaintiff's and the class's RMBS certificates entitle them to the cash flows generated by the Mortgage Loans.  The Covered Trusts, as with other RMBS trusts, are structured such that the risk of loss is divided among different "classes" or "tranches" of RMBS in each Covered Trust. Each class or tranche of the Covered Trusts has a different level of credit risk and reward (the interest or yield), including different levels and types of credit enhancement or protection, and different priorities to payment from the cash flows generated by the Mortgage Loans (the payment priority and distribution is called the payment "waterfall").  Because the classes/tranches have different credit enhancements and different priorities of claim to the cash flow, they are assigned different credit ratings by the credit rating agencies and they sell at different yields or coupons. However, most of the classes/tranches of the RMBS are required to be rated as "investment grade" securities before they can be sold.  As previously alleged, the credit ratings agencies require that the Warrantors make R&Ws, and they base their credit ratings of the RMBS on such R&Ws.

47.     All of the classes/tranches of the RMBS, the plaintiff, the class and all of the Covered Trusts are dependent on the Trustee to act as required under the Governing Agreements in order to ensure that the Covered Trusts and RMBS perform as expected and designed, and are profitable. Thus, the Trustee must act promptly and properly discharge its duties and obligations under the Governing Agreements.  Here, BNY Mellon utterly failed to discharge its duties mandated by the Governing Agreements and the TIA.  Therefore, it breached the Governing Agreements and further violated the TIA and Streit Act, thus entitling plaintiff, the class and the Covered Trusts to damages.

1011938_1

### B.    BNY Mellon's Duties as Trustee for the Covered Trusts

48.    The Governing Agreements set forth BNY Mellon's rights and duties to plaintiff and the class.  All of the Covered Trusts are governed by PSAs (Pooling and Servicing Agreements) or Indentures, and related agreements such as the MLPAs (Mortgage Loan Purchase Agreements), SSAs (Sale and Servicing Agreements) and/or SAs (Servicing Agreements), which the PSAs and Indentures reference and incorporate when relevant.  Each of the Governing Agreements for each of the Covered Trusts is substantially similar and imposes substantially similar duties on BNY Mellon.  Accordingly, the NSTR 2007-C PSA (Exhibit A hereto) is incorporated herein by reference and is used as a representative example of all of the Governing Agreements for all of the Covered Trusts.

49.    While the Governing Agreements set forth certain rights and responsibilities of BNY Mellon, the TIA and Streit Act supplement those agreements.  The TIA was enacted in 1939 because Congress recognized that previous abuses by bond issuers and trustees had adversely affected investors and the national interest.  In enacting the TIA, Congress desired to ensure that there were certain minimum federal protections available to investors, which are deemed to be incorporated into the Governing Agreements.  Those minimum protections are discussed *infra* at ¶¶67-71.  Similarly, the Streit Act was passed after a series of legislative inquiries "exposed evils and abuses which followed in the wake of the depression with respect to . . . improper and wasteful administration of properties by those pretending to act for the bondholders."  It was enacted to "afford genuine and not feigned protection" to plaintiff and the class and "imposed[] active duties upon a trustee under trust indentures."

50.    When the Covered Trusts were formed, the Covered Trusts' Depositors transferred the Mortgage Loans to BNY Mellon along with "all the right, title and interest of the Depositor in and to the Trust Estate" "***for the benefit of the Owners of the Certificates***."  NSTR 2007-C PSA,

"Conveyance" Clause.  Furthermore, BNY Mellon "***acknowledge[d and] . . . accept[ed] the trusts . . . and agree[d] to perform the duties herein in accordance with the provisions of the [Governing Agreements]***," *id.*, "***and [further] declare[d] that it w[ould] hold the Trust Estate in trust . . . for the benefit of the Owners***," *i.e.*, plaintiff and the class.  *Id.* §2.04.

### 1.     BNY Mellon's Duty to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans that Breached Their R&Ws

51.     The PSAs and Indentures (or the related MLPAs, SSAs and Other Transfer Agreements) contained numerous R&Ws made by the Warrantors about the Mortgage Loans in the Covered Trusts.  The Warrantors' R&Ws attested to the credit quality of the Mortgage Loans conveyed to the Covered Trusts and warranted the accuracy of the data the Warrantors conveyed about such Mortgage Loans.  The Warrantors also attested to other characteristics of the Mortgage Loans and their origination.  The following are examples of the R&Ws the Warrantors typically made: (1) that the data and other information the Warrantors conveyed concerning the Mortgage Loans in mortgage loan schedules, exhibits, and other compilations of data in connection with the transfer of the Mortgage Loans to the Covered Trusts was "true and correct"; (2) that the Mortgage Loans complied with and were originated and serviced in compliance with all federal, state and local laws; (3) that the Mortgage Loans were not "high cost," "high risk," "predatory" or "abusive" loans as defined by law; (4) that the Mortgage Loans were originated in accordance with the lender's underwriting guidelines; (5) that the Mortgage Loan borrowers were evaluated to confirm that they had a reasonable ability to afford the Mortgage Loans; and (6) that there was no fraud, error, omission, misrepresentation or negligence by any person involved in the origination of the Mortgage Loans.  *See, e.g.*, NSTR 2007-C PSA §3.02(i); §3.03(i); §3.04(b)(1)(i), (b)(1)(xv), (b)(1)(xxxviii),

- 22 -

(b)(1)(lxii), (b)(2)(x). The Warrantors made numerous other R&Ws concerning the Mortgage Loans in the Covered Trusts. *See generally* NSTR 2007-C PSA §§3.03, 3.04.

52. The Warrantors' R&Ws are specifically contained and/or referenced in the Governing Agreements, along with the Warrantors' obligations to cure, substitute and/or repurchase any defective Mortgage Loans. *Id.*

53. Importantly, the Governing Agreements also provide that whenever BNY Mellon discovers a breach of a Warrantor's R&Ws that materially affects plaintiff and the class, BNY Mellon "***shall give prompt written notice to***" the breaching Warrantor and the other parties to the Governing Agreements. NSTR 2007-C PSA §§3.02, 3.04(a). Thereafter, the breaching Warrantor is required to "promptly cure such breach" or thereafter substitute or repurchase the breaching Mortgage Loans. *Id.* §3.04(a). If the Warrantor fails to cure the breach, then the Trustee is to "***enforce***" that breaching Warrantor's obligations to substitute or repurchase the defective Mortgage Loans. *Id.* §6.03(b) (BNY Mellon "shall enforce the obligations and rights of the other parties to this Agreement, and of the Owners, by action, suit or proceeding at law or equity, and shall also have the power to enjoin, by action or suit in equity, any acts or occurrences which may be unlawful or in violation of the rights of the Owners as such rights are set forth in this Agreement").

54. BNY Mellon's duties are embodied in §§3.04(a) and 6.03(b) of the NSTR 2007-C PSA. First, §3.04(a) provides:

> ***Upon the discovery by the . . . the [Warrantors], . . . or the Trustee (each, for purposes of this paragraph, a party) that the representations and warranties set forth in clause (b)(1) or (b)(2) below were untrue in any material respect, . . . with the result that the interests of the Owners . . . are, or may be, materially and adversely affected, the party discovering such breach shall give prompt written notice to the other parties.***

*     *     *

*Upon the [Warrantors'] . . . receipt of notice of breach from any one of the other parties . . . [the Warrantors] hereby covenant[] and warrant[] that [they] shall promptly cure such breach in all material respects or that [they] shall . . . (i) substitute in lieu of each Home Equity Loan which has given rise to the requirement for action by [the Warrantors] a Qualified Replacement Mortgage . . . or (ii) purchase such Home Equity Loan from the Trust . . . .*

55.    Further, §6.03(b) provides that BNY Mellon

*shall have the power to enforce, and shall enforce the obligations and rights of the other parties to this Agreement, and of the Owners, by action, suit or proceeding at law or equity, and shall also have the power to enjoin, by action or suit in equity, any acts or occurrences which may be unlawful or in violation of the rights of the Owners as such rights are set forth in this Agreement . . . .*

56.    BNY Mellon "agree[d] to perform the[se] duties," *id.* at 1 ("Conveyance" clause), and further agreed that it would "not take any action that would release any Person from any of such Person's covenants or obligations under any instrument or document relating to the Certificates." *Id.* §6.04. BNY Mellon further covenanted that it would "not . . . permit any Person to be released from any covenant or obligation with respect to the [Covered] Trust or to the Certificates under this Agreement." *Id.* §6.05(iv).

57.    The Governing Agreements also provide that "[n]o provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct." *Id.* §10.01(c).

### 2.    BNY Mellon's Duties upon the Occurrence of an Event of Default

58.    BNY Mellon also has obligations under the Governing Agreements whenever it learns of an "Event of Default" by a Master Servicer or Servicer. Under the Governing Agreements, a Master Servicer or a Servicer commits an "Event of Default" whenever it

*fail[s] to perform any one or more of its obligations [under the Governing Agreements] and shall continue in default thereof for a period of thirty (30) days … after the earlier of (a) actual knowledge of an officer of the [Master Servicer or] Servicer or (b) receipt of notice from the Trustee of said failure . . . .*

- 24 -

NSTR 2007-C PSA §8.20(a)(iii).[8]

59.     The chief obligation of the Master Servicers and Servicers under the Governing Agreements is to ensure that the Mortgage Loans in the Covered Trusts are properly and prudently serviced and administered.   Thus, the Governing Agreements require the Master Servicers and Servicers (as well as any sub-servicers they use) to service the Mortgage Loans **"with prudent and reasonable care, using the degree of skill and attention that the [Master Servicer or] Servicer exercises with respect to comparable . . . loans that it services for itself or others."**  NSTR 2007-C PSA §8.01.  This means that the Master Servicers/Servicers must service (or ensure the service of) the Mortgage Loans in a legal, proper and "prudent" manner.  If a Master Servicer or Servicer fails to do so, an Event of Default occurs.

60.     In order to properly and "prudently" service the Mortgage Loans pursuant to the Governing Agreements, the Master Servicers and Servicers must, *inter alia*: (1) ensure that the payments by borrowers are promptly and properly collected and submitted to the Covered Trusts; (2) ensure that timely, appropriate and legal notices are sent to borrowers; (3) ensure that appropriate insurance is in place when required; (4) ensure that accurate information about the Mortgage Loans

---

[8]   Two of the Covered Trusts refer to the Master Servicers' or Servicers' "Events of Default" in different nomenclature, calling such Events of Default "Servicer Termination Events" or "Servicing Defaults."  *See* NSTR 2007-C PSA §8.20(a)(iii) ("Servicer Termination Event"); NHEL 2006-3 PSA §7.01(a)(ii) ("Servicing Default").  Nonetheless, the terms are all used to describe the same failures by the Master Servicers and Servicers to perform as required by the Governing Agreements.  Thus, the term "Event of Default" is used herein to include the terms "Servicer Termination Event" and "Servicing Default."  While the term "Event of Default" is used herein, plaintiff notes that at least one Governing Agreement's use of the alternative term, "Servicer ***Termination*** Events" (emphasis added) illustrates the seriousness and significance of the Master Servicers' and Servicers' defaults on their obligations to properly service the Mortgage Loans.

is maintained; (5) ensure that the Covered Trusts' "REO" properties[9] are properly maintained; (6) ensure that the Mortgage Loans are legally, prudently and properly modified or foreclosed; and (7) otherwise do whatever is needed to ensure that the Mortgage Loans are properly and "prudently" serviced for the benefit of plaintiff and the class. *See generally* NSTR 2007-C PSA, Art. VIII; *id.* §3.09(b).

61. In addition, Master Servicers and Servicers also commit an Event of Default whenever they discover breaches of the Warrantors' R&Ws but fail to promptly notify BNY Mellon and the other parties to the Governing Agreements. *See id.* §3.04(a) ("***Upon the discovery by the Servicer . . . that the representations and warranties [by the Warrantors] . . . were untrue in any material respect . . . the party discovering such breach shall give prompt written notice to the other parties***.").

62. Because the failure to properly service the Mortgage Loans or report breaches of the Warrantors' R&Ws is so harmful to plaintiff, the class and the Covered Trusts, when BNY Mellon becomes aware of an Event of Default it is required by the Governing Agreements to act quickly. Upon becoming aware of an Event of Default, BNY Mellon is required by the Governing Agreements, TIA and Streit Act: (1) to notify the offending Master Servicer or Servicer of its Event of Default (NSTR 2007-C PSA §8.20(a)(iii)); and (2) to give notice of uncured Events of Default to plaintiff and the class. *Id.* §8.20(m). In addition, if the offending Master Servicer or Servicer does not cure its Event of Default within a short period of time, the Governing Agreements give BNY Mellon the power to terminate or replace the offending Master Servicer or Servicer or take over its servicing duties, in certain circumstances. NSTR 2007-C PSA §8.20(b).

---

[9] "REO" properties are "real estate owned" by the Covered Trusts. These properties typically have been vacated or abandoned and foreclosed on or otherwise taken back from defaulted borrowers.

63.     As previously alleged, BNY Mellon also agreed to perform the foregoing duties, and further agreed it would not release any person from their obligations under the Governing Agreements. *Id.* at 1 ("Conveyance" clause); *id.* §§6.04, 6.05(iv). Furthermore, BNY Mellon would be liable to plaintiff and the class if it acted or failed to act negligently, or acted willfully in connection with its obligations under the Governing Agreements. *Id.* §10.01(c).

### 3.     BNY Mellon's Heightened Duty to Prudently Protect Plaintiff's and the Class's Interests as Though They Were BNY Mellon's Own Interests During an Event of Default

64.     Once BNY Mellon becomes aware that a Master Servicer or a Servicer has committed an Event of Default, BNY Mellon's duty of care to plaintiff and the class – under the Governing Agreements, the TIA and the Streit Act – is significantly increased. In the case of a known Event of Default, the Governing Agreements mandate that BNY Mellon ***"shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.*** " NSTR 2007-C PSA §10.01(a).[10] The TIA and the Streit Act require the same. *See* 15 U.S.C. §77ooo(c); N.Y. Real Prop. Law §126(1). In other words, when BNY Mellon learns of an Event of Default, it must act like a quasi-fiduciary for plaintiff and the class and "***shall exercise" all*** of BNY Mellon's rights and powers as Trustee under the Governing Agreements to prudently protect plaintiff's and the class's interests as though those interests were BNY Mellon's very own.

65.     Moreover, this heightened duty is not limited or applied only to correcting Master Servicers'/Servicers' Events of Default. Instead, under the Governing Agreements, once an Event of

---

[10]     As discussed *infra*, the TIA also requires the same heightened prudent person standard of care whenever a "default" ***of any kind*** occurs, and not only when an Event of Default occurs. *See* 15 U.S.C. §77ooo(c).

Default exists, "*[BNY Mellon] shall exercise*" <u>*all*</u> of the "*rights and powers vested in it by th[e]*
*[Governing] Agreement[s]*," not just those pertaining to the Master Servicers/Servicers. *Id.* Thus,
*BNY Mellon's heightened duty of care also requires it to prudently enforce the R&W claims*
*against the Warrantors as though seeking to protect its own interests.*

### 4. BNY Mellon's Duty of Trust to Avoid Conflicts of Interest with Plaintiff and the Class

66.     BNY Mellon also has an extra-contractual, common law "duty of trust" to plaintiff
and the class. BNY Mellon, as "'the trustee[,] *is at all times obligated to avoid conflicts of interest*
*with the beneficiaries [of the Covered Trusts, i.e., plaintiff and the class].*'" *Knights of Columbus*
*v. Bank of N.Y. Mellon*, No. 651442/2011, slip op. at 15 (N.Y. Sup. Ct., N.Y. Cnty. Apr. 26, 2013)
(order granting in part and denying in part motion to dismiss) (quoting *AMBAC Indem. Corp. v.*
*Bankers Trust Co.*, 573 N.Y.S. 2d 204, 206-08 (Sup. Ct. 1991)). Under this duty to avoid conflicts
of interest, BNY Mellon is prohibited from advancing its own interests at the expense of plaintiff and
the class, or benefitting from such actions at any time, including *before, during and after any*
*default*. *Id.*

### 5. BNY Mellon's Duties and Obligations Under the TIA

67.     Two of the five Covered Trusts – the ECR 2005-2 and GSCC 2006-1 Covered Trusts
– are "Indenture Trusts." These Indenture Trusts are protected by, and plaintiff and the class may
assert claims under, the TIA with respect to these two trusts. Thus, the allegations in this section are
applicable only to the ECR 2005-2 and GSCC 2006-1 Covered Trusts.

68.     The TIA imputes certain terms into the Governing Agreements to protect investors.
The TIA imposes two sets of duties and obligations on BNY Mellon – one set "prior to default," and
the other set "in case of default," much like the Governing Agreements.

69.     Prior to a default, under the TIA, a Trustee must perform "such duties as are specifically set out in" the Governing Agreements.  15 U.S.C. §77ooo(a)(1).  This requirement reflects the Governing Agreements' pre-default provisions that BNY Mellon "perform such duties and only such duties as are specifically set forth in this Agreement."  NSTR 2007-C PSA §10.01(a)(i)(A).  Thus, the TIA requires BNY Mellon to perform the duties assigned to it by the Governing Agreements.

70.     In addition, under the TIA, a Trustee must "give to the indenture security holders . . . notice of all *defaults* known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. §77ooo(b) (emphasis added).  Thus, within 90 days, BNY Mellon is required to inform plaintiff and the class of any Events of Default, any other Master Servicers or Servicer "defaults," *and any other "defaults" by others, such as the Warrantors' breaches of their R&Ws, and any "defaults" by the "Issuers," i.e., the ECR 2005-2 or GSCC 2006-1 Covered Trusts.  In addition, the TIA also requires BNY Mellon to notify plaintiff and the class of any "defaults" by BNY Mellon itself*.

71.     Moreover, whenever BNY Mellon is aware of any of the foregoing defaults, it is required under the TIA to exercise a fiduciary-like duty of care toward plaintiff and the class:  *BNY Mellon is required to exercise "such of the rights and powers vested in it by [the Governing Agreements], and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs*."  15 U.S.C. §77ooo(c).  Thus, upon the occurrence of "default" by an Issuer, Warrantor, Master Servicer, Servicer or BNY Mellon itself, BNY Mellon is obligated to exercise this fiduciary-like "prudent person" standard of care to protect plaintiff and the class, and exercise *all* of the "rights and powers vested in it by" the Governing Agreements as though BNY Mellon was protecting its own interests.

- 29 -

### 6. BNY Mellon's Duties and Obligations Under the Streit Act

72.     The Streit Act imposes a duty upon BNY Mellon to discharge its duties under the Governing Agreements with due care to ensure the orderly administration of the Covered Trusts and to protect the trust beneficiaries' rights, *i.e.*, plaintiff and the class' rights.  N.Y. Real Prop. Law §124.  Following an Event of Default, the Streit Act provides that BNY Mellon must exercise the same degree of skill and care performing its duties as a prudent person would under the same circumstances.  N.Y. Real Prop. Law §126(1).  As set forth below, BNY Mellon is liable to plaintiff and the class under the Streit Act for failing to exercise the same degree of skill and care as a prudent person in enforcing its rights and powers under the Governing Agreements.

### C.     The Covered Trusts Suffer from Serious Defects Because BNY Mellon Failed to Perform the Duties Required of It Under the Governing Agreements, the TIA, the Streit Act and Common Law

73.     As set forth herein, BNY Mellon is liable to plaintiff and the class for failing to discharge the duties required of it by the Governing Agreements, common law, the TIA and the Streit Act.  All of BNY Mellon's duties mandated by the Governing Agreements, the common law, the TIA and the Streit Act, as alleged herein, were continuing in nature, and required BNY Mellon to continuously discharge such duties as long as BNY Mellon was Trustee of the Covered Trusts.  When BNY Mellon discovered R&W breaches by the Warrantors and learned of defaults and Events of Default by the Master Servicers/Servicers, as alleged herein, BNY Mellon was required to act prudently, quickly and continuously to protect plaintiff and the class.  BNY Mellon utterly failed to act as required, thereby breaching the Governing Agreements and its common law duties and violating the TIA and the Streit Act, causing plaintiff, the class and the Covered Trusts to suffer damages.

**1.   BNY Mellon Discovered No Later than April 2011 that the Covered Trusts' Warrantors Breached Their R&Ws, Thus Triggering BNY Mellon's Duty to Enforce the R&W Claims Under the Governing Agreements, TIA and Streit Act**

74.   The Warrantors (and loan originators) to the Covered Trusts are set forth below:

**Covered Trusts' Warrantors**

| | Covered Trust | Warrantors | | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|---|
| | | **Loan Seller/Sponsor** | **Other Transferors** | |
| 1. | ECR 2005-2 | ▪ ECC Capital Corporation ("ECC") | ▪ None | ▪ Encore Credit Corporation ("Encore")* |
| 2. | GSCC 2006-1 | ▪ GSC Capital Corporation | ▪ Countrywide Home Loans, Inc. ("Countrywide")** | ▪ Countrywide<br>▪ American Home Mortgage Corporation ("AHM")<br>▪ First National Bank of Nevada ("FNBN") |
| 3. | NHEL 2006-3 | ▪ NovaStar Mortgage, Inc. ("NovaStar") | ▪ None | ▪ NovaStar |
| 4. | NSTR 2007-C | ▪ Nationstar Mortgage LLC ("Nationstar") | ▪ Auburn Funding LLC (an affiliate of Nationstar) | ▪ Nationstar |
| 5. | SAMI 2006-AR4 | ▪ EMC Mortgage Corporation ("EMC")* | ▪ None | ▪ Countrywide<br>▪ Bear Stearns Residential Mortgage Corporation ("Bear Stearns Residential")*<br>▪ SouthStar Funding, LLC ("SouthStar")<br>▪ First Horizon Home Loan Corporation ("First Horizon") |

*EMC, Bear Stearns Residential and Encore (Encore was purchased by Bear Stearns Residential in 2006) were all owned and controlled by the Bear Stearns Companies, Inc. until 2008, when JPMorgan Chase & Co. acquired Bear Stearns. JPMorgan Chase & Co. now owns and controls EMC, Bear Stearns Residential and Encore and has continuously since acquiring them in 2008.

**Countrywide was acquired in 2008 by Bank of America, which has continuously owned and controlled Countrywide since acquiring it.

75.     After the Covered Trusts were formed and settled in 2005, 2006 and 2007, the global financial collapse occurred.  Later, most blamed the collapse on the residential lending industry, claiming that it had corrupted its lending standards and caused pervasive lending misconduct to occur because of Wall Street's insatiable demand for mortgage loans to securitize.  ***The former Chairman of the Federal Reserve, Alan Greenspan, told Congress in October 2008 that "'[t]he evidence strongly suggests'" that "'excess demand from [RMBS] securitizers'" and "'subprime mortgage originations'" were "'undeniably the original source of the [global financial] crisis***."'  Facts then began to publicly emerge revealing endemic misconduct within the lending industry at the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  Many of the revelations disclosed that the Warrantors and loan originators to the Covered Trusts were involved in conduct which would have rendered their R&Ws concerning the Mortgage Loans in the Covered Trusts highly suspect.

        **a.     Prior to April 2011, BNY Mellon Knew that the Warrantors' R&Ws Were False**

76.     During the period from 2007 through 2008, numerous news stories were published, numerous private and governmental lawsuits were filed, and abundant congressional testimony was taken.  The foregoing events revealed that many of the Warrantors to the Covered Trusts routinely engaged in lending practices that would have likely rendered their R&Ws false.  A summary of the events are set forth in Appendix 1 to this Complaint.  These events revealed that lending misconduct was systemic during the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  The events further revealed that Warrantors and loan originators to nearly all of the Covered Trusts had engaged in, or were accused of engaging in, widespread lending misconduct, including the issuance of extremely risky, highly questionable, predatory and/or illegal loans; making loans to borrowers who could not afford them; and abandoning the

- 32 -

underwriting guidelines they claimed to follow. *See* Appendix 1. The events occurring during 2007 and 2008 also revealed that the Warrantors and loan originators to the Covered Trusts were charging excessive and illegal fees to borrowers and routinely making loans based on applications that contained falsified appraisals and borrower incomes, understated borrower debts, and suspect qualifying documentation, as well as other lending misconduct. *Id.* While the foregoing events in 2007 and 2008 did not cause BNY Mellon to "discover" or have "actual knowledge" of R&W breaches by the Warrantors concerning the Mortgage Loans in the Covered Trusts, such events certainly made BNY Mellon suspicious of breaches and caused BNY Mellon to be on high alert and much more attentive to news and information concerning the Mortgage Loans and their Warrantors.

77. However, by the beginning of 2009, it was clear to BNY Mellon that many of the Warrantors and the loan originators for the Covered Trusts had in fact engaged in conduct that would have rendered at least several of the Warrantors' R&Ws concerning the Mortgage Loans false, including their R&Ws that: (1) the Mortgage Loans did not involve any fraud or misrepresentation; (2) the Mortgage Loans were originated in conformance with the lender's underwriting guidelines; (3) the borrowers were evaluated to confirm that they had a reasonable ability to repay the Mortgage Loans; (4) the Mortgage Loans were lawfully originated; and (5) all of the data provided about the Mortgage Loans was true and correct.

78. This is so because, by the beginning of 2009, the lending abuses described above, when coupled with the extremely poor performance of the Mortgage Loans in the Covered Trusts, made it clear that the Covered Trusts' Warrantors had breached their R&Ws concerning the Mortgage Loans, thus causing BNY Mellon to have actual knowledge of such breaches. Indeed, by

January 2009, the Covered Trusts had shockingly high Mortgage Loan default rates.[11]  These historically unprecedented default rates caused BNY Mellon to have actual knowledge that the Warrantors' R&Ws were false.  After all, if the R&Ws were accurate, the Mortgage Loans would not have defaulted at such astounding never-seen-before rates.  All of the Covered Trusts had double-digit Mortgage Loan default rates – much, much higher than historical averages.  *All of the Covered Trusts had Mortgage Loan default rates in excess of 30%, with four of the five Covered Trusts having default rates in excess of 36%, and one Covered Trust having a ridiculously high Mortgage Loan default rates in excess of 55%, indicating that over half of the Mortgage Loans within it were in default*.  The Covered Trusts had also sustained extraordinarily heavy losses by January 2009 – *over $186 million in just a few years* – another indicator that the Warrantors' R&Ws were breached, because if the R&Ws were true, such heavy losses would not have occurred.  BNY Mellon was aware of all this information because it prepared the monthly reports containing this information for four of the Covered Trusts and had access to this information for the fifth Covered Trust.  The chart below sets forth the Mortgage Loan default rates and the cumulative realized losses for each Covered Trust reported in January 2009:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in January 2009 | | |
| --- | --- | --- |
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| ECR 2005-2 | 41.20% | $ 45,413,103.50 |
| GSCC 2006-1 | 30.72% | $ 9,734,803.78 |
| NHEL 2006-3 | 55.54% | $ 65,251,274.64 |
| NSTR 2007-C | 36.84% | $ 13,443,310.52 |
| SAMI 2006-AR4 | 43.72% | $ 52,788,745.90 |
| **Covered Trusts' Total Realized Losses:** | | **$186,631,238.34** |

---

[11]  The term "default rates," as used in this Complaint, refers to the percentage of the Mortgage Loans' aggregate principal balance for each Covered Trust that is delinquent, in bankruptcy, in foreclosure or "real estate owned" ("REO") at that particular point in time.

- 34 -

79.     Thus, by January 2009, BNY Mellon knew there were massive breaches of the Warrantors' R&Ws.  Even so, additional events occurred during 2009, 2010 and the beginning of 2011 that repeatedly re-alerted BNY Mellon to the fact that the Warrantors' R&Ws concerning the Mortgage Loans were false and thus that the Warrantors were in breach.  Those events are set forth in Appendix 2 hereto, and they revealed that many of the Warrantors and the loan originators to the Covered Trusts had engaged in, or had been accused of engaging in, *inter alia*, the use of unlicensed loan officers in violation of law; the routine abandonment of their underwriting guidelines; the routine fabrication of borrowers' FICO scores and other loan information; the removal of negative loan data from loan applications; massive breaches of their R&Ws – in up to 85%-95% of their loans in some cases; the routine use of falsely inflated appraisals; the making of illegal loans; engagement in illegal discriminatory lending; and the securitization of mortgage loans that they knew breached their R&Ws.  *See* Appendix 2 hereto.  These additional events also caused BNY Mellon to have actual knowledge that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the Covered Trusts.

### b.     By April 13, 2011, BNY Mellon Absolutely Knew that the Warrantors Had Breached Their Representations and Warranties Concerning the Mortgage Loans in the Covered Trusts

80.     By April 2011, BNY Mellon **absolutely knew,** without any doubt, that the Warrantors had breached their R&Ws.  This is so primarily because of two Government-issued reports – the "FCIC Report" and the "Senate Report" – which were released in January and April 2011, respectively.  First, on January 27, 2011, the 633-page FCIC Report[12] was made available to the

---

[12]     The FCIC Report was authored by the Financial Crisis Inquiry Commission ("FCIC").  The FCIC was created to "examine the causes, domestic and global, of the . . . financial and economic crisis in the United States" that began in 2008.  The FCIC was established as part of the Fraud Enforcement and Recovery Act (Public Law 111-21) passed by Congress and signed by the

- 35 -

public, and between February 11 and 13, 2011, the FCIC also made public nearly 2,000 pages of supporting documentary evidence and more than 300 witness interviews. The FCIC Report was supported by voluminous evidence and confirmed in detail most if not all of the prior news accounts and events indicating that there were widespread lending abuses that resulted in widespread breaches of the Warrantors' R&Ws regarding the Mortgage Loans in the Covered Trusts.

81.    The FCIC Report confirmed the systemic breakdown in residential loan underwriting standards during the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts. The FCIC Report described in detail the lending abuses that emerged and that were virtually universal during that time period. Significantly, ***for the first time, the FCIC Report also revealed evidence of a pervasive, deliberate and intentional <u>fraud</u> that was being committed by RMBS securitizers with respect to mortgage loans being transferred to RMBS trusts like the Covered Trusts.*** <u>***The FCIC Report specifically identified several of the Covered Trusts' Warrantors and loan originators as being active participants in this fraud.***</u>  ***The***

President in May 2009. The FCIC was composed of private citizens with experience in areas such as housing, economics, finance, market regulation, banking and consumer protection. The FCIC's statutory mandate set out 22 specific topics for inquiry and called for the examination of the collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the government. These topics included, *inter alia*:

- fraud and abuse in the financial sector, including fraud and abuse toward consumers in the mortgage sector;
- federal and state financial regulators, including the extent to which they enforced, or failed to enforce statutory, regulatory, or supervisory requirements;
- credit rating agencies in the financial system, including reliance on credit ratings by financial institutions and federal financial regulators, the use of credit ratings in financial regulation, and the use of credit ratings in the securitization markets;
- lending practices and securitization, including the "originate-to-distribute" model for extending credit and transferring risk;
- the legal and regulatory structure of the United States housing market;
- the legal and regulatory structure governing investor and mortgagor protection; and
- the quality of due diligence undertaken by financial institutions.

*conclusion from the FCIC Report was that the Covered Trusts had been intentionally filled with*

*Mortgage Loans that breached the Warrantors' R&Ws.*

82. First, the FCIC confirmed the extraordinary numbers of R&W breaches that had occurred with respect to mortgage loans that were originated at the same time the Covered Trusts' Mortgage Loans were originated. The FCIC found, in light of the pervasive lending abuses that occurred during the period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, that "*in the years [thereafter], [loan] representations and warranties would prove to be inaccurate.*" FCIC Report at 77.

83. The FCIC Report supported its findings by citing to evidence of massive R&W breaches by many of the Warrantors to the Covered Trusts. The FCIC reported that these Warrantors had breached their R&Ws concerning billions of dollars of mortgage loans they sold to "government-sponsored entities" Fannie Mae and Freddie Mac (sometimes collectively referred to herein as the "GSEs"). The FCIC Report stated that "during the three years and eight months ending August 31, 2010, *Freddie [Mac] and Fannie [Mae] required sellers to repurchase 167,000 loans totaling $34.8 billion.*" *Id.* at 224. This included *$3.3 billion in loan repurchase claims* against JPMorgan Chase & Co. (which included EMC, Encore and Bear Stearns Residential, Warrantors or loan originators for the ECR 2005-2 and SAMI 2006-AR4 Covered Trusts, since they were owned and controlled by JPMorgan Chase & Co.) *due to a pattern and practice of routinely making false R&Ws.* *Id.* at 225. In addition, Countrywide – a Warrantor and/or loan originator for the GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts – *was facing R&W claims of $1.9 billion from Freddie Mac alone because of its business practice of making systemically false R&Ws.* *Id.* The sheer magnitude of these repurchase claims reported by the FCIC indicated that these Warrantors and loan originators routinely issued false R&Ws in the normal course of their businesses. Indeed,

the FCIC Report reported that "[a]s of mid-2010, *court actions embroiled almost all major loan originators and underwriters [and] there were more than 400 lawsuits related to breaches of representations and warranties*." *Id.* Given the pervasive falsity of the R&Ws by these Warrantors and loan originators, BNY Mellon knew that many of the Mortgage Loans in the Covered Trusts were similarly affected.[13]

84.     The FCIC Report also specifically noted that RMBS trustees, such as BNY Mellon, and servicers, like the Covered Trusts' Master Servicers/Servicers, were essentially assisting warrantors in defending R&W claims by refusing to provide information to investors from which the breaches could be established. *Id.* The FCIC Report pointed to the situation of the GSEs and stated: *"Frustrated with the lack of information from the securities' servicers and trustees, in many cases large banks, on July 12, 2010, the GSEs through their regulator, the Federal Housing Finance Agency, issued 64 subpoenas to various trustees and servicers in transactions in which the GSEs lost money."* *Id.* Given the large number of subpoenas issued and the limited number of RMBS trustees and servicers, plaintiff alleges on information and belief that BNY Mellon and the Covered Trusts' Master Servicers/Servicers were among the parties subpoenaed for refusing to provide information to the GSEs. Of course, if BNY Mellon and the Master Servicers/Servicers were uncooperative, they were acting against the best interests of RMBS holders, *i.e.*, the GSEs, contrary to their mandate under RMBS governing agreements.

---

[13]    The FCIC Report further revealed that "private mortgage insurance" ("PMI") companies – which insured lenders against defaults by borrowers – were finding extensive breaches of R&Ws concerning mortgage loans they had insured. *Id.* at 225. The FCIC reported that, "[a]s of October 2010, the seven largest PMI companies, which share 98% of the market, had rejected about 25% of the claims (or $6 billion of $24 billion) brought to them, *because of violations of origination guidelines, improper employment and income reporting, and issues with property valuation.*" *Id.*

85.	***The FCIC also "conclude[d] that there was untrammeled growth in risky*** ***mortgages [and that] [u]nsustainable, toxic loans polluted the financial system and fueled the*** ***housing bubble," while government regulators "failed to . . . establish and maintain prudent*** ***mortgage lending standards and to protect against predatory lending***." FCIC Report at 101. The FCIC Report confirmed that "***[l]ending standards collapsed, and there was a significant failure of*** ***accountability and responsibility throughout each level of the lending system***." *Id.* at 125. In addition, testimony released in connection with the FCIC Report confirmed "***systemic***" misconduct which led to uniformly false loan R&Ws at the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts. In testimony given to the FCIC, former Clayton Holdings, Inc. ("Clayton") executive D. Keith Johnson testified that he had previously worked at lender Washington Mutual Bank ("WaMu") as well as at WaMu's subsidiary, Long Beach Mortgage Company ("Long Beach"), prior to working for Clayton. When Johnson moved to Clayton, he was exposed to the lending practices of nearly all of the lenders in the mortgage loan industry because Clayton was hired by all or nearly all of the RMBS securitizers to sample and test mortgage loans that the securitizers were originating or purchasing from numerous lenders throughout the nation and then re-selling and transferring to RMBS trusts, including the Covered Trusts. WaMu and Long Beach were two of the worst lenders during 2005-2007, as they routinely engaged in egregiously fraudulent lending practices, as documented in the Senate Report discussed *infra*. Johnson testified in an interview with the FCIC on September 2, 2010, concerning the lending practices he observed both before and after he worked at WaMu/Long Beach and Clayton:

> ***I had a really unique perspective working in an environment that turned out bad*** ***loans, Long Beach, right? Then I go to Clayton and I'm dealing with the top*** ***factories in the world. And you know what? They're just like Long Beach.*** ***There's no difference. I mean, this was not a one-off situation; it was systemic.*** ***And all of them*** *– a lot of them had quality control departments internal, but* ***eventually all of those internal quality control departments became compromised***.

- 39 -

86.     The FCIC Report further revealed that, in 2005, federal examiners and agencies conducted a "confidential . . . study of mortgage practices at six lenders that together had originated . . . ***almost half the national total***" of mortgage loans in 2005.  FCIC Report at 172.  ***The study "'showed a very rapid increase in the volume of these irresponsible loans, very risky loans***,'" according to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation.  *Id*.  ***For "[a] large percentage of the[] loans" reviewed, "the underwriting standards . . . had deteriorated***."  *Id*.  The lenders involved in making these "irresponsible, very risky loans" included Countrywide, a Warrantor and loan originator to the GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts.  *Id*.

87.     The FCIC Report also confirmed that several of the Warrantors and loan originators to the Covered Trusts were deeply involved in lending abuses which resulted in pervasive breaches of their R&Ws.  For example, Countrywide was singled out by the FCIC for its rampant lending abuses:

> *Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop*.

FCIC Report at xxii.

88.     The FCIC Report also found that Countrywide ***"originated vast numbers of high-risk, nontraditional mortgages that were in some cases deceptive, in many cases confusing, and often beyond borrowers' ability to repay."***  FCIC Report at 418 ("Dissenting Statement").

89.     According to evidence in the FCIC Report, Countrywide's loan products were simply not designed to evaluate borrowers' repayment abilities.  Indeed, one of Countrywide's loan

- 40 -

products was described as "'*[p]oison*'" by the lender's own co-founder and CEO, who stated in an April 17, 2006 e-mail: "'***In all my years in the business I have never seen a more toxic [product]***' . . . ." FCIC Report at 20. According to information contained in the FCIC Report, the reason Countrywide was willing to offer such products was because its sole focus was "'originating what was salable in the secondary market,'" *i.e.*, to the securitizers that then transferred the toxic mortgage loans into trusts such as the Covered Trusts. *Id.* at 105.

90.     Moreover, former Countrywide employee Eileen Foster ("Foster") confirmed in an interview with the FCIC that fraud was rampant in connection with Countrywide's origination of loans. Foster worked as a mortgage fraud investigator at Countrywide, and confirmed that loans Countrywide's fraud investigators or underwriters rejected due to fraud or non-conformance with the underwriting guidelines were regularly overruled and approved by Countrywide's sales unit, as "***the rules were bent and broken and twisted regularly and it was . . . an accepted mode of doing business***." FCIC Staff Audiotape of Interview with Eileen Foster, Countrywide, http://fcic.law.stanford.edu/interviews/view/381. Foster further stated that "all of the fraud that may have been taking place [was] being managed out by the sales units," or in other words, "'***concealed***.'" *Id.* She suspected that "there was quite a bit of fraud taking place" in connection with Countrywide's loan originations, which her audit manager "confirmed to [her]." *Id.* According to the FCIC, Countrywide had tens of thousands of internal company referrals of potentially fraudulent activity in connection with its mortgage business during the period from 2005-2007, when the Mortgage Loans in the Covered Trusts were originated. FCIC Report at 162. The FCIC Report established that ***Countrywide's "accepted mode of doing business" resulted in its R&Ws being uniformly false***.

91.     The FCIC Report also confirmed the industry-wide use of falsely inflated appraisals during the period when the Mortgage Loans were originated, which also resulted in false R&Ws. According to the FCIC Report, "*[a]s the housing market expanded, another problem emerged, in subprime and prime mortgages alike: inflated appraisals*." FCIC Report at 91. Testimony released with the FCIC Report confirmed the customary use of falsely inflated appraisals – which was a breach of the Warrantors' R&Ws – during the time the Mortgage Loans were originated. Jim Amorin, the President of the Appraisal Institute, testified to the FCIC that "*[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again. . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice*.'"

92.     **_Most Importantly, the FCIC Report also specifically revealed for the first time that it was a customary and regular business practice of RMBS securitizers, including some of the Warrantors and loan originators to the Covered Trusts, to deliberately transfer thousands of mortgage loans that did not comply with applicable laws or underwriting guidelines (and therefore breached the R&Ws made about them) into RMBS trusts offered and sold to investors. This widespread intentionally fraudulent practice occurred during the exact same time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts_**. This startling revelation – that RMBS securitizations like the Covered Trusts had been **_deliberately filled with loans that breached their R&Ws_** – was based on Clayton's "Trending Reports," which were provided to the FCIC.  As previously alleged, Clayton was hired by virtually every RMBS securitizer – **_including several Warrantors and loan originators to the Covered Trusts_** – during 2006 and 2007 to perform due diligence on mortgage loans that were being securitized, warranted and transferred to RMBS trusts.  Clayton tested samples of the loans during the period from January

- 42 -

2006 through June 2007 to determine whether the loans complied with the applicable lending laws and underwriting guidelines (laws and guidelines that were designed to prevent the making of loans to borrowers who could not afford them), or were otherwise defective. Clayton's Trending Reports revealed that large percentages of the sampled loans *for several of the Warrantors and loan originators* did not comply with lending laws or the applicable underwriting guidelines, or were otherwise defective, *i.e.*, the loans were in breach of R&Ws made about them. ***Incredibly, even after being informed of the specific defective loans, these Warrantors and loan originators to the Covered Trusts did not remove all of the defective loans, but rather, "waived" a large portion of them in, i.e., transferred the breaching loans into the RMBS trusts, warranted them as being fine and then sold them to investors***! These same Warrantors and loan originators also did no further testing of the remaining loans in the pools even though it was highly probable from a statistical standpoint that they would have the same defect rates as the sampled loans. Instead, they bought the unsampled loans sight unseen, falsely warranted that the loans were free of defects, and dumped them into the RMBS trusts they were selling to investors like plaintiff and the class. The following chart summarizes the FCIC's findings concerning the Covered Trusts' specific Warrantors and loan originators and their deliberate inclusion of defective loans breaching their R&Ws into RMBS trusts:

| Covered Trust Loan Warrantor and/or Loan Originator Identified by FCIC Report | Covered Trusts Involving Identified Warrantor or Loan Originator | Percentage of Loans in Test Samples that Breached R&Ws | Percentage of Loans that Breached R&Ws but Were "Waived" into the RMBS Trusts and Sold to Investors |
|---|---|---|---|
| Countrywide | GSCC 2006-1 SAMI 2006-AR4 | 26% | 12% |
| EMC (includes Bear Stearns Residential and Encore) | ECR 2005-2 SAMI 2006-AR4 | 16% | 42% |

93.     The FCIC Report, via the Clayton Trending Reports, also made it clear that the inclusion of defective, breaching mortgage loans into RMBS trusts was not limited only to those warrantors and loan originators specifically identified in the FCIC Report.  Rather the FCIC Report made clear that this fraudulent behavior was ubiquitous.  Clayton's Trending Reports included information about "*All Others*" that originated loans for RMBS trusts, or in other words, those lenders and warrantors that had not been specifically identified in Clayton's reports.  Such information showed that all the other unidentified loan originators and warrantors had also deliberately transferred defective mortgage loans into RMBS trusts.  On information and belief, and based on the evidence in the FCIC Report (including the Clayton Trending Reports), plaintiff alleges that all of the Covered Trust Warrantors and loan originators were intentionally transferring defective mortgage loans into RMBS trusts – including the Covered Trusts – which breached their R&Ws.  Indeed, the FCIC Report revealed that false R&Ws affected virtually every RMBS trust created during the time period the Covered Trusts were formed.  Thus, BNY Mellon learned from the FCIC Report (and the Senate Report) that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the Covered Trusts, particularly after comparing the soaring default rates of

- 44 -

the Mortgage Loans in the Covered Trusts in April 2011 to historical averages, and the Covered Trusts' obscene losses by then. *See infra* ¶103 (chart).

94.     Then, on April 13, 2011, the Senate Report[14] was publicly released.  The Senate Report confirmed again for BNY Mellon that the lending industry in general and the Warrantors to the Covered Trusts in particular had uniformly breached their R&Ws.  The 635-page Senate Report was supported by thousands of pages of documentary evidence and the testimony of numerous witnesses subpoenaed by the Senate Subcommittee on Investigations.  The Senate Report not only confirmed the FCIC Report's findings, but also provided amplified additional evidence that the Warrantors had breached their R&Ws.  The Senate Report also provided an inside look at a lending industry run amok during the period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, exposing an industry that uniformly and intentionally churned out thousands of defective mortgage loans in breach of the R&Ws made about them, leading to the inescapable conclusion that the Mortgage Loans in the Covered Trusts suffered from extensive breaches of the Warrantors' R&Ws.

95.     First, the Senate Report re-confirmed that from 2005 through 2007 "*[l]enders introduced new levels of risk into the U.S. financial system by selling . . . home loans with . . . poor underwriting*," and that "<u>*a host of financial institutions . . . knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans*</u>."  Senate Report at 12, 50.

---

[14]   The Senate Report was issued by U.S. Senators Carl Levin and Tom Coburn for the United States Senate Permanent Subcommittee on Investigations concerning their inquiry into key causes of the financial crisis.  The Senate Report examined four aspects of the financial crisis: (1) high-risk mortgage lending; (2) regulatory inaction; (3) inflated credit ratings that misled investors; and (4) the role played by investment banks in creating and selling structured finance products such as RMBS that foisted billions of dollars of losses on investors, while the banks profited from betting against the mortgage market.

96.     In addition, due in part to a lack of proper regulatory oversight by the Government, the Senate Report also found that, shortly after the Mortgage Loans in the Covered Trusts were originated, warranted and transferred to the trusts, there existed

> *a mortgage market saturated with risky loans, and financial institutions [and investors] that were supposed to hold predominantly safe investments . . . instead held portfolios rife with high risk, poor quality mortgages. When those loans began defaulting in record numbers and mortgage related securities plummeted in value, financial institutions around the globe suffered hundreds of billions of dollars in losses, triggering an economic disaster.*

Senate Report at 5.

97.     These conclusions should have caused BNY Mellon to have absolute knowledge that the Covered Trusts were also "rife with high risk, poor quality mortgages" in breach of the Warrantors' R&Ws.

98.     The Senate Report also identified many of the abusive lenders that made loans that breached their R&Ws. Not surprisingly, the Senate Report singled out Covered Trust Warrantor and/or loan originator Countrywide (and others), reporting that:

> *The fact is that each of these lenders [including Countrywide] issued billions of dollars in high risk, poor quality home loans. By allowing these lenders, for years, to sell and securitize billions of dollars in poor quality, high risk home loans, regulators permitted them to contaminate the secondary market and introduce systemic risk throughout the U.S. financial system*.

Senate Report at 239.

99.     The Senate Report also revealed that large percentages of Countrywide's loans breached its R&Ws. Countrywide was a Warrantor and/or loan originator for the GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts. The Senate found that *Goldman Sachs, "after reviewing certain loans [it] purchased from Countrywide, … [found] that about 50% of the loans reviewed were candidates for return" because of breaches of Countrywide's R&Ws. Id.* at 487. The Senate Report cited to an internal Goldman Sachs email it had obtained to support its finding. The email

- 46 -

revealed that Goldman Sachs' "investigations team" had reviewed 125 of 150 loans from a pool of loans purchased from Countrywide and "***identified fraud in 72 (48%) of the completed reviews*** which represents a total fraud exposure of $46,977,184.50." *See* 6/29/07 email from Goldman Sachs employee Ed Chavez to various other Goldman Sachs employees titled "Countrywide Investigation Review Update."

100.     In addition, the Senate Report reported that NovaStar, the Warrantor and loan originator for the NHEL 2006-3 Covered Trust, was also facing numerous loan repurchase demands from Goldman Sachs in early 2007 because of breaches of its loan R&Ws. *See* Senate Report at 485 & n.2041 (citing an internal Goldman Sachs email Bates numbered GS MBS-E-002211055, which indicated that NovaStar was finalizing one loan repurchase settlement with Goldman Sachs and that there was at least one additional repurchase claim pending).

101.     The Senate Report also revealed that as early as August 2006, traders at Deutsche Bank knew that AHM, a loan originator for the GSCC 2006-1 Covered Trust, was "considered bad" because of its defective loans, and thus the traders were recommending to select clients that RMBS backed by AHM loans be shorted.  Senate Report at 338 & n.1277.  This should have indicated to BNY Mellon that any R&Ws regarding AHM loans were false.

102.     The Senate Report served to make it exceedingly clear that the Mortgage Loans in the Covered Trusts were subjected to the same misconduct as reported therein.  Therefore, by no later than April 13, 2011, the date of the Senate Report's release, and based on the tsunami of previously reported information, including the FCIC and Senate Reports and the volumes of evidence they disclosed, BNY Mellon had "actual knowledge," as that term is used in the Governing Agreements, that there were pervasive breaches of the Warrantors' R&Ws concerning thousands of Mortgage

Loans within the Covered Trusts. Once BNY Mellon became aware of the FCIC and Senate Reports, there was **no doubt** that it knew the Warrantors were in breach of their R&Ws.

103. Further supporting the conclusion that BNY Mellon had discovered by April 2011 that thousands of Mortgage Loans in the Covered Trusts breached the Warrantors' R&Ws, is the fact that, by that time, the Mortgage Loans in the Covered Trusts had continued to default at rates never seen before, and the Covered Trusts' losses were skyrocketing to levels that could only have been caused by massive breaches of the Warrantors' R&Ws. Indeed, by April 2011, the Covered Trusts' Mortgage Loan default rates ranged from over 31% to a high of over 54%. Each of the five Covered Trusts had default rates in excess of 31%, with three having default rates in excess of 45.5% and two having default rates in excess of 50%.[15] In addition, the Covered Trusts' losses had mushroomed from approximately $186 million in January 2009 (*see supra* ¶78), to **over $669 million by April 2011**, due in large part to BNY Mellon's failure to enforce the Warrantors' R&W obligations. These default rates and losses were known to BNY Mellon because it prepared the monthly reports containing this information for four of the Covered Trusts, and had access to this information concerning the fifth Covered Trust. The Covered Trusts' default rates and losses reported in April 2011 were as follows:

---

[15] It should be noted that the foregoing Mortgage Loan default rates actually **understate the aggregate default rates for all of the Mortgage Loans that were _originally_ within the Covered Trusts**. To explain, the foregoing default rates are derived from the monthly Covered Trust reports which disclose the default rates **for only those Mortgage Loans _still remaining within the Covered Trusts_**. In other words, these default rates **_do not include all those Mortgage Loans that were originally within the Covered Trusts that had been in default but were already liquidated and therefore removed from the Covered Trusts before the specific report was issued_**. Thus, the actual aggregate default rates for all of the Mortgage Loans that were originally in the Covered Trusts is actually **much, much higher**.

- 48 -

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in April 2011 | | |
|---|---|---|
| **Covered Trust** | **Mortgage Loan Default Rates** | **Cumulative Realized Losses** |
| ECR 2005-2 | 32.45% | $108,330,308.96 |
| GSCC 2006-1 | 45.54% | $ 38,311,233.65 |
| NHEL 2006-3 | 50.76% | $195,531,673.59 |
| NSTR 2007-C | 31.76% | $122,642,898.47 |
| SAMI 2006-AR4 | 54.82% | $204,891,982.90 |
| **Covered Trusts' Total Realized Losses:** | | **$669,708,097.57** |

104. Even after April 2011, there were hundreds of additional events that came to light that publicly and repeatedly re-informed BNY Mellon that the Warrantors had systematically breached their R&Ws concerning the Mortgage Loans in the Covered Trusts. These events are far too numerous to list in this Complaint, but they all corroborate the fact that the Warrantors had breached their R&Ws concerning thousands of Mortgage Loans in the Covered Trusts. However, one event is particularly noteworthy and relevant to BNY Mellon's knowledge of widespread breaches by the Warrantors to the Covered Trusts. ***In June 2011, Bank of America, which owned Countrywide, a Warrantor and/or loan originator for two of the Covered Trusts, agreed to pay a stunning $8.5 billion to settle claims that Countrywide breached its R&Ws as to tens of thousands of mortgage loans in 530 different RMBS trusts <u>for which BNY Mellon served as Trustee</u>***! This settlement agreement underscored how the lending industry in general, and Countrywide in particular, was engaged in the practice of routinely issuing blanket false R&Ws concerning loans just like those in the Covered Trusts. And BNY Mellon could not claim it was unaware of such practices, as it was the Trustee for the 530 trusts, agreed to the settlement, and even negotiated a release for itself in the settlement from any claims by investors in the 530 trusts that it failed to enforce Countrywide's R&Ws.[16] Given the breadth and scope of the settled misconduct, and BNY Mellon's participation in

---

[16] BNY Mellon was also sued in at least six cases as a result of its failure to enforce Countrywide's repurchase obligations for some of the 530 trusts. *See, e.g.*, *Walnut Place LLC, et al. v. Countrywide*

the settlement, this provided further confirmation to BNY Mellon that Countrywide in particular, and the other Warrantors to the Covered Trusts generally, issued pervasively false R&Ws as to the Mortgage Loans in the Covered Trusts.

> **c.** **Specific Claims Made About the Mortgage Loans in the Specific Covered Trusts at Issue Herein Caused BNY Mellon to Discover Breaches of the Warrantors' R&Ws**

105.    Several lawsuits were filed by purchasers of the RMBS in the Covered Trusts alleging that numerous misrepresentations had been made about the ***specific Mortgage Loans in the specific Covered Trusts at issue herein***. In addition, other investors publicly notified BNY Mellon that at least one of the Covered Trusts contained Mortgage Loans that breached the Warrantors' R&Ws. These lawsuits and notification informed BNY Mellon that there were numerous defective Mortgage Loans in the Covered Trusts that breached the Warrantors' R&Ws. For example:

- **May 21, 2008**: The NHEL 2006-3 Covered Trust was sued in a class action by purchasers of RMBS alleging violations of the federal securities laws. *See* Complaint, *New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc., et al.*, No. 601563/08 (N.Y. Sup. Ct., N.Y. Cnty. May 13, 2008). The complaint alleged that defendants ***had misrepresented that the Mortgage Loans in the NHEL 2006-3 Covered Trust were originated in conformity with Warrantor NovaStar's underwriting guidelines. This would have been a breach of NovaStar's R&Ws concerning the Mortgage Loans within that Covered Trust***.

- **August 8, 2011:** Several American International Group, Inc. ("AIG") companies sued various RMBS securitizers and their related companies. *See* Complaint, *American Int'l Group, Inc., et al. v. Bank of America Corp., et al.*, No. 652199/2011 (N.Y. Sup. Ct., N.Y. Cnty. Aug. 8, 2011). AIG alleged that defendants ***(1) misrepresented that the Mortgage Loans in the NSTR 2007-C Covered Trust were originated in conformance with Warrantor Nationstar's underwriting guidelines; (2) misrepresented that the borrowers had been evaluated to determine whether***

---

*Home Loans, Inc.*, No. 650497/2011 (N.Y. Sup. Ct., N.Y. Cnty.); *Knights of Columbus v. Bank of N.Y. Mellon*, No. 651442/2011 (N.Y. Sup. Ct., N.Y. Cnty.); *Am. Fid. Assurance Co. v. Bank of N.Y. Mellon*, No. 11-cv-1284 (W.D. Okla.); *Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon*, No. 11-cv-5459 (S.D.N.Y.); *Sterling Fed. Bank, F.S.B. v. Countrywide Fin. Corp.*, No. 11-cv-2012 (N.D. Ill.); and *Bankers Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-cv-01630 (M.D. Fla.).

- 50 -

*they could afford the Mortgage Loans; and (3) misrepresented the Mortgage Loans' loan-to-value ("LTV") ratios, occupancy data and debt-to-income ratios. These misrepresentations would have been breaches of Nationstar's R&Ws concerning the Mortgage Loans within that Covered Trust.*

- **September 2, 2011:** The Federal Housing Finance Agency ("FHFA") filed over a dozen actions against numerous RMBS securitizers, *including Covered Trust Warrantors EMC and Countrywide, alleging that they and others had made numerous misrepresentations concerning the Mortgage Loans in the NSTR 2007-C and SAMI 2006-AR4 Covered Trusts.  See* Complaint, *FHFA v. JPMorgan Chase & Co., et al.*, No. 11-CV-06188 (S.D.N.Y. Sept. 2, 2011) (Warrantor EMC sued regarding SAMI 2006-AR4 Covered Trust); and Complaint, *FHFA v. Bank of America Corp., et al.*, No. 11-CV-06195 (S.D.N.Y. Sept. 2, 2011) (NSTR 2007-C Covered Trust).  The FHFA alleged that Covered Trust Warrantors EMC and Countrywide had: *(1) misrepresented that the Mortgage Loans in the two above-referenced Covered Trusts had been originated pursuant to the lenders' underwriting guidelines; and (2) misrepresented the Mortgage Loans' LTV ratios and owner occupancy data.  These misrepresentations would have been breaches of the Warrantors' R&Ws concerning the Mortgage Loans.*

- **December 16, 2011**: A law firm representing a group of RMBS investors in the SAMI 2006-AR4 Covered Trust publicly issued a press release notifying BNY Mellon and directing it "*to open investigations of ineligible mortgages in pools securing" that Covered Trust and others.  "Ineligible mortgages" in these trusts were Mortgage Loans within the SAMI 2006-AR4 Covered Trust that breached Warrantor EMC's R&Ws*.

106.    The foregoing lawsuits and investor notification/direction involving the *specific* Covered Trusts at issue herein, and the *specific* Mortgage Loans within them, caused BNY Mellon to discover that the Warrantors had breached their R&Ws as to the Mortgage Loans in those Covered Trusts.

### d.    BNY Mellon Also Learned of the Warrantors' R&W Breaches from Borrowers' Bankruptcies

107.    In addition to all of the foregoing information that BNY Mellon was aware of, BNY Mellon was also aware of additional *specific information about the specific Mortgage Loans in the specific Covered Trusts* from the bankruptcies of the Mortgage Loans' borrowers, which also indicated that the Warrantors had breached their R&Ws.  This information indicated that fraud or

misrepresentations had occurred in connection with the origination of the Mortgage Loans, that borrowers were given Mortgage Loans they could not afford, that lenders' underwriting guidelines were ignored, and that the Mortgage Loans were not legally originated, as either predatory lending or mortgage fraud had occurred. Plaintiff's counsel has obtained information concerning Mortgage Loans within the Covered Trusts from bankruptcy filings by the borrowers. BNY Mellon was aware of this information since it made appearances in, monitored, and/or made claims or filed or defended actions in the bankruptcies by or against the Mortgage Loans' borrowers. This information from the bankruptcies, as set forth below, shows that the Warrantors breached their R&Ws. The accumulation of this information from the numerous borrower bankruptcies over time resulted in BNY Mellon obtaining actual knowledge by April 2011 that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the Covered Trusts.

### (i)   ECR 2005-2 Covered Trust

108.   A borrower obtained a Mortgage Loan for $215,600 in 2005 from loan originator Encore, which was contained within the ECR 2005-2 Covered Trust. The borrower had income of $1,500 per month in 2005 according to the borrower's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $1,866, in excess of the borrower's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated under any lender's underwriting guidelines for such a loan, contrary to Warrantor ECC's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrower's income and/or debts that occurred to "qualify" the

- 52 -

borrower for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts ECC's representations that the Mortgage Loan data they provided was true and correct. The fact that the foregoing breaches of ECC's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (ii)     GSCC 2006-1 Covered Trust

109.     A borrower obtained a Mortgage Loan for $424,000 in 2005 from loan originator United Financial Mortgage Corp., which was contained within the GSCC 2006-1 Covered Trust. The borrower and her husband had joint income of $2,123 per month in 2005 according to the borrower's and her husband's sworn bankruptcy filings. ***However, the borrower's monthly debt payments were at least $2,556, in excess of the borrower's and her husband's monthly income***. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated under any lender's underwriting guidelines for such a loan, contrary to Warrantors GSC Capital Corporation's and Countrywide's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrower's income and/or debts that occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts the Warrantors' representations that the Mortgage Loan data they provided was true and correct. The fact that the foregoing breaches of the Warrantors' R&Ws occurred is corroborated by the fact that the borrower and her husband declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

### (iii)    NHEL 2006-3 Covered Trust

110.    A borrower obtained a Mortgage Loan for $441,900 in 2006 from loan originator Lenders Depot, Inc., which was then purchased by Warrantor NovaStar and then transferred to the NHEL 2006-3 Covered Trust.  The borrower had *income of only $476 per month in 2006 according to the borrower's sworn bankruptcy filings.  However, the borrower's monthly debt payments were at least $3,331, far in excess of the borrower's monthly income*.  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to Warrantor NovaStar's R&Ws.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan.   In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts Warrantor NovaStar's representations that the Mortgage Loan data it provided was true and correct.  The fact that the foregoing breaches of NovaStar's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

### (iv)    NSTR 2007-C Covered Trust

111.    A borrower obtained a Mortgage Loan for $410,000 in 2006 from Warrantor Nationstar, which was contained within the NSTR 2007-C Covered Trust.  *This borrower had income of $0 per month in 2006 according to the borrower's sworn bankruptcy filings.  However, the borrower's monthly debt payments were at least $3,359, far in excess of the borrower's monthly income*.  The borrower's monthly debt payments were in addition to the borrower's

- 54 -

monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to Warrantor Nationstar's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts Nationstar's representations that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of Nationstar's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

**(v)**      **SAMI 2006-AR4 Covered Trust**

112. A borrower obtained a Mortgage Loan for $915,750 in 2006 from loan originator Sierra Pacific Mortgage Services, which was contained within the SAMI 2006-AR4 Covered Trust. *This borrower had <u>income of $0 per month</u> in 2006 according to the borrower's sworn bankruptcy filings. However, the borrower's monthly debt payments were at least $5,343, far in excess of the borrower's monthly income*. The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was obviously not originated under any lender's underwriting guidelines for such a loan, contrary to Warrantor EMC's R&Ws. The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws since the borrower clearly could not afford the Mortgage Loan. In addition, the apparent misrepresentation of the borrower's income and/or debts

- 55 -

that must have occurred to "qualify" the borrower for the Mortgage Loan appears to violate mortgage fraud laws, and contradicts Warrantor EMC's representations that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of EMC's R&Ws occurred is corroborated by the fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2008.

113. As the foregoing demonstrates, Mortgage Loans in the Covered Trusts were extended to borrowers who, in light of their extremely heavy pre-existing debt loads and/or lack of income, clearly had no ability to repay the Mortgage Loans. The foregoing information also reveals that: (1) the Mortgage Loans were obtained by providing falsified information; (2) lenders ignored their stated underwriting guidelines; and (3) illegal mortgage fraud and/or predatory lending by either lenders or borrowers, or both, had occurred.

114. The foregoing examples are not isolated or extreme, or aberrations or outliers. In fact, there were large numbers of Covered Trust Mortgage Loan borrowers that went bankrupt under similar circumstances, and BNY Mellon learned of widespread breaches of the Warrantors' R&Ws through such bankruptcies.

115. Despite BNY Mellon's discovery and actual knowledge of systemic R&W breaches concerning Mortgage Loans in the Covered Trusts by the Warrantors, BNY Mellon did not enforce the Warrantors' obligations to cure, substitute or repurchase thousands of defective Mortgage Loans as required by the Governing Agreements, the TIA and the Streit Act. Moreover, BNY Mellon's continuing failure to act, after learning of the breaches, and after learning of new breaches, has resulted in BNY Mellon engaging in numerous additional breaches of its continuing duties under the Governing Agreements, the TIA and the Streit Act to enforce the R&W claims after 2011, and has caused the loss of hundreds of millions of dollars in meritorious R&W claims that are now barred by

- 56 -

the statute of limitations. By these failures, BNY Mellon breached, and then repeatedly re-breached, the Governing Agreements, the TIA and the Streit Act, thereby causing plaintiff, the class and the Covered Trusts to suffer massive damages.

### 2. BNY Mellon Had Actual Knowledge of Events of Default No Later than April 13, 2011, Thus Triggering Its Duties to Act Under the Governing Agreements, the TIA and the Streit Act

116. BNY Mellon was also required by the Governing Agreements, the TIA and the Streit Act to act as a quasi-fiduciary whenever it became aware of Events of Default by the Covered Trusts' Master Servicers or Servicers. That is, whenever the Master Servicers/Servicers failed to ensure that the Mortgage Loans in the Covered Trusts were being serviced in accordance with the law and as "prudent" master servicers or servicers using customary and usual standards of loan servicing practice, an Event of Default occurred. In addition, an Event of Default occurred whenever BNY Mellon learned that the Master Servicers/Servicers knew of Warrantor R&W breaches but did not report them to BNY Mellon. When BNY Mellon learned of these Events of Default, it was required to notify the offending Master Servicer or Servicer and seek a cure of the default, and also notify plaintiff and the class if the default was not cured, and take other actions if necessary. ***Most importantly, BNY Mellon was required to exercise all of its powers under the Governing Agreements as a "prudent person" would, and seek to protect plaintiff's and the class's interests as if they were BNY Mellon's very own interests.*** BNY Mellon's powers included terminating or replacing the offending Master Servicers/Servicers or taking over their responsibilities. However, as alleged more fully below, even though BNY Mellon obtained actual knowledge of rampant Master Servicer/Servicer Events of Default with respect to the Mortgage Loans in the Covered Trusts by no later than April 2011 (if not sooner), BNY Mellon breached the Governing Agreements and violated the TIA and the Streit Act by failing to take any of the actions

- 57 -

required of it or allowed by the Governing Agreements, the TIA and the Streit Act. Moreover, even though numerous new Events of Default have occurred after April 2011, BNY Mellon has continued to fail to act, and thus has committed numerous additional breaches of its duties under the Governing Agreements, the TIA and the Streit Act.

117. The Master Servicers and Servicers to the Covered Trusts as designated in the Governing Agreements, and their successors, if any, are set forth in the chart below. To plaintiff's knowledge, none of these Master Servicers or Servicers have been terminated or replaced by BNY Mellon due to any of the Events of Default alleged herein, nor has BNY Mellon notified plaintiff and the class of such Events of Default:

**Covered Trusts' Master Servicers and Servicers**

| Covered Trust | Original Master Servicers | Original Servicer(s) and Successor Servicer(s) |
|---|---|---|
| ECR 2005-2 | ▪ **Countrywide Home Loan Servicing LP** (changed its name to BAC Home Loan Servicing LP after being acquired by Bank of America in 2008) **(hereinafter "CHLS/BACHLS")** | ▪ **ECC** |
| GSCC 2006-1 | ▪ **CHLS/BACHLS** | ▪ **CHLS/BACHLS** |
| NHEL 2006-3 | ▪ **None** | ▪ **NovaStar** (Saxon Mortgage Services ("**Saxon**") acquired the loan servicing rights in November 2007 and serviced this trust until 2012, when Ocwen Loan Servicing LLC ("**Ocwen**") acquired Saxon) |
| NSTR 2007-C | ▪ **None** | ▪ **Nationstar** |
| SAMI 2006-AR4 | ▪ **Wells Fargo Bank, N.A. ("Wells Fargo")** | ▪ **EMC** <br> ▪ **CHLS/BACHLS** |

118. Due to the large number of defective Mortgage Loans in breach of the Warrantors' R&Ws that remained in the Covered Trusts due to BNY Mellon's failures to act as alleged above, a flood of defaults started occurring in late 2007 and early 2008, which in turn led to a flood of

- 58 -

subsequent foreclosure proceedings. Under the Governing Agreements, the Master Servicers/Servicers were responsible for instituting and prosecuting foreclosures on behalf of BNY Mellon, and were required to conduct the foreclosures *legally and "prudently*," as though the Master Servicers/Servicers were servicing their own portfolios of loans. *E.g.*, NSTR 2007-C PSA §8.01 ("the Servicer . . . is hereby authorized and empowered . . . to institute foreclosure proceedings . . . on behalf of the Trustee"); *id.* §8.13(a) ("*The Servicer shall foreclose . . .[and] shall exercise such of the rights and powers vested in it hereunder, and use the same degree of care and skill in their exercise or use, as prudent mortgage lenders would exercise or use under the circumstances in the conduct of their own affairs*."). Indeed, another RMBS trustee has previously characterized a RMBS trustee's and the Master Servicers'/Servicers' duties with respect to servicing loans as follows: "*our legal duty [is] to protect the interests of*" plaintiff and the class in servicing the Mortgage Loans.

> a. **Shortly After the Covered Trusts Were Formed, BNY Mellon Became Aware of Widespread Loan Servicing Abuses that Likely Affected the Covered Trusts**

119. Beginning as early as the summer of 2008, BNY Mellon became aware of several loan servicing issues involving several of the Covered Trust Master Servicers/Servicers. For example, Covered Trust Servicer Saxon (which had assumed loan servicing duties for the NHEL 2006-3 Covered Trust in 2007) was charged with violating the laws of New Hampshire and Maryland in June and December 2008, respectively. In New Hampshire, Saxon was charged with violating several state laws and regulations by failing to designate a person with sufficient authority to facilitate foreclosure avoidance procedures, failing to communicate with borrowers, and failing to respond to the New Hampshire Banking Department's inquiries. Saxon entered into a consent order with New Hampshire and paid a fine. Subsequently, in December 2008, Saxon was charged with

servicing loans in the state of Maryland without a proper license, also a violation of law. Again, it quickly entered into a consent order, agreeing to comply with the law and paying a fine.

120.    In addition, in September 2008, BNY Mellon was made aware of improper loan servicing practices by another Servicer to the Covered Trusts. In September 2008, the Federal Trade Commission ("FTC") announced that EMC – a Servicer (and Warrantor as well) for the SAMI 2006-AR4 Covered Trust – had agreed to settle charges that EMC and its related company Bear Stearns had "misrepresented the amounts borrowers owed, charged unauthorized fees, such as late fees, property inspection fees, and loan modification fees, and engaged in unlawful and abusive collection practices." The FTC's complaint alleged that EMC and Bear Stearns "neglected to obtain timely and accurate information on consumers' loans, made inaccurate claims to consumers, and engaged in unlawful collection and servicing practices." The FTC charged EMC and Bear Stearns with violating the FTC Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Truth in Lending Act's Regulation Z. EMC paid $28 million to settle the charges.

121.    The foregoing events put BNY Mellon on notice that there might be loan servicing misconduct by the Covered Trust Servicers as to the Mortgage Loans in the Covered Trusts. However, these events did not cause BNY Mellon to have actual knowledge of Events of Default as to the Mortgage Loans in the Covered Trusts at that time. Instead, it caused BNY Mellon to be much more attentive to and suspicious of the activities of these Servicers.

122.    In addition, starting in 2008 and 2009, all RMBS trustees, including BNY Mellon, were beginning to experience loan servicing issues. BNY Mellon and the other RMBS trustees were having difficulties foreclosing on defaulted mortgage loans because of widespread loan servicing errors and misconduct. Courts were denying, delaying, halting, and even invalidating many foreclosures because of shoddy foreclosure practices and other misconduct by loan servicers.

Because of these erroneous and improper servicing practices, RMBS trustees were having difficulty establishing that they owned or possessed the notes and mortgages at the time they filed suit or foreclosed, as required by law. In addition, RMBS trustees were facing long delays in foreclosing caused by faulty or in some cases false mortgage documentation filed by the master servicers and servicers, as well as their assertions of erroneous or false facts. Over time, and by October 2010, it became apparent to BNY Mellon that the loan servicers it was using, including the Covered Trusts' Master Servicers and Servicers, were filing fraudulent affidavits in many cases and some were also creating bogus mortgage and note assignments, as well as filing foreclosure complaints and other court documents that contained false allegations. Such loan servicing practices were clearly not legal or "prudent," as required by the Governing Agreements.

123. Indeed, BNY Mellon has experienced hundreds, if not thousands, of denials, dismissals, delays and invalidations of its foreclosure proceedings filed by the loan servicers it used, and numerous motions for relief from bankruptcy stays being denied or delayed, because of misconduct by such loan servicers. By October 2010, it was apparent to BNY Mellon that the loan servicers it was using, including the Covered Trusts' Master Servicers and Servicers, were not foreclosing "prudently" as required by the Governing Agreements. Instead, they were engaging in slipshod behavior, committing grossly negligent errors, or making inconsistent or fraudulent representations in pleadings and affidavits, and engaging in other improper or deceptive behavior, including ignoring and violating court orders and violating state foreclosure laws, all of which were Events of Default. In many cases, the Covered Trusts' Master Servicers and Servicers were involved.[17]

---

[17] *See, e.g.*, *Bank of N.Y. v. Orosco*, No. 32052/07, slip op. at 2-3 (N.Y. Sup. Ct., Kings Cnty. Nov. 19, 2007) (BNY Mellon's application for order of reference denied because, "***[d]espite claiming to be the owner of the note and mortgage in this action by assignment of the previous mortgagee,***

*there is no record of the assignment recorded in the Office of the City Register*." "*The Court is [also] concerned that [BNY Mellon employee] Ms. Selman might be engaged in a subterfuge, wearing various corporate hats.*"); *Bank of N.Y. v. Singh, et al.,* No. 22434/07, slip op. at 2 (N.Y. Sup. Ct., Kings Cnty. Dec. 14, 2007) (BNY Mellon's application for order of reference denied because **BNY Mellon's "*attempt to retroactively assign the mortgage is insufficient to establish plaintiff's ownership interest at the time the action was commenced,*" thus BNY Mellon's attempt to foreclose was "*without foundation in law or fact*"**"); *In re Barbara Smith Jackson,* Adv. Proc. No. 07-00095-NPO, slip op. at 13 (Bankr. S.D. Miss. July 17, 2008) (**court holds that BNY Mellon's "*foreclosure sale was conducted in violation of the automatic stay [statutorily granted to debtors when they file for bankruptcy] and, therefore, is invalid and of no effect and should be set aside*"**); *Bank of N.Y. v. Myers,* 880 N.Y.S. 2d 871 (Sup. Ct. 2009) (The court denied BNY Mellon's summary judgment motion because BNY Mellon employee Keri Selman, who had submitted an affidavit in favor of BNY Mellon, was also an employee of the lender's nominee, Mortgage Electronic Registration Systems, Inc. ("MERS"), and had executed an assignment on behalf of MERS to BNY Mellon, thereby creating "issues of material fact with respect to **the conflict of interest** between assignor MERS, as nominee for [the lender], and assignee BNY [Mellon]." The court stated that **Ms. Selman, who had executed other documents in other cases before the court as an employee of multiple parties to the foreclosures – such as Covered Trust Master Servicer/Servicer CHLS/BACHLS – was a "*milliner's delight by virtue of the number of hats she wears,*" and the "*Court is concerned that Ms. Selman,*" a BNY Mellon employee, "*might be engaged in a subterfuge, wearing various corporate hats.*"**); *Bank of N.Y. v. Gindele,* No. C-090251, slip op. at 2 (Ohio Ct. App. Feb. 19, 2010) (summary judgment in favor of BNY Mellon is reversed on appeal; court holds that "[a]t oral argument in this case, **Bank of New York has repeated its [false] assertion that it had an existing interest in the property at issue when it filed suit, but the record does not support this assertion**"); *Verizzo v. Bank of N.Y.,* No. 2D08-4647 (Fla. Dist. Ct. App. Mar. 3, 2010) (in case involving a Mortgage Loan in the NHEL 2006-3 Covered Trust, summary judgment in favor of BNY Mellon was reversed on appeal because BNY Mellon, through **Servicer Saxon, blatantly failed to comply with the Florida Rules of Civil Procedure and filed a false and untimely notice of filing of evidence in support of BNY Mellon's summary judgment motion**); *Bank of N.Y. v. Raftogianis,* 418 N.J. Super. 323, 334, 362-63 (Ch. Div. June 29, 2010) (**court dismisses BNY Mellon's complaint for foreclosure, holding that the evidence presented by BNY Mellon and its servicer at summary judgment and at trial was "*evasive,*" "*potentially misleading,*" "*confusing,*" and "*contradict[ory],*" and that "*it was entirely appropriate to question the reliability of the materials submitted by plaintiff;*" and court also notes that BNY Mellon failed to comply with court rules regarding assignments, and failed to present relevant witnesses and documents**); *Bank of N.Y. v. Smith,* No. 0-407 / 09-1816, slip op. at 11 (Iowa Ct. App. July 28, 2010) (**court reverses foreclosure in favor of BNY Mellon because it inexplicably failed to foreclose within statute of limitations; court "*reverse[s] the decision of the district court and remand[s] for entry of a decree declaring the sheriff's sale null and void, returning legal title to [borrower] Smith, and declaring the July 5, 2007 foreclosure judgment null and void for any purpose other than setoff or counterclaim*"**); *In re Kemp,* Adv. No. 08-2448, slip op. at 8, 18 & n.7 (Bankr. D.N.J. Nov. 16, 2010) (**court expunges proof of claim filed in bankruptcy of borrower on behalf of BNY Mellon by Covered Trust Servicer CHLS/BACHLS**, holding that BNY Mellon and CHLS/BACHLS failed to prove that BNY Mellon possessed note and therefore had authority to foreclose; **court holds that facts presented by CHLS/BACHLS "*conflicted with other facts [it] presented on this record*"**

and noted that, "[i]n a bizarre twist," CHLS/BACHLS "produced a copy of a 'Lost Note Certification,'" attesting that the original note had been lost and could not be found <u>on the very same day</u> that it also filed a submission in which it stated that it had "'located the original Note,'" which was "available for inspection"; court further notes that "counsel [for BNY Mellon and CHLS/BACHLS] was not able to explain the inconsistencies between the lost note certification . . . and the 'rediscovery' of the note"); Bank of N.Y. v. Cano, No. 2010AP477, slip op. at 2, 8-9 & n.5 (Wis. Ct. App. Jan. 20, 2011) (appeals court reverses summary judgment in favor of BNY Mellon, holding that *affidavits filed by BNY Mellon and Covered Trust Master Servicer/Servicer CHLS/BACHLS were grossly defective in that they "d[id] not establish a prima facie case for summary judgment," were not "based on personal knowledge," did not present evidence that "would be admissible at trial," "d[id] not contain any facts to show that [CHLS/BACHLS] [wa]s qualified to testify" about the matters in its affidavit, failed to introduce necessary documentary evidence, and created "a reasonable inference … that [CHLS/BACHLS] did not have personal knowledge of how the [borrowers'] payment records . . . were made*"); Bank of N.Y. Mellon v. Elghossain, No. F-13402-10 (N.J. Sup. Ct., Middlesex Cnty. Apr. 4, 2011) (*BNY Mellon's foreclosure action was dismissed because Covered Trust Master Servicer/Servicer CHLS/BACHLS mailed a defective notice of intent to foreclose that violated New Jersey law*); Bank of N.Y. v. Silverberg, 86 A.D.3d 274, 280 (N.Y. Sup. Ct. App. Div. 2011) (appellate division reverses denial of borrowers' motion to dismiss and instead grants the motion, holding that "corrected assignment of mortgage" was defective); Bank of N.Y. v. Bailey, 951 N.E.2d 331, 336-37 (Mass. Sup. Jud. Ct. 2011) (after foreclosing on borrower, BNY Mellon filed suit to evict borrower and moved for summary judgment; Housing Court granted the motion; on appeal, summary judgment in favor of BNY Mellon was reversed because "*BNY [Mellon or its servicer] failed to submit an affidavit of sale 'show[ing] that the requirements of the power of sale and of the [foreclosure] statute have in all respects been complied with'" under Massachusetts law*); Bank of N.Y. v. Laks, 27 A.3d 1222 (N.J. App. Div. Aug. 8, 2011) (*judgment of foreclosure in BNY Mellon's favor reversed and remanded for entry of an order dismissing BNY Mellon's complaint because Covered Trust Master Servicer/Servicer CHLS/BACHLS mailed notice of intent to foreclose to borrower that violated New Jersey law*); Bank of N.Y. Mellon Trust Co. Nat'l. v. Mihalca, No. 25747, 2012 Ohio App. LEXIS 495, at *2, *19 (Ohio Ct. App. Feb. 15, 2012) (*appeals court reverses summary judgment in favor of BNY Mellon because, notwithstanding BNY Mellon's allegation and certification that it held "'in its custody and control the original note and mortgage, and said documents [we]re available for inspection,'" in fact "for a number of months [the borrowers'] counsel demanded the production and inspection of the original note [but] . . . the note [was never] produced," and BNY Mellon failed to provide any evidence that it actually held the original note; court rejects servicer's affidavit claiming BNY Mellon held the original note, as servicer lacked personal knowledge to so testify; court further finds that BNY Mellon violated court rules by failing to provide judgment to borrowers' counsel before submitting it to the court*); Beaumont v. Bank of N.Y. Mellon, 81 So.3d 553 (Fla. Ct. App. 2012) (court reverses summary judgment for foreclosure because it was erroneously entered in favor of Covered Trust Servicer NovaStar instead of BNY Mellon; *court also holds that summary judgment would have been reversed even if it was entered in favor of BNY Mellon, because BNY Mellon failed to prove it owned the note at time of suit, as no admissible evidence was submitted in support of BNY Mellon's ownership and "the claimed transfer . . . <u>was either concealed by Novastar for more than three years . . . or Novastar backdated the assignment</u> . . . as justification for substituting [BNY]*

*Mellon as plaintiff*"); *Bank of N.Y. v. LaFalce, et al.,* No. 1 006966 (Fla. Cir. Ct., Hillsborough Cnty. Mar. 12, 2012) (in action to foreclose filed by BNY Mellon, *court grants borrower's motion for summary judgment and enters final judgment against BNY Mellon; court holds that BNY Mellon failed to submit any evidence in opposition to borrower's motion for summary judgment, failed to comply with court orders, and failed to attend hearing*); *Bank of N.Y. Mellon v. Teague*, No. 07-2009-CA-003121, slip op. at 2 (Fla. Cir. Ct., Hernando Cnty. Oct. 29, 2012) (BNY Mellon's summary judgment motion is denied and borrower's summary judgment motion is granted because *servicer failed to provide borrowers with 30-day notice to cure default prior to filing suit as required by mortgage; court notes that unauthenticated and therefore inadmissible evidence was presented by BNY Mellon; court also holds that note endorsement "is to a different company, not Plaintiff [BNY Mellon]"*); *Bank of N.Y. Mellon v. McKlintock*, No. 10-1030, slip op. at 3 (N.Y. Sup. Ct., Ulster Cnty. Nov. 15, 2012) (*court denies BNY Mellon's motion for summary judgment, finding that servicer's contradictory "affidavit . . . is not substantiated by [BNY Mellon's] own submissions*"); *Bank of N.Y. v. Cepeda*, No. 10596/08 (N.Y. Sup. Ct., Kings Cnty. May 2, 2013) (court holds that *"plaintiff BNY has no right to foreclose and the Court dismisses the instant action and cancels the notices of pendency," and that BNY Mellon's and Covered Trust Servicer CHLS/BACHLS's affidavits and evidence are hopelessly deficient and inadequate*); *Bank of N.Y. v. Mungro*, No. 33836/10, slip op. at 4-5 (N.Y. Sup. Ct., Suffolk Cnty. May 8, 2013) (court denies BNY Mellon's motion for summary judgment on standing grounds, holding that, *contrary to servicer's affidavit attesting that BNY Mellon held the note prior to commencement of the action, BNY Mellon's "evidence did not demonstrate that the note was physically delivered to [BNY Mellon] prior to the commencement of the action" or that BNY Mellon "had physical possession of the note prior to commencing this action*"); *Bank of N.Y. Mellon v. Deane*, 970 N.Y.S. 2d 427, 431, 438-39 (N.Y. Sup. Ct., Kings Cnty. 2013) (The court denied BNY Mellon's *unopposed* motion for summary judgment, *citing numerous deficiencies in BNY Mellon's and Covered Trust Master Servicer Wells Fargo's evidence, and held that "[n]either the affidavit of [Wells Fargo's] Angela Frye, nor the affirmation of [BNY Mellon's] counsel, nor counsel's memorandum of law, attempts to describe the transactions purportedly reflected in the submitted agreements, nor does any of them cite to specific language or provisions that purportedly have the legal effects ascribed to them in conclusory fashion. Indeed, the cursory treatment of the standing question in [BNY Mellon's] memorandum of law evidences a misunderstanding of the general law of negotiable instruments . . . ." The court also noted numerous "evidentiary deficiencies in the affidavit of [Wells Fargo employee] Angela Frye," including "inconsisten[t]" facts, the failure to attest to facts based on "personal knowledge," the failure to attach relevant documents, the failure to attest to "admissible . . . evidence," and the failure to provide "proof of service of [a required] notice of default.*"); *Bank of N.Y. v. Romero*, 320 P.3d 1, 7-8, 10 (N.M. Sup. Ct. 2014) (New Mexico Supreme Court reverses summary judgment in BNY Mellon's favor, *noting that BNY Mellon and its servicer alleged in the foreclosure complaint that BNY Mellon was the holder of the note and mortgage at the time of filing when in fact it was not; court also holds that "<u>[w]ithout explanation, the note [BNY Mellon and its servicer] introduced at trial differed significantly from the original note attached to [BNY Mellon's] foreclosure complaint, despite testimony at trial that the Bank of New York had physical possession of the … note from the time the foreclosure complaint was filed,</u>" and that BNY Mellon's evidence was "conflicting," while the servicer's representatives testified to facts at trial on which they "had no personal knowledge*"").

124.     The foregoing cases, and others, also illustrate that not only was BNY Mellon acutely

aware of the loan servicers' Events of Default, *BNY Mellon was also either acquiescing in or*

*actively participating in such misconduct*, as BNY Mellon itself was sometimes accused of, or

found to have engaged in, fraud, sanctionable misconduct or contempt in connection with the

foreclosures.[18]

125.     By October 2010, BNY Mellon *actually knew* that these improper loan servicing

practices, amounting to Events of Default, were pervasive and therefore the Mortgage Loans in the

Covered Trusts were similarly affected.  This is so because BNY Mellon had learned of Events of

Default by the foregoing experiences it had with its loan servicers.  In addition, BNY Mellon was

---

[18]    *See supra* n.17; *see also Orosco*, No. 32052/07, slip op. at 3 ("*The Court is concerned that [BNY Mellon employee] Ms. Selman might be engaged in subterfuge . . . .*"); *Myers*, 880 N.Y.S. 2d 871 (same); *Pino v. Bank of N.Y. Mellon,* No. 4D10-378 (Fla. Ct. App. Feb. 2, 2011) (*In a foreclosure action by BNY Mellon, the borrower moved for sanctions and alleged that BNY Mellon had committed a fraud on the court by filing a fraudulent assignment containing numerous and very suspicious discrepancies. The borrower simultaneously noticed depositions of the signer of the assignment, the notary that notarized the assignment and the witnesses named in the assignment, all of which were employees of BNY Mellon's counsel in the case. Before the deposition could take place, BNY Mellon filed a notice of voluntary dismissal in an obvious attempt to avoid confirmation of the fraud.*), *aff'd*, No. SC11-697, slip op. (Fla. Sup. Ct. Feb. 7, 2013); *Bank of N.Y. v. Moorings at Edgewater Condo. Assoc., Inc.*, No. 2D10-4792, slip op. at 2 (Fla. Ct. App. 2d Dist. Feb. 8, 2012) (*appeals court reverses trial court order holding BNY Mellon and its counsel in contempt for failing to comply with trial court's orders, failing to attend hearings, and ordering BNY Mellon and its counsel to pay $13,394 in sanctions, because trial court did not follow procedures set forth in Florida criminal statutes given that BNY Mellon and its counsel were in "indirect criminal contempt;" appeals court remands matter for consideration of such procedures, but does not disturb trial court's conclusion that BNY Mellon and its counsel engaged in contempt and sanctionable conduct*); *cf. City of Cleveland v. Bank of N.Y. Mellon,* No. 99559, 2013 Ohio App. LEXIS 3204, at *12 (Ohio Ct. App. July 18, 2013) (*appeals court affirms trial court's holding of BNY Mellon in contempt and the imposition of $45,000 in sanctions in connection with foreclosure proceeding because BNY Mellon intentionally failed to appear at three court hearings; court notes that BNY Mellon had similarly failed to appear in at least 7 other cases and was recently found in contempt in at least one other case for its deliberate failure to appear; court also noted that BNY Mellon had been sanctioned in at least five other cases and that BNY Mellon "appeared to treat the payments . . . as merely a cost of doing business, without any modification in the way it conducted itself in court"*).

- 65 -

aware that, in October and November 2010, a New York state court had issued scores of orders delaying foreclosures by BNY Mellon and many other RMBS trustees and loan servicers because of these very same loan servicing issues. *See* Exhibit B hereto (numerous orders from Justice Tanenbaum of the Supreme Court of New York).[19]

> **b.** **By October 2010, BNY Mellon Knew the Master Servicers/Servicers Were Committing Events of Default with Respect to the Mortgage Loans in the Covered Trusts**

126.    In mid to late 2010, a flood of news stories and other events began publicly revealing these illegal, improper and abusive practices (and others) by the Covered Trust Master Servicers/Servicers. *See* Appendix 3 hereto for a sample of some of the stories/events occurring from June 2010 through October 2010. By October 2010, the public was aware of what was called the "robo-signing" scandal, which involved the mass signing and filing of false affidavits and other documents in foreclosure proceedings by either fictitious persons or persons without personal knowledge of the facts asserted in the affidavits, which were also improperly and illegally notarized. Robo-signing also included the filing of fraudulently altered note and mortgage assignments. These public revelations also showed that many of the Covered Trust Master Servicers and Servicers were engaged in the robo-signing scandal, and that they were also engaged in the improper charging of fees, the filing of false bankruptcy claims and affidavits, and the commission of frauds on courts. They also revealed that the Master Servicers/Servicers were being investigated by multiple federal and state governmental agencies for loan servicing misconduct. Some Master Servicers/Servicers

---

[19]    Similarly, the *Mortgage Daily* reported in 2011 that New York Supreme Court Justice F. Dana Winslow "***dismissed or froze 20 percent of his [foreclosure] cases [in 2010] due to evidence disputes***."

were forced to halt or delay foreclosures because of their robo-signing misconduct.  *See generally* Appendix 3.

127.    The upshot of these public revelations – when they were coupled with BNY Mellon's firsthand experience with its servicers, including with the Covered Trusts' Master Servicers/Servicers, and the dismal performance of the Mortgage Loans in the Covered Trusts – was that BNY Mellon had actual knowledge that the Master Servicers and Servicers were engaged in pervasive Events of Default concerning the Mortgage Loans in the Covered Trusts by October 2010. Indeed, by October 2010, the effects of the Master Servicers'/Servicers' Events of Default were reflected in the Covered Trusts' continuing, extremely high Mortgage Loan default rates and mushrooming losses.  In October 2010, the Mortgage Loan default rates continued at unprecedented levels (35+% to 54+%), while the Covered Trusts' cumulative realized losses by October 2010 *exceeded $601 million*, as set forth below.  BNY Mellon was aware of this information because it prepared monthly reports containing this information for four of the Covered Trusts, and had access to the information concerning the fifth Covered Trust:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in October 2010 | | |
|---|---|---|
| **Covered Trust** | **Default Rates** | **Cumulative Realized Losses** |
| ECR 2005-2 | 35.18% | $ 99,318,402.45 |
| GSCC 2006-1 | 45.17% | $ 34,364,442.30 |
| NHEL 2006-3 | 54.30% | $178,309,496.51 |
| NSTR 2007-C | 36.39% | $107,125,517.63 |
| SAMI 2006-AR4 | 53.55% | $182,742,495.90 |
| **Covered Trusts' Total Realized Losses:** | | **$601,860,354.79** |

128.    Nonetheless, even after October 2010, additional public events occurred that repeatedly re-confirmed for BNY Mellon that the Master Servicers and Servicers were continuing to commit the same and new Events of Default as to the Mortgage Loans in the Covered Trusts.  *See* Appendix 4 hereto for a summary of such events.  By April 13, 2011, however, there was absolutely

- 67 -

no doubt that BNY Mellon had actual knowledge of Master Servicer/Servicer Events of Default as to the Mortgage Loans in the Covered Trusts.

> ### c. By April 13, 2011, BNY Mellon Absolutely Knew that the Covered Trusts' Master Servicers and Servicers Had Committed Events of Default with Respect to the Mortgage Loans in the Covered Trusts

129.    On April 13, 2011, major events transpired in the loan servicing industry that conclusively established that the Master Servicers and Servicers to the Covered Trusts were systematically engaging in the commission of Events of Default under the Governing Agreements, and that such misconduct extended to the Mortgage Loans in the Covered Trusts.  On April 13, 2011, the U.S. Government released a report entitled the "Interagency Review of Foreclosure Policies and Practices" (hereinafter the "Government Foreclosure Report") and also took sweeping legal action against 14 loan servicers, which together comprised nearly 70% of the loan servicing industry and nearly 36.7 million mortgage loans.  ***The Government found "foreclosure-processing weaknesses that [had] occurred <u>industrywide</u>.***"  The Government stated that it was taking action against the 14 loan servicers because it had identified "***unsafe and unsound [foreclosure] practices and violations of applicable . . . law" by them***.  Among the offending 14 loan servicers were ***most*** of the Master Servicers and Servicers to the Covered Trusts (and/or their parent or sister companies).  Each had entered into "consent cease and desist orders" or "consent orders" with the U.S. Treasury's Office of the Comptroller of the Currency ("OCC"), the Federal Reserve, the Office of the Thrift Supervisor ("OTS") and/or the Federal Deposit Insurance Corporation ("FDIC") wherein they all essentially admitted to (*i.e.*, they did not deny or contest) facts that conclusively established that they had systematically failed to service mortgage loans in accordance with the standards set forth in the Governing Agreements.  Acting Comptroller of the Currency, John Walsh, stated the following

concerning the Government's actions: "***We found significant deficiencies*** . . . . ***This is a very serious problem that servicers are going to have to do substantial work . . . to fix***."

130.    The Master Servicers and Servicers to the Covered Trusts are set forth again in the chart below, and those that entered into consent orders with the Government appear in bold, italics and underline:

**Covered Trusts' Master Servicers and
Servicers Entering into Consent Orders**

| Covered Trust | Master Servicers | Servicers |
|---|---|---|
| ECR 2005-2 | ▪ ***CHLS/BACHLS (through CHLS/BACHLS's parent company Bank of America)*** | ▪ ECC |
| GSCC 2006-1 | ▪ ***CHLS/BACHLS (through Bank of America)*** | ▪ ***CHLS/BACHLS (through Bank of America)*** |
| NHEL 2006-3 | ▪ None | ▪ ***Saxon\**** |
| NSTR 2007-C | ▪ None | ▪ Nationstar |
| SAMI 2006-AR4 | ▪ ***Wells Fargo*** | ▪ ***EMC***<br>▪ ***CHLS/BACHLS (through Bank of America)*** |
| \*        *In April 2012, Saxon entered into a nearly identical consent order through its parent company Morgan Stanley.  See Appendix 5 at 7 (third bullet point).* | | |

131.    As the chart above shows, ***most of the Master Servicers and Servicers to the Covered Trusts entered into consent orders with the Government***.[20]  In addition, the "***industrywide***" nature of the misconduct by these Master Servicers and Servicers made it clear that it reached the Mortgage Loans in all of the Covered Trusts.  Indeed, ***four of the five Covered Trusts*** had (or would have shortly in the case of the NHEL 2006-3 Covered Trust) one or more Master Servicers or Servicers that entered into the consent orders.  The admitted misconduct in the orders was an unequivocal Event of Default under the Governing Agreements.

---

[20]    As noted above, Saxon, the Servicer for the NHEL 2006-3 Covered Trust in April 2011, would also enter into a virtually identical consent order within the year.  Moreover, the only reason Nationstar was not charged was because it was a "non-bank" servicer and therefore was beyond the jurisdiction of the federal government's servicing crackdown.

132.     In the 14 consent orders, each consenting Master Servicer and Servicer did not dispute the Government's findings that they had engaged in the following illegal and improper loan servicing practices (or misconduct substantially similar to it):

- engaging in "unsafe or unsound practices in residential mortgage servicing and . . . foreclosure proceedings";

- filing false affidavits in foreclosure proceedings in "which the affiant represented that the assertions in the affidavit were made based on personal knowledge . . . when . . . they were not based on . . . personal knowledge";

- filing false affidavits in foreclosure proceedings which were "not properly notarized";

- "fail[ing] to devote to [their] foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training";

- "fail[ing] to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services"; and

- engaging in "unsafe or unsound banking practices."[21]

133.     It was stunning that *nearly 70% of the loan servicing industry had essentially admitted that they systematically engaged in widespread robo-signing, false affidavits, false foreclosure documents, improper notarizations, and other illegal conduct*.  It was even more stunning that most of the Master Servicers and Servicers to the Covered Trusts essentially admitted that they had committed Events of Defaults by agreeing with the Government to form action plans to "*ensure compliance with . . . [the loan] servicing guides of . . . investors," an admission that they had not previously been complying with their duties mandated by the Governing Agreements*.[22]

---

[21]     As previously alleged, Saxon entered into a nearly identical consent order one year later through its parent company Morgan Stanley.  *See* Appendix 5 at 7 (third bullet point).

[22]     The Master Servicers'/Servicers' improper servicing practices were so widespread and so egregious that the Government required sweeping reforms.  The Master Servicers/Servicers (and their related companies) were required by the consent orders to:

134.     In light of the above information, BNY Mellon unquestionably had actual knowledge, no later than April 13, 2011, that Events of Default had been committed by the Master Servicers and Servicers with respect to Mortgage Loans within the Covered Trusts.

135.     The Government Foreclosure Report further confirmed that the Master Servicers and Servicers had committed Events of Default.  The Government Foreclosure Report, written by the Federal Reserve, OCC and OTS, and released at the same time as the consent orders were entered into by the Master Servicers/Servicers, found that the loan servicing industry – including the Master Servicers and Servicers that entered into the consent orders – had engaged in "***violations of applicable federal and state law requirements***" and "***notary practices which failed to conform to state legal requirements***."  These findings that the Master Servicers and Servicers violated the law were absolute Events of Default.

---

- submit a plan to the Government to strengthen their board of directors' oversight of loan servicing;
- submit a "comprehensive action plan" describing how they would comply with the consent orders and properly service loans;
- submit a compliance program designed to ensure the proper servicing and foreclosure of mortgage loans;
- submit policies and procedures to ensure the proper supervision of third-party vendors and outside law firms;
- submit a plan to ensure proper controls over and supervision of MERS, used by the Master Servicers/Servicers in connection with loan servicing, foreclosures and title transfers;
- retain an independent outside consultant to conduct a review of the Master Servicers'/Servicers' past foreclosure practices and submit a report to the Government concerning such review;
- submit a plan to ensure the proper functioning of the Master Servicers'/Servicers' MIS systems and the accuracy of loan data;
- submit a plan to ensure proper, timely and effective communications with borrowers and to prevent the impedance or discouragement of loan modifications;
- submit a risk assessment and management plan concerning the Master Servicers'/Servicers' loan servicing operations; and
- submit a quarterly progress report detailing all actions taken to comply with the consent orders.

136.    The Government Foreclosure Report also specifically focused on facts that gave BNY Mellon actual knowledge of numerous other Events of Default committed by the Master Servicers and Servicers with respect to the Mortgage Loans in the Covered Trusts.  For example, the Government Foreclosure Report revealed the following "industrywide" misconduct by the Master Servicers and Servicers to the Covered Trusts that amounted to Events of Default under the Governing Agreements:

- "*violations of applicable federal and state law requirements*," such as violations of the Service Members Civil Relief Act, the bankruptcy laws, and "notary practices which failed to conform to state legal requirements";

- "*inadequate* organization and staffing of foreclosure units";

- "*inadequate* policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process";

- "*inadequate* monitoring and controls" over third-party vendors;

- "*lack of sufficient audit trails*" between information contained in affidavits and "the servicers' internal records";

- "*inadequate* quality control and audit reviews to ensure compliance with legal requirements";

- "*inadequate* identification of financial, reputational, and legal risks" by "boards of directors and senior management";

- *false affidavits*;

- *false mortgage documents*;

- *improper notarizations*; and

- "*weaknesses in quality-control procedures at all servicers, which resulted in servicers not . . . ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed*."

137.    ___The Government Foreclosure Report also specifically found that the Master Servicers' and Servicers'" "industrywide" misconduct "pose[d] a variety of risks to [RMBS] investors___," Government Foreclosure Report at 6, *because they had failed to satisfactorily*

- 72 -

*"evaluat[e] and test[] compliance with applicable . . . __pooling and servicing agreements__."* *Id.* at 11. This finding unequivocally established that the Master Servicers and Servicers were engaging in Events of Default.

138. Thus, between the consent orders entered into by most of the Master Servicers and Servicers to the Covered Trusts on April 13, 2011 – consenting to conduct that demonstrated that they had not serviced loans "prudently," and thus had committed Events of Default – and the Government Foreclosure Report's simultaneous finding that such Events of Default "*occurred industrywide*," BNY Mellon had actual knowledge of Events of Default committed by the Master Servicers and Servicers concerning the Mortgage Loans in the Covered Trusts *no later than April 13, 2011*.[23] The Covered Trusts' ridiculously high Mortgage Loan default rates (31+% to 54+%) and large losses (over $669 million) by April 2011, *see supra* ¶103 (chart), further confirmed the existence of the Master Servicers' and Servicers' Events of Default.

  **d. BNY Mellon Knew of Specific Events of Default that Were Occurring with Respect to the Specific Mortgage Loans in the Specific Covered Trusts**

139. BNY Mellon was also experiencing the very same Events of Default as to the very Mortgage Loans in the Covered Trusts. For example, in 2008, with respect to the NHEL 2006-3

---

[23]  Later, it was announced that the consent orders had been amended because many of the Master Servicers and Servicers had agreed to pay $3.6 billion to borrowers and further provide borrowers with another $5.2 billion in relief through loan modifications and forgiveness, for a total of $8.8 billion in relief, for their loan servicing abuses. Some news outlets reported that the actual total relief equaled $10 billion. Of course, the $5.2 billion in loan modifications and loan forgiveness came mainly out of RMBS investors' pockets and not the Master Servicers'/Servicers'. *See* Appendix 5 at 7 (fourth bullet point) (June 7, 2012 testimony by Professor Levitin). In any event, this agreement to pay such a huge penalty was further proof that the Covered Trusts' Master Servicers/Servicers committed pervasive Events of Default which reached the Mortgage Loans in the Covered Trusts.

Covered Trust, Saxon (the Servicer for the Covered Trust at the time) or its sub-servicer[24] filed a foreclosure action in BNY Mellon's name against Mortgage Loan borrower David Verizzo. Attached to the complaint was a copy of the mortgage indicating that NovaStar was the lender and that MERS was the mortgagee and nominee for NovaStar. However, inexplicably, there was no promissory note attached to the complaint establishing that the borrower had an obligation to pay BNY Mellon. BNY Mellon alleged – through Saxon – that the note was lost and that it was seeking to reestablish the lost promissory note. Saxon also failed to attach to the complaint an assignment of either the note or mortgage to BNY Mellon, in order to establish that BNY Mellon had standing to enforce the note and foreclose the mortgage.

140. Thereafter, Saxon and the borrower agreed that the borrower would have an extension of time to respond to the complaint, to 20 days after the date of entry of an order granting the extension. However, before the borrower's deadline to respond to the complaint expired, and thus before the borrower could even file a response to the complaint, Saxon filed a motion for summary judgment on BNY Mellon's behalf on August 5, 2008. In connection with the motion for summary judgment, on August 18, 2008, Saxon served and filed a "notice of filing" of the purported original promissory note, which Saxon had previously alleged was lost, along with the original recorded mortgage and the original recorded assignment of the mortgage, in order to comply with Florida Rule of Civil Procedure 1.510(c), which required that all evidence in support of a motion for summary judgment not previously filed be filed not less than 20 days before the hearing on the motion. However, there were several problems with Saxon's "notice of filing" of evidence. First, it was untimely, as it was filed less than 20 days before the hearing on the motion, which was set for August 29, 2008. Second, the filing was also ***blatantly false***, as Saxon did not file the evidence with

---

[24] "Saxon" shall refer to Saxon or its sub-servicer in this section of the Complaint.

the court on August 18, 2008, as required and as represented by Saxon. Instead, the evidence was not actually filed with the court until the day of the hearing – August 29, 2008 – much too late to comply with the rules and contrary to Saxon's representation that it had filed the evidence on August 18, 2008. Third, the note that Saxon filed indicated that it had not been assigned to BNY Mellon and thus it did not have standing to foreclose. Instead, the note filed by Saxon indicated that it had been endorsed to "JPMorgan Chase Bank, as Trustee." This was another obvious blunder by Saxon, as it had failed to obtain an assignment from JPMorgan Chase Bank – the previous Trustee to the NHEL 2006-3 Covered Trust – to BNY Mellon, the current Trustee before filing the action.

141. Nonetheless and inexplicably, the trial court granted BNY Mellon's summary judgment motion. However, on appeal, the borrower, proceeding *pro se*, successfully had the summary judgment reversed. The Florida appeals court pointed out each of the foregoing errors committed by Saxon on BNY Mellon's behalf as a basis for the reversal. *See Verizzo v. The Bank of New York*, No. 2D08-4647, slip op. (Fla. Ct. App. Mar. 3, 2010). The case was therefore remanded to the trial court for further proceedings. *Id.*

142. The foregoing grossly negligent errors and falsehoods by Saxon were hardly the "prudent" loan servicing standards mandated by the Governing Agreements, and were obvious Events of Default. In addition, Saxon's gross incompetence and deceptive behavior caused the NHEL 2006-3 Covered Trust to incur additional unnecessary expenses and costs because, upon remand, it would essentially have to start the foreclosure proceedings all over again and incur double the legal and other fees to foreclose, solely because of Saxon's prior Events of Default.

143. BNY Mellon also obtained actual knowledge of Events of Default on December 16, 2011, when a group of RMBS investors in the SAMI 2006-AR4 Covered Trust publicly announced that they had instructed BNY Mellon to investigate defective loan servicing in that Covered Trust

and other RMBS trusts. The investors' lawyer stated: ***"Our clients continue to seek a comprehensive solution to the problems of ineligible mortgages in RMBS pools and <u>deficient servicing of those loans</u>***. Today's action is another step toward achieving that goal."

144. In addition, in November 2013, JPMorgan Chase (the owner of EMC, a Servicer for the SAMI 2006-AR4 Covered Trust) announced that it had offered to enter into a settlement whereby JPMorgan Chase would pay ***<u>$4.5 billion</u>*** to settle R&W ***and <u>loan servicing claims for tens of thousands of loans in 330 RMBS trusts, including the SAMI 2006-AR4 Covered Trust</u>***. From this, BNY Mellon learned that JPMorgan Chase was essentially admitting that there were loan servicing Events of Default by EMC as to this Covered Trust.

145. The foregoing events show that ***BNY Mellon had actual knowledge of specific Events of Default by specific Master Servicers and specific Servicers concerning the specific Mortgage Loans in the specific Covered Trusts***.

146. Notwithstanding BNY Mellon's actual knowledge of Events of Default, BNY Mellon never did any of the things required of it under the Governing Agreements. BNY Mellon's failures to act with respect to these known Events of Default breached the Governing Agreements and violated the TIA and Streit Act, and caused plaintiff and the class to suffer millions of dollars in damages, as foreclosures were stopped, withdrawn, dismissed, denied, delayed or invalidated due to the Master Servicers' and Servicers' misconduct, and millions of dollars in bogus and excessive fees and costs were improperly charged to the Covered Trusts by the Master Servicers and Servicers because of their misconduct. Moreover, BNY Mellon also knew that the Master Servicers and Servicers had engaged in other Events of Default by April 2011 – such as their failure to notify BNY Mellon of their own Warrantors' R&W breaches (in most cases the Master Servicers/Servicers were also Warrantors) – yet failed to act in breach of the Governing Agreements, the TIA and the Streit

Act, which also caused plaintiff, the class and the Covered Trusts to suffer massive damages. BNY Mellon also knew no later than April 2011 of the Master Servicers'/Servicers' practice of servicing the Mortgage Loans for their own financial benefit instead of plaintiff's and the class's – which were also Events of Default – yet failed to act in breach of the Governing Agreements, the TIA and the Streit Act, and also caused plaintiff, the class and the Covered Trusts to suffer additional substantial damages.

> **e.** **After April 2011, BNY Mellon Also Had Actual Knowledge that the Master Servicers and Servicers Were Continuing to Commit the Same and New Events of Default with Respect to the Mortgage Loans in the Covered Trusts**

147. Incredibly, even ***after*** the U.S. Government's sweeping actions on April 13, 2011 against most of the Master Servicers and Servicers to the Covered Trusts, and even ***after*** those Master Servicers/Servicers promised to stop engaging in defaults and Events of Default via the consent orders, ***they thereafter continued to engage in the same defaults and Events of Default and also engaged in new defaults and Events of Default***. And, even though BNY Mellon had actual knowledge of these continuing and new defaults and Events of Default, it did nothing, and has continued to do nothing, allowing the defaults and Events of Default to go on unabated and uncured to the present. BNY Mellon thereby breached the Governing Agreements and violated the TIA and Streit Act numerous additional times after April 2011 by failing to fulfill its duties under the Governing Agreements, TIA and Streit Act to act when the new defaults and Events of Default occurred or the existing defaults and Events of Default continued. News and public information concerning the Master Servicers'/Servicers' numerous continuing and new defaults and Events of Default after April 13, 2011 are summarized in Appendix 5 hereto. Given the repeated, egregious,

public nature of these numerous defaults and Events of Default, BNY Mellon had actual knowledge of the new and continuing defaults and Events of Default also. *See* Appendix 5 hereto.

**f. BNY Mellon Also Knew that Successor Master Servicer/Servicer Ocwen Was Committing Events of Default**

148. Starting in 2012, many loan servicers began selling their loan servicing rights to Ocwen.[25] Ocwen had become a Servicer to at least the NHEL 2006-3 Covered Trust by 2012. *See supra* ¶117 (chart of Master Servicers/Servicers). Ocwen was a "non-bank" loan servicer and it was purchasing massive amounts of loan servicing rights from the much more heavily regulated "bank" master servicers and servicers during 2012 and 2013. Regulators were becoming increasingly concerned that non-bank servicers like Ocwen were growing too quickly to properly service the many loans they were acquiring. In addition, Ocwen, as a non-bank servicer, faced much less regulatory scrutiny than bank servicers, and Ocwen had already compiled a substantial and infamous track record of loan servicing abuses. Thus, in February 2014, New York Superintendent of Financial Services, Benjamin Lawsky, halted Ocwen's purchase of $39 billion in servicing rights from Master Servicer Wells Fargo. Lawsky put a halt to the sale until Ocwen could provide information sufficient to demonstrate that Ocwen could satisfactorily handle the increased servicing load, particularly in light of previous loan servicing misconduct Lawsky's office had discovered and taken Ocwen to task for, and for which Lawsky had required the appointment of a monitor to oversee Ocwen's conduct. *See* Appendix 6 at 7 (December 5, 2012 actions by N.Y. Dept. Fin. Servs.).[26]

---

[25] "Ocwen," is meant to refer to Ocwen Financial Corporation and all of its affiliates, subsidiaries and predecessor companies, including Ocwen Federal Bank FSB and Ocwen Loan Servicing LLC.

[26] Shortly after Lawsky halted the sale and asked Ocwen for information, Ocwen announced that the Wells Fargo deal was on indefinite hold.

149.     In any event, well prior to Ocwen's acquisition of the servicing rights to the Mortgage Loans in the NHEL 2006-3 Covered Trust, BNY Mellon had actual knowledge that Ocwen was an awful loan servicer that had a long history of loan servicing abuses.  *See* Appendix 6 hereto.  As shown in Appendix 6, Ocwen was found by governmental entities, juries, courts and reporters to have engaged in numerous instances of egregious, illegal and sanctionable misconduct meriting punitive damages in some cases for its loan servicing abuses, demonstrating that it routinely engaged in Events of Default.

150.     The repeated misconduct by Ocwen alone should have alerted BNY Mellon to the fact that Ocwen had a pattern and practice of committing Events of Default.  However, if there was any doubt, it was erased by December 2013.  At that time, Ocwen entered into a consent order with the U.S. Government's Consumer Financial Protection Bureau ("CFPB"), 49 States and the District of Columbia.  Pursuant to the consent order, Ocwen did not dispute or contest any of the facts alleged against it by the multiple government agencies, and it agreed to provide borrowers with an astounding ***$2 billion in principal reduction and further refund $127.3 million to nearly 185,000 borrowers it had improperly foreclosed on***.  The misconduct covered by the consent order extended for an unlimited period of years, up to and including through December 2013, and covered every State in the nation except one, demonstrating that Ocwen had engaged in serial Events of Default involving the Mortgage Loans in the Covered Trusts right up to the time it entered into the consent order in December 2013.  Richard Cordray, the Director of the CFPB, stated in a conference call that "***[w]e believe that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process***," a clear Event of Default.  The huge size of the relief agreed to by Ocwen (over $2 billion), the comprehensive misconduct "at every stage," the broad geographic scope (49 of 50 States), the expansive temporal range of the misconduct ("years"), and the huge number of

borrowers affected, confirmed that Ocwen's misconduct occurred nationwide and infected all of its loan servicing operations, including those provided to the NHEL 2006-3 Covered Trust and any other Covered Trusts it was sub-servicing. The CFPB stated that Ocwen had engaged in "***years of systemic***" misconduct amounting to Events of Default, including :

- ***Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;***

- ***Charging borrowers unauthorized fees for default-related services;***

- ***Imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage; . . .***

- ***Providing false or misleading information in response to consumer complaints.***

    \*        \*        \*

- ***Failing to provide accurate information about loan modifications and other loss mitigation services;***

- ***Failing to properly process borrowers' applications and calculate their eligibility for loan modifications;***

- ***Providing false or misleading reasons for denying loan modifications;***

- ***Failing to honor previously agreed upon trial modifications with prior servicers; . . .***

- ***Deceptively seeking to collect payments under the mortgage's original unmodified terms after the consumer had already begun a loan modification with the prior servicer***.

- ***Engaged in illegal foreclosure practices*** . . . .

- ***Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen***; and

- ***Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure***

*proceedings with courts and government agencies without verifying the information*.

151.     These "systemic" illegal and improper practices (which Ocwen did not deny), and which had gone on for "years" in 49 States and the District of Columbia, clearly imparted to BNY Mellon actual knowledge that Ocwen was engaging in Events of Default as to the Covered Trusts' Mortgage Loans.

152.     However, even after this massive settlement, Ocwen **continued to commit Events of Default**.  For example, *see* Appendix 7 hereto for a summary of such continuing Events of Default.  These events caused BNY Mellon to have actual knowledge of new and continuing Events of Default by Ocwen as to the Mortgage Loans in the Covered Trusts even after December 2013.  In fact, these Events of Default, and other new ones, have continue unabated to the present.  *See* Appendix 7.

153.     As the numerous foregoing events demonstrate, the Master Servicers and Servicers to the Covered Trusts and their successors engaged in, and have continued to engage in, numerous, repeated, systemic defaults and Events of Default as to the Mortgage Loans in the Covered Trusts.  Such misconduct is so ingrained in their cultures that they do not know of any other way to "service" mortgage loans.  Indeed, as recently as May 29, 2014, Ira Rheingold, Director of the National Association of Consumer Advocates in Washington, D.C. stated: "'**You've got a lot of people trying to clean up the servicing industry, but the truth is we are seeing the same servicing problems over and over** . . . .'"  Given this widespread, repetitious and brazen misconduct, which shows no signs of stopping and which has caused long delays in foreclosures of the Mortgage Loans in the Covered Trusts, extremely long delinquencies, and excessive and improper fees and expenses added by the Master Servicers/Servicers, the Covered Trusts have experienced huge losses and persistently high Mortgage Loan default rates.  These large losses and unprecedented default rates corroborate and

- 81 -

confirm to BNY Mellon that the Mortgage Loans have suffered, and are continuing to suffer, from

pervasive defaults and Events of Default by the Master Servicers and Servicers. The chart below

sets forth the continuing high Mortgage Loan default rates and the Covered Trusts' cumulative

realized losses, which exceeded $1.1 billion by February 2015. BNY Mellon was well aware of this

information because it prepared monthly reports for four of the Covered Trusts containing this

information, and had access to such information for the fifth Covered Trust:

| Covered Trusts' Mortgage Loans Default Rates and Cumulative Realized Losses Reported in February 2015 | | |
|---|---|---|
| Covered Trust | Mortgage Loan Default Rates | Cumulative Realized Losses |
| ECR 2005-2 | 27.92% | $145,483,553.55 |
| GSCC 2006-1 | 25.96% | $ 70,619,939.23 |
| NHEL 2006-3 | 31.85% | $306,972,607.29 |
| NSTR 2007-C | 36.81% | $220,916,471.66 |
| SAMI 2006-AR4 | 36.71% | $379,122,163.98 |
| Covered Trusts' Total Realized Losses: | | $1,123,114,735.71 |

> **3. BNY Mellon Had Actual Knowledge of "Defaults" Committed by Itself, the Warrantors, the Master Servicers, the Servicers and the Issuers No Later than April 13, 2011, Thus Triggering Its Duties to Act Under the TIA**

154. As previously alleged, BNY Mellon owed plaintiff and the class certain additional

duties under the TIA as to the ECR 2005-2 and GSCC 2006-1 Covered Trusts because such trusts

are "Indenture Trusts" subject to the TIA. Under the TIA, BNY Mellon was required to: (1)

discharge its duties set forth in the Governing Agreements (15 U.S.C. §77ooo(a)(1)); (2) "give

[plaintiff and the class] notice of all defaults known to the trustee, within ninety days after the

occurrence thereof" (15 U.S.C. §77ooo(b)); and (3) "exercise in case of default (as such term is

defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the

same degree of care and skill in their exercise, as a prudent man would exercise or use under the

circumstances in the conduct of his own affairs" (15 U.S.C. §77ooo(c)).

- 82 -

155.    Because neither the Indentures nor the documents related to the Indentures for the ECR 2005-2 and GSCC 2006-1 Covered Trusts define the term "default," such term is given its ordinary meaning.  Thus, the term "default" as used in the TIA means and encompasses not only the Events of Default alleged herein, but also the Warrantor R&W breaches alleged herein, any other "defaults," *i.e.*, failures to perform, by the Master Servicers and Servicers that did not amount to Events of Default, any defaults by an "Issuer," and even BNY Mellon's own "defaults," *i.e.*, BNY Mellon's failures to perform its duties under the Governing Agreements.

156.    As set forth above, BNY Mellon had actual knowledge by April 2011 that the Master Servicers were engaging in pervasive Events of Default and other misconduct, and that the Warrantors had breached their R&Ws.  These were "defaults" under the TIA of which BNY Mellon was aware, yet BNY Mellon failed to provide notice of such defaults to plaintiff and the class, and further failed to protect plaintiff's and the class' interests as a prudent man would during such defaults.  In fact, BNY Mellon did nothing, thereby violating the TIA.

157.    Furthermore, any failure by the Master Servicers or Servicers to properly perform any of their duties under the Governing Agreements amounted to a "default" under the TIA, even though those failures may not have amounted to an Event of Default.  Even though BNY Mellon was aware of numerous failures by the Master Servicers and Servicers to properly perform their duties under the Governing Agreements, and BNY Mellon also knew of gross negligence committed by the Master Servicers/Servicers in their servicing the Mortgage Loans as alleged herein, which were "defaults" under the TIA, BNY Mellon failed to provide notice of these additional defaults to plaintiff and the class and further failed to act like a prudent person during such defaults.  By doing nothing, BNY Mellon violated the TIA.

158.     BNY Mellon was also aware that BNY Mellon itself was defaulting under the Governing Agreements because it was failing to perform its required duties as alleged herein.  BNY Mellon's defaults required it under the TIA to notify plaintiff and the class of its own defaults, and further required BNY Mellon to act prudently during such defaults, neither of which it did.  These failures also violated the TIA.

159.     BNY Mellon also had actual knowledge that the "Issuers," *i.e.*, the ECR 2005-2 and GSCC 2006-1 Covered Trusts (collectively the "Issuers"), were engaging in "defaults" within the meaning of the TIA.  For example, the Indentures for the two Issuers provide that the Issuers were required to:

- take whatever actions that were necessary to cause BNY Mellon or the Master Servicers to enforce the rights related to the Mortgage Loans;

- take whatever actions were necessary to preserve and defend the trust estates and the rights of plaintiff and the class;

- refuse to allow any action to be taken by others which would release anyone from their obligations under any documents relating to the Mortgage Loans;

- refuse to waive, impair or fail to assert rights under the Mortgage Loans, or impair or cause to be impaired the Issuers' interests in such loans, the MLPAs, SSAs, SAs and other documents related to the Governing Agreements, to the extent such actions would adversely affect plaintiff and the class; and

- "punctually perform" all of their obligations and agreements in the Indentures, SSAs, SAs and other agreements related to the Governing Agreements.

*See, e.g.*, ECR 2005-2 Indenture §§3.05(a)(iii)-(iv), 3.07(a), (c), 3.08(iv); GSCC 2006-1 Indenture §§3.05(a)(iii)-(iv), 3.07(a), (c), 3.08(iv) (same).

160.     BNY Mellon knew the Issuers were in default because BNY Mellon knew the Issuers were not taking any action to require BNY Mellon to enforce the R&W rights against the Warrantors, or taking any actions to require BNY Mellon to perform its required duties when the Master Servicers/Servicers engaged in the defaults and Events of Default alleged herein.  BNY

Mellon further knew the Issuers took no actions against the Master Servicers or Servicers to attempt to have them service the Mortgage Loans properly, prudently or legally. Indeed, BNY Mellon knew that the Issuers were taking absolutely no action at all and were not performing any of the duties in the Indentures listed above, and thus the Issuers were in "default" under the TIA. BNY Mellon knew this because the Issuers – the two Indenture Trusts – can act only through their trustees. BNY Mellon was the trustee for the Issuers, and BNY Mellon knew that it had failed to do anything, or cause the Issuers to do anything.

161. Because BNY Mellon had actual knowledge of all the foregoing defaults yet failed to notify plaintiff and the class, and further failed to act as a prudent person, BNY Mellon has violated the TIA. BNY Mellon's violations of the TIA have caused plaintiff and the class to suffer substantial damages.

### 4. BNY Mellon Has Conflicts of Interest with Plaintiff and the Class and Has Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself

162. As previously alleged, BNY Mellon also owes a duty of trust to plaintiff and the class. As such, BNY Mellon is required to avoid conflicts of interest with plaintiff and the class. This means that BNY Mellon is not permitted to put its interests ahead of plaintiff's and the class's, nor is BNY Mellon permitted to benefit therefrom.

163. BNY Mellon provides and has provided RMBS trustee services to the RMBS industry for some time and has derived substantial income from the RMBS trusts set up and "sponsored" by the Loan Sellers/Sponsors, Other Transferors, loan originators, and Master Servicers/Servicers to the Covered Trusts, and their related companies. The Warrantors and loan originators to the Covered Trusts (and their related companies) handpicked BNY Mellon for the RMBS trustee positions, as they knew that BNY Mellon would not cause trouble for them by noticing defaults or making

significant R&W claims against them, to plaintiff's and the class's detriment. Similarly, the Master Servicers and Servicers (and their related companies) also handpicked BNY Mellon because they knew BNY Mellon would not accuse them of committing defaults or Events of Default, or replace them, as they too provided substantial RMBS trustee business to BNY Mellon. Indeed, BNY Mellon had and has a particularly close relationship with Countrywide, which is a Warrantor or Master Servicer/Servicer, or both, to three of the five Covered Trusts. Countrywide has also selected BNY Mellon as Trustee for hundreds, if not thousands, of other RMBS trusts, and thus BNY Mellon is very reluctant to do anything to upset Countrywide. Indeed, the relationship between BNY Mellon and Countrywide is the type of relationship that the *Yale Journal of Regulation* warned of: "*[T]here is often a very close relationship between the servicer and the trustee; many originators and servicers have a 'pet' or 'pocket' trustee that they use for most of their deals*." BNY Mellon, the "pet" or "pocket" Trustee for Countrywide, put its financial interests ahead of plaintiff's and the class's, and refrained from discharging its duties under the Governing Agreements, the TIA and the Streit Act.

164. Because the Warrantors and Master Servicers/Servicers to the Covered Trusts and their related companies were the source of substantial income for BNY Mellon, BNY Mellon did not seek to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans in the Covered Trusts which breached their R&Ws or notice defaults against them. Nor did BNY Mellon declare or notice defaults or Events of Default against the Master Servicers and Servicers or replace them. By doing so, BNY Mellon put its own interests ahead of plaintiff's and the class's and benefitted by doing so.

165. BNY Mellon also refrained from discharging its duties under the Governing Agreements, the TIA and the Streit Act with respect to the Master Servicer/Servicer loan servicing

defaults and Events of Default, because BNY Mellon itself was also involved in such misconduct. By informing plaintiff and the class of such defaults and Events of Default, as it was required to do by the Governing Agreements, the TIA and the Streit Act, BNY Mellon would have also revealed BNY Mellon's participation in such wrongdoing, revealed its failure to abide by the Governing Agreements, and subjected itself to liability to plaintiff and the class. Given this conflict of interest, BNY Mellon chose to protect its interests instead of plaintiff's and the class's, and refrained from acting as required by the Governing Agreements, TIA and Streit Act during the defaults and Events of Default.

166. Because of the foregoing conflicts of interest, BNY Mellon refused to perform its duties required by the Governing Agreements for the benefit of plaintiff and the class, and instead put its own interests ahead of plaintiff's and the class's, which benefitted BNY Mellon but injured plaintiff and the class.

**D.  BNY Mellon Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA, the Streit Act and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA, the Streit Act and Common Law**

167. Despite its discovery and actual knowledge of information requiring BNY Mellon to act to protect plaintiff and the class under the Governing Agreements, the TIA and the Streit Act, BNY Mellon failed to act as required and thus breached the Governing Agreements and violated the TIA and the Streit Act. Moreover, by failing to avoid conflicts of interest with plaintiff and the class, BNY Mellon breached its common law duty of trust to plaintiff and the class. BNY Mellon's failures to act, and its breaches and violations alleged herein, were grossly negligent and were willful misconduct.

1011938_1

1. **BNY Mellon Failed to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Defective, Breaching Mortgage Loans as Required by the Governing Agreements, the TIA and the Streit Act**

168. As alleged above, BNY Mellon discovered breaches of the Warrantors' R&Ws concerning thousands of the Mortgage Loans, yet failed to enforce the Warrantors' obligations to cure, substitute or repurchase the defective Mortgage Loans as required by the Governing Agreements, the TIA and the Streit Act. BNY Mellon discovered the breaches of the Warrantors' R&Ws concerning the Mortgage Loans through:

- The numerous news reports, congressional testimony and other information that indicated that the lending industry in general was engaging in widespread lending abuses during the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, thus making it highly likely that any R&Ws by the Warrantors concerning the Mortgage Loans were false;

- The numerous news stories, reports, lawsuits and governmental actions concerning most of the specific Warrantors to the Covered Trusts indicating that their R&Ws were systematically false;

- BNY Mellon's participation in and monitoring of bankruptcy proceedings by borrowers of the Mortgage Loans in the Covered Trusts from which it learned of specific and systemic R&W breaches by the Warrantors as to the Mortgage Loans;

- The lawsuits filed by others against the Warrantors detailing the high numbers of defective loans that breached their R&Ws;

- The lawsuits alleging misrepresentations concerning the specific Mortgage Loans in the specific Covered Trusts, which indicated that the Warrantors' R&Ws had been breached as to the Mortgage Loans;

- The Covered Trusts' historically unprecedented, extremely high and prolonged Mortgage Loan default rates and huge realized losses;

- The OCC's "Worst Ten in the Worst Ten" report, identifying the areas of the United States with the highest foreclosure rates – rates that were from 13 to 22 times higher than historical averages – from loans originated by some of the Covered Trusts' Warrantors and loan originators;

- Numerous governmental investigations of and actions against the Warrantors for lending abuses which rendered their R&Ws false;

- 88 -

- The FCIC Report detailing: (1) the huge numbers of loans some Warrantors were being required to repurchase because of systemic breaches of their R&Ws; (2) the fact that some of the Covered Trusts' Warrantors *intentionally* put defective loans that breached their R&Ws into RMBS trusts just like the Covered Trusts as a matter of course; and (3) the routine practice of many of the Covered Trusts' Warrantors to engage in lending abuses and fraud that guaranteed their R&Ws would be false; and

- The Senate Report demonstrating that the lending industry in which the Covered Trusts' Warrantors participated was engaged in systematic lending abuses which rendered any R&Ws by those Warrantors false.

169.    Moreover, even after discovering the breaches of the R&Ws by the Covered Trusts' Warrantors, BNY Mellon was grossly negligent and engaged in willful misconduct by failing to act in breach of the Governing Agreements, the TIA and the Streit Act.  BNY Mellon further failed to discharge its obligations under the TIA by failing to notify plaintiff and the class of these R&W breaches – which were defaults – with respect to the Indenture Trusts.  Moreover, after learning of the breaches, as well as of new breaches of the Warrantors' R&Ws, BNY Mellon has engaged in numerous new and additional breaches of the Governing Agreements, TIA and Streit Act by failing to perform its continuing duties to enforce the Warrantors' R&Ws, thereby engaging in continuous breaches of the Governing Agreements, the TIA and the Streit Act.  BNY Mellon's failures to act caused the loss of hundreds of millions of dollars of meritorious R&W claims against the Warrantors to the statutes of limitations, and thereby caused substantial damages to plaintiff, the class and the Covered Trusts.

**2.    BNY Mellon Failed to Perform Its Duties with Respect to Events of Default as Required by the Governing Agreements, the TIA and the Streit Act**

170.    As previously alleged, BNY Mellon obtained actual knowledge that the Master Servicers and Servicers committed Events of Default with respect to the Mortgage Loans in the Covered Trusts, yet failed to: (1) notify the Master Servicers and Servicers to cure such Events of Default; (2) give notice of the Events of Default to plaintiff and the class; or (3) take other prudent

- 89 -

actions to remedy the Events of Default, such as the termination or replacement of the defaulting Master Servicers or Servicers. Further, with respect to the two Indenture Trusts, BNY Mellon failed to give notice to plaintiff and the class of all "defaults" as required by the TIA. All of these failures to act breached the Governing Agreements, the TIA and the Streit Act. As previously alleged, BNY Mellon had actual knowledge of the defaults and Events of Default through:

- Numerous news reports, congressional testimony and governmental investigations indicating that there were systemic loan servicing abuses, including foreclosure fraud and robo-signing throughout the loan servicing industry and the nation, and that many of the Master Servicers/Servicers were involved in such misconduct;

- Numerous news reports about and governmental investigations directed at many of the specific Master Servicers and Servicers to the Covered Trusts concerning their improper loan servicing practices;

- BNY Mellon's firsthand experience with, observance of and participation in loan servicers' Events of Default through the many cases in which BNY Mellon was an RMBS trustee in foreclosure actions and bankruptcy proceedings, wherein the loan servicers and/or BNY Mellon made false statements, filed false affidavits or documents and engaged in other misconduct that delayed, invalidated or led to dismissals of BNY Mellon's foreclosures;

- BNY Mellon's discovery that the Master Servicers and Servicers were engaging in Events of Default by discovering but not reporting to BNY Mellon breaches of the Warrantors' R&Ws through their servicing of the Mortgage Loans and/or the borrowers' foreclosure and bankruptcy proceedings;

- BNY Mellon's awareness that loan servicers' abuses were systemic and were similarly affecting many other RMBS trustees;

- Numerous governmental enforcement actions against many of the specific Master Servicers and Servicers to the Covered Trusts for company-wide loan servicing abuses;

- The disclosure of deposition transcripts of employees of the Master Servicers and Servicers that indicated that they had engaged in company-wide robo-signing and loan servicing abuses;

- The large number of Mortgage Loans in the Covered Trusts that were extremely delinquent because of delays caused by the Master Servicers' and Servicers' Events of Default;

- The huge losses being suffered by the Covered Trusts due to the Master Servicers' and Servicers' robo-signing, foreclosure frauds and delays (during which they improperly imposed additional excessive fees and costs on the Covered Trusts), which were Events of Default;

- The FCIC Report and Legal Services of New Jersey Report (*see* Appendix 4 at 1) confirming nationwide Events of Default by the Master Servicers and Servicers to the Covered Trusts;

- The April 13, 2011 consent orders entered into by many of the Master Servicers and Servicers to the Covered Trusts, in which they all essentially admitted that they committed Events of Default, and the Government Foreclosure Report, which confirmed "***industrywide***" Events of Default by the Master Servicers and Servicers to the Covered Trusts;

- The billions of dollars in principal reduction and monetary relief paid by many of the Covered Trusts' Master Servicers and Servicers to settle private and government claims that they engaged in company-wide loan servicing misconduct amounting to Events of Default; and

- The numerous and continuing news reports and governmental actions after April 2011 indicating that the Master Servicers and Servicers to the Covered Trusts (including Ocwen) were and are continuing to engage in loan servicing misconduct amounting to Events of Default.

171.   Even after obtaining actual knowledge of defaults and Events of Default, and even after obtaining actual knowledge that such defaults and Events of Default were continuing to the present, and that new defaults and Events of Default were also occurring, BNY Mellon was and is grossly negligent and engaged and continues to engage in willful misconduct by failing to do any of the things required of it by the Governing Agreements, the TIA or the Streit Act.  Therefore, BNY Mellon has breached the Governing Agreements, TIA and Streit Act numerous times by repeatedly failing to fulfill its duties with respect to new and continuing defaults and Events of Default, as it has allowed the new and continuing defaults and Events of Default to continue unabated.

### 3. BNY Mellon Failed to Exercise All of Its Rights and Duties Under the Governing Agreements as a Prudent Person Would, as Required by the Governing Agreements, the TIA and the Streit Act

172. As alleged above, when BNY Mellon became aware of the Master Servicer/Servicer defaults and Events of Default, the Warrantors' default/breaches of their R&Ws, the Issuer's defaults and BNY Mellon's own defaults, BNY Mellon was required by the Governing Agreements, TIA and Streit Act to use all of its rights and powers under the Governing Agreements to protect plaintiff's and the class's interests, as a prudent person would in protecting his or her own interests. BNY Mellon failed to act as required by the Governing Agreements, TIA and Streit Act by:

- Failing to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans that breached the Warrantors' R&Ws, as a reasonable, prudent person would in trying to protect his/her own interests;

- Failing to discharge its duties upon the occurrence of an Event of Default, as a reasonable, prudent person would in trying to protect his/her own interests;

- With respect to the TIA and the Indenture Trusts, failing to discharge all of its obligations under the Governing Agreements as a reasonable, prudent person would in trying to protect his/her own interests during any "default"; and

- With respect to the TIA and the Indenture Trusts, failing to give notice of all "defaults" as a reasonable, prudent person would.

173. BNY Mellon has continued its failure to act prudently while the defaults and Events of Default have continued unabated, and after it learned of the Warrantors' R&W default/breaches, and thus BNY Mellon has engaged in numerous continuing and additional breaches of its duties under the Governing Agreements, the TIA and the Streit Act. Such failures were grossly negligent and amounted to willful misconduct.

### 4. BNY Mellon Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class

174. As alleged above, BNY Mellon did not perform its duties required by the Governing Agreements, TIA and Streit Act because BNY Mellon desired to economically benefit currently and

- 92 -

in the future from its ongoing business relationships with the Covered Trusts' Warrantors, loan originators and Master Servicers/Servicers, and in particular Countrywide, from which BNY Mellon derived huge amounts of its RMBS trustee business. BNY Mellon also refrained from giving notice of loan servicing Events of Default and other defaults to plaintiff and the class, or doing the other things required of it under the Governing Agreements, the TIA and the Streit Act, because discharging such duties would have revealed that BNY Mellon was also participating in the defaults and Events of Default. By deciding to refrain from performing its duties mandated by the Governing Agreements, the TIA and the Streit Act, BNY Mellon failed to avoid a conflict of interest with plaintiff and the class and benefitted thereby, breaching its duty of trust to plaintiff and the class. BNY Mellon's failures to act were grossly negligent and amounted to willful misconduct. BNY Mellon's continuing and repeated failures to properly discharge its duty of trust also resulted in new and additional breaches of its duty of trust up to and through the present.

### E. Plaintiff and the Class Have Suffered Significant Damages Due to BNY Mellon's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA and the Streit Act

175.    Because BNY Mellon has failed to act as required by the Governing Agreements, the TIA and the Streit Act, as alleged above, plaintiff, the class and the Covered Trusts have suffered over $1.1 billion dollars in damages.

176.    BNY Mellon's failure to enforce the R&W claims against the Warrantors for thousands of breaching Mortgage Loans has caused plaintiff, the class and the Covered Trusts to suffer significant damages in the form of hundreds of millions of dollars in R&W claims that could have been asserted against the Warrantors but were not. BNY Mellon's failure to assert these claims was a breach of the Governing Agreements, the TIA and the Streit Act for which BNY Mellon could foresee that plaintiff, the class and the Covered Trusts would be damaged. Moreover, BNY

Mellon's continuing failure to act on those R&W claims was a continuing breach and/or new breach of the Governing Agreements, the TIA and the Streit Act, and BNY Mellon's new and continuing breaches have now caused the R&W claims against the Warrantors to become time-barred, also causing plaintiff and the class to suffer foreseeable damages.

177. BNY Mellon's failure to act as required by the Governing Agreements, TIA and Streit Act when defaults and Events of Default occurred, as alleged above, has caused plaintiff, the class and the Covered Trusts to suffer millions of dollars in additional damages. BNY Mellon's new and continuing failures to act to remedy the defaults and Events of Default have caused plaintiff and the class to sustain millions of dollars in damages due to the improper and imprudent servicing of the Mortgage Loans, including damages caused by delayed, denied and invalidated foreclosures, increased loan servicing costs due to the Master Servicers/Servicers needing to correct prior shoddy, fraudulent or robo-signed foreclosures, increased attorney fees to correct or redo the improper and fraudulent foreclosures, extremely long mortgage loan delinquencies causing extra "carrying" costs for the properties, excessive fees improperly charged by the Master Servicers and Servicers, and dispositions of the Mortgage Loans by the Master Servicers and Servicers that financially benefitted them but caused damages to plaintiff, the class and the Covered Trusts. BNY Mellon's new and continuing failures to act with respect to Master Servicer/Servicer defaults and Events of Default arising out of their failure to report Warrantor R&W breaches to BNY Mellon has also caused damages to plaintiff, the class and the Covered Trusts. BNY Mellon's further failure to act during Issuer defaults and BNY Mellon's own defaults have caused plaintiff, the class and the Covered Trusts to suffer damages. The foregoing damages were foreseeable to BNY Mellon from its new and continuing failures to act as required by the Governing Agreements, the TIA and the Streit Act.

178.     BNY Mellon's new and continuing failures to act prudently during the defaults and Events of Default also caused plaintiff, the class and the Covered Trusts to suffer damages.  If BNY Mellon had acted prudently, as required by the Governing Agreements, the TIA and the Streit Act, most, if not all, of the damages to plaintiff, the class and the Covered Trusts alleged above could have been avoided.  It was foreseeable to BNY Mellon, therefore, that plaintiff and the class would suffer such massive damages if it failed to act prudently as required by the Governing Agreements, the TIA and the Streit Act.

179.     Similarly, BNY Mellon's decision to repeatedly refuse to act and instead to put its financial interests ahead of plaintiff's and the class's because of its conflicts of interest, caused plaintiff, the class and the Covered Trusts to suffer damages.  These damages were also very foreseeable to BNY Mellon by its failures to act.

180.     By virtue of its breaches of the Governing Agreements and its common law duties and its violations of the TIA and the Streit Act, BNY Mellon has caused damages to plaintiff, the class and the Covered Trusts for which BNY Mellon is responsible.

**F.     Plaintiff May Sue BNY Mellon as Trustee**

181.     The Governing Agreements provide certain limitations on the rights of RMBS holders like plaintiff and the class that are not applicable to this lawsuit.  More specifically, the Governing Agreements may limit in part the rights of RMBS holders like plaintiff and the class to bring lawsuits relating to the Governing Agreements against the Depositor, the Securities Administrator, the Master Servicer or Servicer, or any successor to any such parties.

182.     However, the Governing Agreements do not so limit suit against BNY Mellon.  In fact, the Governing Agreements provide that "[n]o provision of this Agreement shall be construed to

relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct." NSTR 2007-C PSA §10.01(c).

183. Additionally, under the TIA and New York law, "no action" clauses do not apply to actions by RMBS holders like plaintiff and the class against trustees like BNY Mellon for BNY Mellon's own wrongdoing. This is not a situation where plaintiff and the class are demanding that BNY Mellon initiate a suit in its own name to enforce their rights and obligations under the Governing Agreements. Rather, this is an instance where plaintiff and the class are bringing a direct action *against* BNY Mellon for breaching its statutory, contractual and common law obligations under the Governing Agreements, the TIA and the Streit Act. Because this is not an "action, suit or proceeding" that BNY Mellon is capable of bringing in its own name as Trustee under the Governing Agreements, the "no action" clause of the Governing Agreements does not apply and does not bar plaintiff and the class from proceeding with this lawsuit.

## V. CLASS ACTION ALLEGATIONS

184. Plaintiff brings this action as a class action on behalf of a class consisting of all current and former investors who acquired RMBS certificates in the Covered Trusts (the "class") and who held such certificates at or after the time when BNY Mellon discovered breaches of the Warrantors' R&Ws or other defaults, or BNY Mellon had actual knowledge of defaults and Events of Default by the Master Servicers and Servicers to the Covered Trusts, and suffered damages as a result of BNY Mellon's breaches of the Governing Agreements, TIA, Streit Act and common law. Excluded from the class are BNY Mellon, the loan originators, the Warrantors, the Master Servicers and Servicers of the Covered Trusts, and their officers and directors, their legal representatives, successors or assigns, and any entity in which they have or had a controlling interest.

- 96 -

185.     The members of the class are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown to plaintiff at this time and can only be ascertained though appropriate discovery, plaintiff believes that there are at least hundreds of members of the proposed class.  Record owners and other members of the class may be identified from records maintained by BNY Mellon, DTC, Cede & Co., or others and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

186.     Plaintiff's claims are typical of the claims of the members of the class as: (1) they all acquired RMBS certificates in the Covered Trusts and held them at or after the time when BNY Mellon discovered defaults and breaches of R&Ws concerning the Mortgage Loans by the Warrantors or BNY Mellon had actual knowledge of Master Servicer and Servicer defaults and Events of Default; (2) all the claims are based upon the Governing Agreements, substantially in the same form as the NSTR 2007-C PSA (*see* Ex. A), common law, TIA and Streit Act; (3) BNY Mellon's alleged misconduct was substantially the same with respect to all class members; and (4) all class members suffered similar harm as a result.  Thus, all members of the class are similarly affected by BNY Mellon's statutory, contractual and common law breaches and violations that are alleged of herein.

187.     Plaintiff will fairly and adequately protect the interests of the members of the class and has retained counsel competent and experienced in class action and RMBS litigation.

188.     Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.  Among the questions of law and fact common to the class are:

(a)     Whether BNY Mellon breached its contractual duties under the Governing Agreements and common law duties owed to plaintiff and the class by:

(i)     failing to enforce R&W claims against the Covered Trusts' Warrantors when BNY Mellon discovered breaches of the R&Ws;

(ii)     failing to discharge its duties under the Governing Agreements when BNY Mellon obtained actual knowledge of Events of Default;

(iii)     failing to exercise the rights and powers vested in BNY Mellon by the Governing Agreements, and failing to use the same degree of care and skill a prudent person would under the circumstances and in the conduct of his or her own affairs after obtaining actual knowledge of Events of Default; and

(iv)     failing to avoid conflicts of interest with plaintiff and the class while advancing its own interests at the expense of plaintiff and the class, while benefitting therefrom.

(b)     Whether BNY Mellon violated the TIA by:

(i)     prior to default, failing to perform the duties specifically assigned to it under the Governing Agreements;

(ii)     failing to inform the class of defaults under the Governing Agreements within 90 days after their occurrence;

(iii)     during any default, failing to exercise its rights and powers under the Governing Agreements as a prudent person would; and

(c)     Whether BNY Mellon violated the Streit Act by failing to exercise its rights and powers under the Governing Agreements as a prudent person would.

(d)     Whether and to what extent members of the class have suffered damages as a result of BNY Mellon's breaches of its statutory, contractual and common law duties and the proper measure of damages.

189.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## VI.    DERIVATIVE ACTION ALLEGATIONS

190.    Alternatively, plaintiff brings this case as a derivative action against BNY Mellon in the right and for the benefit of the Covered Trusts to redress losses suffered by the Covered Trusts as a direct result of BNY Mellon's breaches of the Governing Agreements, the TIA, the Streit Act and common law.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

191.    Plaintiff will adequately and fairly represent the interests of the Covered Trusts in enforcing and prosecuting their rights.  Plaintiff is the owner of RMBS in each of the Covered Trusts during all or a large portion of BNY Mellon's wrongful course of conduct alleged herein.  Moreover by operation of law, under New York General Obligations Law §13-107, RPI obtained all rights and causes of action of all prior holders of RPI's RMBS.

192.    Plaintiff did not make a pre-suit demand on BNY Mellon to pursue this action because such a demand would have been futile.  The wrongful acts alleged herein were committed by BNY Mellon itself and BNY Mellon would not agree to sue itself, particularly since it faces claims for losses by the Covered Trusts in excess of $1.1 billion.  In addition, since BNY Mellon itself committed the wrongdoing complained of herein, and is accused of grossly negligent and willful misconduct, it therefore is not disinterested and lacks independence to exercise business

- 99 -

judgment. Moreover, BNY Mellon has benefitted from, and continues to benefit from, its wrongdoing as alleged herein (*i.e.*, failures to act), as it has not enforced the Covered Trusts' rights against the Warrantors' for their defaults and breaches of their R&Ws or remedied or declared defaults or Events of Default against the Master Servicers, Servicers and others, and thus BNY Mellon has maintained and preserved its business relationships with the Warrantors, Master Servicers and Servicers and has thereby continued to derive financial benefits from serving as Trustee to the Covered Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein.

193.    The Covered Trusts could only act through BNY Mellon since BNY Mellon was the Trustee of each Covered Trust.  When BNY Mellon failed to act, as was required by the Governing Agreements, the TIA, the Streit Act and the common law, to protect the Covered Trusts and their assets –including the Mortgage Loans and the rights attendant to them – BNY Mellon caused the Covered Trusts to suffer massive losses.  BNY Mellon deliberately failed to perform the following duties required of it under the Governing Agreements, the TIA, the Streit Act or the common law, which injured the Covered Trusts: (1) enforce the Covered Trusts' rights to pursue and enforce breach of R&W claims against the Warrantors; (2) notify and demand that the Master Servicers and Servicers cure their Events of Default, provide notice of the defaults and Events of Default to plaintiff and the class, and take further steps, such as terminating or replacing the Master Servicers and Servicers; (3) act as a prudent person would in the conduct of his or her own affairs during the defaults; and (4) discharge its duty of trust to plaintiff and the class.

194.    BNY Mellon's failures to act amounted to gross negligence and willful misconduct on its part and caused the Covered Trusts to suffer losses in excess of $1.1 billion.  Plaintiff seeks to recover, for the benefit of the Covered Trusts: (i) the losses suffered by the Covered Trusts to date,

- 100 -

totaling in excess of $1.1 billion; (ii) all future losses caused by BNY Mellon's continuing failures to act as required by the Governing Agreements, the TIA, the Streit Act and the common law; and (iii) equitable relief preventing BNY Mellon from continuing to breach the Governing Agreements, the TIA, the Streit Act and the common law.

## COUNT I
### Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq.*
### (As to the ECR 2005-2 and GSCC 2006-1 Covered Trusts Only)

195.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein. This count applies only to the Indenture Trusts – the ECR 2005-2 and GSCC 2006-1 Covered Trusts.

196.     Congress enacted the TIA, 15 U.S.C. §77aaa, *et seq.*, to ensure, among other things, that investors in RMBS, bonds and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees. 15 U.S.C. §77bbb. The Covered Trusts' Governing Agreements are "indentures," and BNY Mellon is an "indenture trustee" within the meaning of the TIA. 15 U.S.C. §77ccc(7), (10). Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements and the related RMBS. 15 U.S.C. §77ddd(a)(1). BNY Mellon violated multiple provisions of the TIA.

197.     First, the TIA requires that, prior to default, the indenture trustee shall be liable for any duties specifically set out in the indenture. 15 U.S.C. §77ooo(a)(1). As alleged above, BNY Mellon failed to comply in good faith with the following duties specifically assigned to it by the Governing Agreements, including the duties to:

            (a)       enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans when BNY Mellon discovered breaches of the Warrantors' R&Ws concerning such Mortgage Loans;

- 101 -

(b)     notify the Master Servicers and Servicers of their Events of Default and seek a cure;

(c)     notify plaintiff and the class of all Events of Default and of the Warrantors' breaches/defaults; and

(d)     exercise its rights and powers under the Governing Agreements to take further actions, including terminating or replacing a Master Servicer or Servicer that continued engaging in an uncured Event of Default.

198.    In addition, the TIA requires that BNY Mellon inform plaintiff and the class of all "defaults" under the Governing Agreements known to BNY Mellon within 90 days after their occurrence.  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  As alleged herein, there were numerous Events of Default by the Master Servicers and Servicers under the Governing Agreements of which BNY Mellon was aware.  In addition, as alleged herein, BNY Mellon had knowledge of massive breaches of the Warrantors' R&Ws, which were also defaults under the TIA.  Further, as alleged herein, there were also numerous other defaults by the Master Servicers/Servicers, Issuers and BNY Mellon itself of which BNY Mellon had knowledge.  BNY Mellon was required to provide notice of each of these defaults within 90 days.  BNY Mellon failed to provide notice to plaintiff and the class, and thereby violated 15 U.S.C. §77ooo(b) of the TIA.

199.    Second, during any "default," the TIA requires BNY Mellon to exercise all of its rights and powers under the Governing Agreements as a prudent person would in the conduct of his or her own affairs.  15 U.S.C. §77ooo(c).  Given the obvious negative impacts of the numerous defaults alleged herein, any prudent person under those circumstances would have exercised all of his or her rights and powers to, among other things, compel and enforce the cure, substitution or repurchase of defective Mortgage Loans that breached the Warrantors' R&Ws in a timely fashion,

- 102 -

and taken actions to remedy the Master Servicer and Servicer defaults and Events of Default, Issuer defaults and BNY Mellon's own defaults, and notify plaintiff and the class of such defaults. Indeed, with the huge numbers of breaching and defaulting Mortgage Loans in the Covered Trusts, and the pervasive defaults that were and are occurring, plaintiff, the class and the Covered Trusts could have been protected in large part from the damages they suffered only through BNY Mellon's prompt and prudent exercise of those rights. By failing to prudently exercise its rights in those circumstances, BNY Mellon violated 15 U.S.C. §77ooo(c) of the TIA.

200. BNY Mellon is therefore liable to plaintiff, the class and the Indentured Trusts for their actual losses and damages incurred as a result of BNY Mellon's violations of the TIA.

**COUNT II**
**Breach of Contract**
**(As to Each of the Covered Trusts)**

201. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein. This count applies to all of the Covered Trusts.

202. As set forth in detail above, the Governing Agreements are contracts setting forth the duties BNY Mellon owed to plaintiff, the class and the Covered Trusts with respect to their RMBS and the Mortgage Loans in the Covered Trusts. As a matter of law, the Governing Agreements incorporate the provisions of the TIA and the Streit Act. Under the Governing Agreements, the TIA and the Streit Act, BNY Mellon owed plaintiff, the class and the Covered Trusts a duty to perform certain duties, including, without limitation, the duties to:

      (a)      notify the Warrantors of breaches of the R&Ws concerning the Mortgage Loans discovered by BNY Mellon, and enforce the Warrantors' breaches of the R&Ws by seeking the cure, substitution or repurchase of any and all defective Mortgage Loans;

- 103 -

(b)     notify the Master Servicers and Servicers of their defaults and Events of Default upon obtaining knowledge of such defaults and Events of Default and seeking the cure of said defaults and Event of Default;

(c)     notify plaintiff and the class of defaults and Events of Default, the Warrantors' breaches/defaults and any other defaults BNY Mellon became aware of;

(d)     take prudent actions, including taking prudent actions to terminate or replace Master Servicers and Servicers that fail to cure their defaults and Events of Default, and taking prudent actions to enforce the Warrantors' R&Ws; and

(e)     exercise all of its rights and powers under the Governing Agreements during a default or an Event of Default for the benefit of plaintiff and the class and as a reasonable, prudent person would in the conduct of his or her own affairs.

203.     As alleged herein, BNY Mellon failed to perform the above duties required of it by the Governing Agreements, TIA and Streit Act and therefore breached the Governing Agreements. BNY Mellon's breach of its duties set forth in the Governing Agreements deprived plaintiff, the class and the Covered Trusts of the consideration they bargained for, *i.e.*, they did not receive RMBS that were collateralized by Mortgage Loans that were warranted to be of a certain credit quality, and breaches of these R&Ws were not enforced as required by the Governing Agreements. These breaches of the Governing Agreements by BNY Mellon caused plaintiff, the class and the Covered Trusts to suffer damages.

204.     In addition, plaintiff and the class did not receive the benefit of their bargain under the Governing Agreements when BNY Mellon failed to perform the obligations required of it by the Governing Agreements when BNY Mellon knew of uncured and ongoing defaults and Events of

Default. BNY Mellon's failure to act breached the Governing Agreements and caused plaintiff, the class and the Covered Trusts to suffer damages.

205.    Furthermore, plaintiff, the class and the Covered Trusts did not receive the consideration they bargained for, *i.e.*, that BNY Mellon would act as a prudent person and exercise all of its rights and powers under the Governing Agreements to protect plaintiff and the class as though it were seeking to protect its own interests when BNY Mellon knew of defaults and Events of Default. BNY Mellon's failure to so act breached the Governing Agreements and caused plaintiff, the class and the Covered Trusts to suffer damages.

206.    BNY Mellon and its responsible officers discovered and had actual knowledge of the Warrantors' breaches of their R&Ws, the Master Servicers' and Servicers' defaults and Events of Default, and of the other defaults alleged herein.

207.    As a result of BNY Mellon's multiple breaches of the Governing Agreements alleged herein, BNY Mellon is liable to plaintiff, the class and the Covered Trusts for the damages they suffered as a direct result of BNY Mellon's failure to perform its contractual obligations under the Governing Agreements.

208.    In addition, BNY Mellon has engaged in continuing breaches, as well as multiple new and additional breaches of the Governing Agreements by failing to fulfill its duties to act as alleged herein and has caused plaintiff, the class and the Covered Trusts to suffer damages.

**COUNT III**
**Breach of Trust**
**(As to Each of the Covered Trusts)**

209.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein. This count applies to all of the Covered Trusts.

210.     Under common law, BNY Mellon had a duty to plaintiff and the class to affirmatively avoid conflicts of interest with them.  Further, that duty also required BNY Mellon to refrain from advancing its own interests at the expense of plaintiff and the class, or benefitting therefrom.

211.     BNY Mellon breached its duty of trust owed to plaintiff and the class by advancing its own interests at the expense of plaintiff and the class, by failing to demand that the Warrantors cure, substitute, or repurchase Mortgage Loans that breached their R&Ws, and by failing to act and failing to act prudently, as was required when it became aware of defaults and Events of Defaults by the Master Servicers/Servicers and others.  BNY Mellon failed to act because it had conflicts of interest with plaintiff and the class from which it benefitted at the expense of plaintiff and the class, as alleged herein.

212.     By doing so, BNY Mellon breached its duty of trust to plaintiff and the class.

213.     BNY Mellon has continued to breach its duty of trust and has also engaged in new and additional breaches of its duty of trust, and thus has continually failed to fulfill its duty of trust.

214.     As a result of BNY Mellon's breaches of its duty of trust, defective Mortgage Loans were not remedied and Events of Default were not corrected, and continued unabated, causing plaintiff and the class to suffer damages.

### COUNT IV
### Violation of the Streit Act, N.Y. Real Prop. Law §124, *et seq.*
### (As to Each of the Covered Trusts)

215.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

216.     The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the Trustee exercise due care in performing its obligations.  N.Y. Real Prop. Law §124.

- 106 -

217.    Plaintiff and the class, as Certificateholders and beneficiaries of the Covered Trusts, are and were entitled to the protections afforded under the Streit Act.

218.    The certificates at issue herein are "mortgage investments" subject to the Streit Act, N.Y. Real Prop. Law §125(1).

219.    The Governing Agreements that established the trusts are "interest[s] in real property" and BNY Mellon is a "trustee" under the Streit Act.  N.Y. Real Prop. Law §125(3).

220.    Following an Event of Default, the Streit Act provides that BNY Mellon must exercise the same degree of skill and care in the performance of its duties as a prudent person would under the same circumstances.  N.Y. Real Prop. Law §126(1).

221.    As set forth above, BNY Mellon failed to exercise its rights under the Governing Agreements after becoming aware of numerous Events of Default, failed to act as a prudent person during the Events of Default alleged herein, failed to notify Certificateholders and other parties of deficiencies, failed to take steps to address those deficiencies, and failed to enforce the repurchase, cure, or substitution of defective Mortgage Loans.

222.    BNY Mellon is liable to plaintiff and the class for damages incurred as a result of its violations of the Streit Act in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing the undersigned as class counsel;

B.    Alternatively, allowing this action to proceed as a derivative action in the right of and for the benefit of the Covered Trusts;

C.     Awarding damages and/or equitable relief in favor of plaintiff, the class and/or the Covered Trusts against BNY Mellon for breaches of its statutory, contractual and common law duties, in an amount to be proven at trial, including interest thereon;

D.     Awarding plaintiff, the class and the Covered Trusts their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

E.     Such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

DATED:  March 20, 2015                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                          ARTHUR C. LEAHY
                                          STEVEN W. PEPICH
                                          ASHLEY M. ROBINSON
                                          JENNIFER N. CARINGAL


                                                  s/ Arthur C. Leahy
                                          ARTHUR C. LEAHY

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101-8498
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)
                                          artl@rgrdlaw.com
                                          stevep@rgrdlaw.com
                                          arobinston@rgrdlaw.com
                                          jcaringal@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  800/449-4900
615/252-3798 (fax)

Attorneys for Plaintiff

1011938_1

# APPENDIX 1

- **February and March 2007**:  Numerous securities fraud class actions were filed against the parent company of NovaStar.  NovaStar was the sole Warrantor and loan originator for the NHEL 2006-3 Covered Trust.  The actions alleged that *NovaStar "routinely deviated from [its] underwriting guidelines so that overly risky loans were being approved in order to . . . fuel [RMBS] securitization[s]*."  The consolidated complaint cited numerous former NovaStar employees stating that:

  - *NovaStar "'grant[ed] exceptions'" to NovaStar's underwriting guidelines "'for everything'";*
  - *NovaStar extended loans "regardless of whether it made sense to approve the loan[s]";*
  - *NovaStar "never checked [loan] applicants' credit histories";*
  - *NovaStar "pressured line auditors to overlook failures to comply with NovaStar's underwriting guidelines";*
  - *NovaStar issued loans that "ran counter to NovaStar's guidelines in 2006";*
  - *NovaStar "took advantage of its existing [borrowers] and 'raked them over the coals' by charging" excessive "points on the new loans they sought";*
  - *NovaStar put borrowers into "loans to which they had [not] agreed" by, unbeknownst to the borrowers, "chang[ing]" the loans' "terms";*
  - *NovaStar falsely "increased a borrower's income so that the borrower could qualify for a certain loan program";*
  - *NovaStar "audits showed that about 90% to 95% of the loans involved fraud such as misstatements of income, misrepresentations in the loan documents or an inflated appraisal"; and*
  - *"[M]ore than 20% of [NovaStar's] loans written in early to mid-2006," the same time period when many of the Mortgage Loans in the NHEL 2006-3 Covered Trust were originated and warranted by NovaStar, "turned out to have 'defects' that put [NovaStar] at risk of having to repurchase them*."

- **August 2007**: *SMR Research Corp. issued a report on 163 of the nation's largest lenders and issued "risk scores" to each lender*.  The risk scores were designed to determine which lenders made the riskiest loans during the period from 2005 through 2007.  Those lenders with the highest risk scores issued the riskiest loans.  *SouthStar, a loan originator for the SAMI 2006-AR4 Covered Trust – had the highest risk score of any lender.  This indicated that SouthStar made extremely risky loans and in doing so it probably issued false R&Ws*.  The report also noted that SouthStar had closed down due to its risky lending.

- **October 2007**: Alan Hummel, Chair of the Appraisal Institute, testified to a U.S. House Committee *that appraisers "experience[d] <u>systemic problems</u> with coercion" and were "'ordered to doctor their reports' or else they would never 'see work . . . again' and/or would be placed on 'exclusionary appraiser lists*.'"

1011938_1

- **October 24, 2007**: A derivative lawsuit was filed against the executives of *Countrywide's* parent company, alleging that *they had caused Countrywide to abandon its underwriting guidelines and engage in predatory lending*. *See* Complaint, *Arkansas Teacher Retirement System, et al. v. Mozilo, et al.,* No. CV07-06923 (C.D. Cal. Oct. 24, 2007). *Countrywide was a Warrantor and/or loan originator to the GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts*.

- **December 30, 2007**: *The Kansas City Star* reported that Kurt Eggert, a law professor and member of the Federal Reserve's Consumer Advisory Panel, stated: "'*Originators were making loans based on quantity rather than quality . . . . They made loans even when they didn't make sense from an underwriting standpoint.*'" The article also stated: "Mark Duda, a research affiliate at Harvard University's Joint Center for Housing Studies, said that because *brokers were so intent to quickly sell off loans to investors, they had little incentive to make sure the loans were suitable for borrowers. 'They were setting people up to fail,*' Duda said."

- **January 2008**: It was reported that Cleveland, Ohio had sued 21 mortgage lenders and investment banking firms, alleging that *they had caused "entire neighborhoods" in the city to become full of "abandoned and boarded up properties" because the lenders and investment bankers "routinely ma[de] loans to borrowers who had no ability to pay them back*." The defendants included a Warrantor and/or loan originator (or their related companies) for four of the five Covered Trusts: *Countrywide, NovaStar, and EMC, Bear Stearns Residential and Encore (through Bear Stearns, which owned and controlled all three lenders at that time).*

- **January 31, 2008**: A securities class action was filed against Nomura Asset Acceptance Corp. and other defendants alleging that defendants made misrepresentations and omissions in offering documents used to sell RMBS to investors. *The complaint alleged that FNBN was a loan originator for the RMBS at issue and that it did not follow its underwriting guidelines when originating loans. In addition, the complaint alleged that FNBN "was, in fact, misrepresenting home values, income, net worth and employment status of borrowers*." Complaint, *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corporation, et al.,* No. 08-0544-BLS (Mass. Sup. Ct., Suffolk Cnty. Jan. 31, 2008). *FNBN was a loan originator for the GSCC 2006-1 Covered Trust.*

- **February 5, 2008**: *The Oregonian* published a news story on *Encore, a loan originator for the ECR 2005-2 Covered Trust. The news article documented that Encore ignored its stated underwriting guidelines, falsified incomes, did not determine whether borrowers could afford to repay their loans, forged documents, and put borrowers into loans they obviously could not afford to repay. The Oregonian recounted the story of borrower Paul Hoffhine Jr., a mentally disabled man who subsisted on Social Security payments of $624 per month. The*

*Oregonian* reported that Hoffhine stated: "'**They forged my signature, [and] they inflated my income**.'"

- **March 2008**: An article in *The Wall Street Journal* reported on the criminal conviction of AHM sales executive Kourash Partow. **AHM was a loan originator for the GSCC 2006-1 Covered Trust. Partow admitted that he falsified borrowers' incomes and assets in order to get loans approved**. After his conviction, Partow, who worked for Countrywide before joining AHM, sought a lighter sentence on the grounds that **both of his former employers – Countrywide (which was also a Warrantor and/or loan originator for at least two of the Covered Trusts) and AHM – had knowledge of the falsified incomes and assets and in fact encouraged manipulation by intentionally misrepresenting the performance of the loans and the adequacy of how the loans were underwritten**. The import of this article was that AHM's and Countrywide's regular business practices made it probable that any R&Ws about their loans were false.

- **May 9, 2008**: A class action lawsuit was filed by employees of First Horizon's parent company (**First Horizon was a loan originator for the SAMI 2006-AR4 Covered Trust**) against the parent company and certain individual defendants, for ERISA violations based on defendants' investment of employee retirement plans in First Horizon's parent company's stock. *See Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293 (W.D. Tenn. May 9, 2008). The plaintiff employees alleged that the plan requirement that participants invest in the parent company's stock was imprudent, risky, and in violation of the participants' ERISA rights, because **First Horizon was engaging in risky lending practices.**

- **May 21, 2008**: **Covered Trust Warrantor NovaStar's sister company and the NHEL 2006-3 Covered Trust were sued in a class action by purchasers of RMBS alleging violations of the federal securities laws**. *See* Complaint, *New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc., et al.*, No. 601563/08 (N.Y. Sup. Ct., N.Y. Cnty. May 21, 2008). The complaint alleged that defendants **falsely represented that the Mortgage Loans in the NHEL 2006-3 Covered Trust were originated in conformity with NovaStar's underwriting guidelines**.

- **May 2008**: National Public Radio broadcast a segment on a company called Watterson-Prime. Watterson-Prime was hired by numerous RMBS securitizers to test samples of the loans they were securitizing. Watterson-Prime's job was to identify any loans which did not comply with the applicable underwriting guidelines or had other defects. In the radio broadcast, a former Watterson-Prime employee, Tracy Warren, was interviewed and stated that **Watterson-Prime's largest customer was Bear Stearns, which included EMC, Bear Stearns Residential and Encore, Warrantors or loan originators for the ECR 2005-2 and SAMI 2006-AR4 Covered Trusts. She recounted obvious fraudulent loan applications where hotel workers claimed $15,000 per month in income. She stated that whenever she would reject deficient loan files, her supervisors would overrule her and approve the loans. She recalled loans to borrowers with terrible credit scores and falsified incomes which**

- 3 -

*she rejected, only to be overruled by her supervisors who would say "'Oh, it's fine. Don't worry about it.'" Warren stated that about 75% of the loans which should have been rejected were purchased and securitized nonetheless*. This information confirmed that EMC's, Bear Stearns Residential's and Encore's normal business practices made it likely that any representations and warranties about their loans would be false.

- **June 25, 2008**: *The States of Illinois and California sued Countrywide* in separate lawsuits, each alleging that Countrywide violated their respective state laws by making illegal mortgage loans. *Countrywide was a Warrantor and/or loan originator for the GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts*. Illinois alleged that *Countrywide violated Illinois laws by making "risky" and "unaffordable" mortgage loans to borrowers and using "[u]nfair and deceptive advertising, marketing and sales practices . . . [which] hid[] the real costs and risks to borrowers." The complaint further alleged that Countrywide "was forced to repurchase or replace [its] failing loans in investor pools," indicating that Countrywide was breaching its R&Ws*. *See* Complaint, *People of the State Of Illinois v. Countrywide Fin. Corp., et al.*, No. 08CH22994 (Ill. Cir. Ct., Cook Cnty. June 25, 2008). California alleged that *Countrywide violated state laws by "approv[ing] loans that it knew to be high risk, and therefore highly likely to end up in default, by ignoring its own minimal underwriting guidelines" and "originating loans with little or no regard to borrowers' long-term ability to afford them." California also alleged that "Countrywide was . . . a mass production loan factory set up to produce an ever-increasing stream of loans without regard to borrowers' ability to repay their loans.*" Complaint, *People of the State of California v. Countrywide Fin. Corp., et al.*, No. LC081846 (Cal. Super. Ct., L.A. Cnty. June 25, 2008).

- **June 30, 2008**: *The Attorney General of Florida sued Countrywide* for violating Florida laws prohibiting unfair and deceptive acts and practices. *The Attorney General alleged that Countrywide "did not adhere to [its] underwriting standards . . . and failed to ensure that borrowers had sufficient capacity to repay [their] mortgage loans," "approved [loans] for borrowers who were not qualified and could not afford such loans," "approve[d] as many loans as possible, regardless of credit risk," made loans "regardless of whether or not the loan fit the professed underwriting standards," "made . . . [l]oans to borrowers when they knew or should [have] known that the borrowers would not be able to repay" the loans, "permitted a culture where its own underwriters were threatened with termination for attempting to verify a borrower's ability to pay, or otherwise impeding loan approval," "encouraged managers to approve . . . [l]oan applications that were initially denied by underwriters who suspected fraud," and "made material misrepresentations to consumers relating to its ARM[] [loans].*" Complaint, *Office of the Attorney General, Dep't of Legal Affairs, State of Florida v. Countrywide Fin. Corp., et al.*, No. 08-30105 (Fla. Cir. Ct., 17th Jud. Dist., Broward Cnty. June 30, 2008).

- 4 -

- **July 27, 2008**: *The State of Connecticut sued Countrywide*, alleging that Countrywide made illegal mortgage loans to Connecticut consumers. *See* Complaint, *State of Connecticut, et al. v. Countrywide Fin. Corp., et al.*, No. 3:08-cv-01301-SRU (Conn. Super. Ct., Hartford Jud. Dist. Aug. 27, 2008). Connecticut alleged that *Countrywide "made loans to consumers on terms that differed materially from those represented to consumers prior to closing, which were not suitable and affordable, were not appropriate for consumers' specific situations, and were not made based on consumers' ability to pay. . . . In other instances, [Countrywide] improperly inflated consumers' incomes in order to qualify them for loans they otherwise would not have received, and pressured consumers into inappropriate payment-option ARM [loans]*."

- **August 2008**: *The States of West Virginia and Indiana filed lawsuits against Countrywide* alleging that Countrywide made mortgage loans in violation of their respective state laws. *West Virginia alleged that Countrywide engaged in numerous "unfair and deceptive acts or practices" in connection with its making of mortgage loans to state residents that violated West Virginia law. West Virginia alleged that Countrywide made "loans with risky, unconscionable terms," made loans "without regard for the consumer's ability to afford them," failed to disclose the terms of the loans to borrowers, made loans "when there was no reasonable probability of the consumers being able to pay the loan in full," "engaged in unfair and deceptive acts or practices in the marketing, originating and servicing of mortgages to West Virginia consumers," used "inflated" appraisals, "charged consumers prepayment penalties in violation of West Virginia law," and "used unfair and deceptive acts or practices in [mak]ing mortgages to consumers*." Complaint, *State of West Virginia, et al. v. Countrywide Fin. Corp., et al.*, No. 08-C-268 (W. Va. Cir. Ct., Putnam Cnty. Aug. 12, 2008). *Indiana alleged in its complaint that Countrywide: (1) "knowingly made deceptive or misleading representations or omissions [to borrowers] regarding [mortgage] loan terms and charges including, but not limited to, the interest rate of the loan, the presence or the mechanics of the adjustable rate features of the loan, and the interest rate or the material costs of the proposed loan"; (2) "engaged in a practice of misleading borrowers about the presence, the significance, and/or meaning of a prepayment penalty, and/or the duration of a prepayment penalty on their loans"; and (3) "engaged in acts and practices which resulted in fabricated and/or inflated income information for prospective borrowers . . . [who] would have failed to qualify for said loans without the fabricated or inflated income*." Complaint, *State of Indiana v. Countrywide Fin. Corp., et al.*, No. 76C01-0808-PL-0652 (Ind. Cir. Ct., Steuben Cnty. Aug. 22, 2008).

- **September 23, 2008**: *Over 20 borrowers sued Covered Trust Warrantor and loan originator Nationstar* and a Nationstar manager alleging that, *"[u]nbeknownst to the borrower Plaintiffs, in many instances [Nationstar and its manager] caused false information to be placed on [Plaintiffs'] loan applications, including, but not limited to, inflated income, false employment positions, primary residence declarations, false income information, and other misleading information such*

*that underwriting could successfully occur. Plaintiffs were simply asked to sign blank or incomplete application information or their signatures would simply be forged on title, loan, or escrow documents." The borrowers further alleged that neither Nationstar nor its manager "had any reasonable basis for believing that the borrower Plaintiffs could actually repay the loans, that they would be able to keep the security (homes) covered by the loans, or that their creditworthiness would not be negatively affected as a result of bad loans*." Complaint, *Richter, et al. v. Nationstar Mortg., LLC, et al.*, No. 37-2008-00092170-CU-BT-CTL (Cal. Super. Ct., San Diego Cnty. Sept. 23, 2008).

- **September 30, 2008**: RMBS insurer ***MBIA Insurance Corporation ("MBIA") sued Countrywide***, alleging that ***Countrywide had breached its R&Ws as to thousands of mortgage loans in 10 RMBS trusts. The complaint alleged that there were "substantial breaches of" Countrywide's R&Ws***, due in part to the fact that Countrywide "developed a systematic pattern and practice of abandoning its [underwriting] guidelines[, and] . . . lending to borrowers who could not afford to repay the loans, or who committed fraud in loan applications, or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use." Complaint, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc., et al.*, No. 602825/08 (N.Y. Sup. Ct., N.Y. Cnty. Sept. 30, 2008). Countrywide ultimately paid $1.7 billion to settle the action.

- **November 13, 2008**: The OCC released a report entitled the "Worst Ten in the Worst Ten," identifying the ten metropolitan areas in the United States with the highest foreclosure rates in the first half of 2008, and the lenders that made the loans. The report studied loans originated between 2005 through 2007 – the same time period the Mortgage Loans in the Covered Trusts were originated, warranted and transferred to the Covered Trusts – and revealed that they had astoundingly high foreclosure rates: *from 13.9% to 22.9% of the loans were in foreclosure in the ten areas during the first half of 2008. These foreclosure rates were far higher than the historical average because "[p]rior to 2007, the foreclosure rate was historically less than 1%*." FCIC Report at 402. *The list of offending lenders identified in the OCC report included Countrywide and AHM, Warrantors and/or loan originators to two of the Covered Trusts.*

- **November 2008**: *Business Week* published an exposé on the mortgage lending industry. The *Business Week* article reported that industry "*[loan] wholesalers . . . offered bribes to fellow employees [to approve unacceptable loan applications], fabricated documents, and coached brokers on how to break the rules. . . . [Loan] [b]rokers, who work directly with borrowers, altered and shredded documents. [In addition, loan] [u]nderwriters, the bank employees who actually approve mortgage loans, also skirted boundaries, demanding secret payments from wholesalers to green-light loans they knew to be fraudulent*."

- **January 2009**:  *It was reported that Nationstar, a Warrantor and the loan originator for the NSTR 2007-C Covered Trust, entered into a settlement agreement with the State of Kentucky over charges that it used unlicensed loan officers and "faked borrowers' credit scores*."

- **March 2009**: A class action lawsuit was filed against JPMorgan on behalf of investors in its RMBS, alleging false and misleading statements in connection with the offering and sale of RMBS in numerous RMBS trusts.  *That action contained allegations concerning AHM,  a loan originator for the GSCC 2006-1 Covered Trust*.  The complaint alleged that AHM failed to follow its loan underwriting guidelines and fabricated loan information, obvious breaches of its R&Ws, when originating mortgage loans during much of the same period the Mortgage Loans in the Covered Trusts were originated.  In 2010, an amended complaint was filed that contained *detailed statements from numerous former AHM employees indicating the wholesale abandonment of AHM's origination guidelines and the widespread fabrication of loan data*.  *See* Second Amended Complaint, *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co., et al.*, No. 1:09-cv-03701-JGK (S.D.N.Y. July 8, 2010).

- **March 19, 2009**:  RMBS insurer United Guaranty Mortgage Indemnity Company sued Countrywide and BNY Mellon, alleging that *Countrywide and BNY Mellon made false R&Ws concerning the "majority" of over $1 billion of mortgage loans in numerous RMBS trusts.*  Complaint, *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp., et al*., No. 09-cv-1888-RZ (C.D. Cal. Mar. 19, 2009).

- **March 31, 2009**: RMBS insurer *Syncora Guarantee Inc. ("Syncora") sued EMC* alleging "*pervasive breaches" of EMC's R&Ws* concerning loans in an RMBS trust. Complaint, *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 1:09-cv-03106-PAC (S.D.N.Y. Mar. 31, 2009).  EMC was a Warrantor to the SAMI 2006-AR4 Covered Trust.  In the complaint, Syncora alleged that it hired a consultant to review documentation concerning the loans in the trust at issue there and the consultant discovered that between *85.5% and 95% of the loans it reviewed breached EMC's R&Ws concerning the loans.  Syncora alleged that the trust "was replete with loans that did not comply with . . . EMC's clear and unambiguous representations and warranties." Syncora further alleged that "[t]he most prevalent and troubling of the breaches identified by Syncora involve (i) rampant misrepresentations about borrower income, employment, assets, and intentions to occupy the purchased properties and (ii) the loan originator's abject failure to adhere to proper and prudent mortgage-lending practices and its own underwriting guidelines*."

- **April 2009**: *The SEC filed fraud charges against the former top executives of AHM's parent company*, American Home Investment Corp. ("American Home"), for their role in misleading investors regarding AHM's systematic disregard of sound

underwriting standards and risky lending practices that led to the lender's bankruptcy in August of 2007. ***AHM was a loan originator for the GSCC 2006-1 Covered Trust. "'These senior [American Home] executives did not just occupy a front row seat to the mortgage meltdown – they were part of the show,'"*** said Robert Khuzami, Director of the SEC Division of Enforcement in a press release. ***The SEC charged that AHM was not the "prime" lender it claimed to be, but rather routinely issued high-risk loans to borrowers with poor credit in order to drive growth and capture additional market share.*** American Home's former CEO subsequently paid $2.5 million to settle the SEC's fraud charges.

- **May 2009**: A reporter for *The New York Times* published a news report recounting his experience in obtaining a loan from AHM. ***The reporter revealed how AHM actively concealed and omitted negative information on his loan application in order to qualify him for a loan.*** Not surprisingly, shortly after obtaining the AHM loan – a loan the reporter could not afford – the reporter defaulted.

- **May 13, 2009**: *A False Claims Act lawsuit was brought by the U.S. Government against Countrywide* and real estate appraisal firm Land Safe Appraisal Services, Inc., alleging that ***Countrywide routinely and falsely inflated appraisals***. Countrywide was a Warrantor and/or loan originator for the GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts. This action was ultimately settled as part of a global $1 billion settlement with Countrywide's parent company, Bank of America.

- **June 2009**: *The SEC sued former Countrywide executives for securities fraud*. The court overseeing the case denied the Countrywide executives' motions for summary judgment and held that there was ***evidence that Countrywide "routinely ignored its official underwriting guidelines to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market," and that "Countrywide all but abandoned managing credit risk through its underwriting guidelines."*** The executives subsequently paid over $73.1 million to settle the charges.

- **September 2009**: National Public Radio interviewed former Morgan Stanley employee Mike Francis, who worked as an Executive Director on Morgan Stanley's residential mortgage trading desk. Francis revealed that there was ***industrywide*** misconduct occurring during the time period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, which would have rendered the Warrantors' R&Ws regarding the Mortgage Loans false. Francis stated: ***"No income no asset loans, that's a liar's loan. We are telling you to lie to us, effectively. I mean, we're hoping you don't lie, but – tell us what you make. Tell us what you have in the bank. But we're not going to actually verify it? We're setting you up to lie. Something about that transaction feels very wrong. It felt wrong way back when. And I wish we had never done it. <u>Unfortunately what happened, we did it because everybody else was doing it</u>."***

1011938_1

- **January 5, 2010**:  RMBS insurers Republic Mortgage Insurance Company and Republic Mortgage Insurance Company of North Carolina *filed an amended complaint in a case against Countrywide and BNY Mellon, alleging that Countrywide had made numerous misrepresentations concerning "over 1500 loans*."  Amended Complaint, *Republic Mortg. Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 603915/2009 (Sup. Ct. N.Y., Cnty. N.Y. Jan. 5, 2010).

- **March 2010**:  *The parent company of First Horizon, a loan originator for the SAMI 2006-AR4 Covered Trust, reported that there were a stunning number of loan repurchase requests for First Horizon's loans, indicating pervasive breaches of First Horizon's R&Ws*.  The report stated: "*For repurchase requests . . . related to breach of contract . . . [a]s of December 31, 2009, [First Horizon] has observed loss severities ranging between 50 percent and 60 percent of the principal balance of the repurchased loans and rescission rates between 30 percent and 40 percent of the repurchase and make-whole requests*."

- **May 2010**: A news article in *The Atlantic* reported that former EMC employee Matt Van Leeuwen, a mortgage analyst at the company from 2004-2006, and another former EMC employee each revealed that *EMC routinely provided false information about its loans and told employees to make up loan data.  EMC was a Warrantor for the SAMI 2006-AR4 Covered Trust.  These former EMC employees reported that EMC concocted borrower FICO scores and provided false information about the loan types (i.e., whether the loans were full documentation loans or low documentation or other types of loans).  The article quoted one former EMC analyst as stating that employees falsified data because EMC did not "'want to waste the resources on deep investigation'" in its rush to securitize the loans.  The Atlantic article further confirmed that EMC also provided falsified loan data to the credit rating agencies: "After they prepped the rating agencies for what they 'thought' the loans would look like, they would buy loans in bulk, and then spend a day scrubbing them," removing negative loan data, thereby misleading the credit rating agencies and falsifying loan information that they then warranted was true in connection with EMC's R&Ws to investors like plaintiff and the class and RMBS trustees such as BNY Mellon*.[1]

---

[1]    Subsequently, a former underwriter for Clayton and Watterson-Prime was deposed and testified under oath in *Ambac Assurance Corp. v. EMC Mortgage LLC, et al.*, No. 650421/2011 (N.Y. Sup. Ct., N.Y. Cnty. Feb. 2, 2011), a breach of R&Ws case.  The former employee confirmed systematic breaches by EMC of its R&Ws.  To explain, Clayton and Watterson-Prime tested loans for EMC to determine whether they complied with the applicable underwriting guidelines or were otherwise defective.  *The former underwriter testified under oath that he was required to "approve loans that often did not satisfy the underwriting guidelines," to ignore defects in loan applications, to code defective loans as non-defective, and to change many of the grades on loans that were coded as defective to reflect that they were non-defective*.  For example, the former underwriter testified:

- **June 2010**: *Shareholders filed a derivative suit on behalf of First Horizon's parent company against the parent company's executives* alleging that *First Horizon engaged in illegal origination activities, failed to disclose the true risks and losses as a result of such unlawful origination activities, and failed to implement and follow controls designed to minimize risk and loss.* See Complaint, *Reid v. First Horizon Nat'l, et al.*, No. 10-cv-02413-STA-cgc (W.D. Tenn. June 2, 2010). *First Horizon was a loan originator for the SAMI 2006-AR4 Covered Trust.*

- **June 29, 2010**: *Illinois sued Countrywide*, *a Warrantor and/or loan originator for the GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts,* alleging that *Countrywide engaged in illegal discriminatory lending in connection with the making of mortgage loans to Illinois residents during the period from 2005 through 2007*, the same time period the Mortgage Loans to the Covered Trusts were originated, warranted and transferred to those trusts. See Complaint, *People of the State of Illinois v. Countrywide Fin. Corp., et al.*, No. 10CH27929 (Ill. Cir. Ct., Cook Cnty. June 29, 2010).

- **December 2010**: It was reported that JPMorgan analysts estimated "that 'put-back risk'" for loan warrantors, *i.e.*, loans subject to repurchase demands due to breaches of R&Ws, ranged *from $60 to $110 billion for RMBS trusts like the Covered Trusts*.

   **January 2011**: It was reported that *Bear Stearns and EMC employees referred to the mortgage loans in their RMBS trusts as "SACK[S] OF SHIT" and "DOG[S]," due to their extremely poor quality, contradicting EMC's R&Ws about the loans*.

---

- During the due diligence process, *Clayton and Watterson-Prime underwriters were directed to overlook defects and to grade defective loans as non-defective. These instructions came from EMC* and were conveyed to underwriters by their supervisors;

- *Clayton and Watterson-Prime underwriters were directed by EMC not to look for fraud in the loan files and to overlook any fraudulent documents*;

- *Clayton and Watterson-Prime underwriters were directed by EMC to grade loans as non-defective, even when the underwriters had determined the borrowers' incomes listed on loan applications were unreasonable*;

- Clayton and Watterson-Prime performed "1003/1008 underwriting," *a practice whereby an underwriter does not verify the information on the borrower's loan application, when reviewing loans for EMC*;

- *Clayton and Watterson-Prime were instructed by EMC to grade defective loans as non-defective by utilizing "compensating factors" that were not supported by the data in the loan files*; and

- *Clayton underwriters used the phrase "'Bear don't care'" to describe EMC's attitude towards the due diligence underwriting review process* (EMC was a division of Bear Stearns).

- 4 -

EMC was a Warrantor for the SAMI 2006-AR4 Covered Trust. In addition, it was revealed that EMC employees concealed that they were aware of numerous breaches of their R&Ws, and yet still manufactured a way to secretly profit from it. *In many cases, EMC purchased the loans it transferred to RMBS trusts from other loan originators, including many of the loan originators to the Covered Trusts. When it acquired the loans, EMC obtained R&Ws from the loan originators that were very similar or identical to the ones EMC made to the Covered Trusts when it sold loans to the Covered Trusts' Depositors. After EMC sold and transferred the loans to the RMBS trusts (and made its own R&Ws concerning the loans to RMBS trusts, Depositors and Trustees), EMC subsequently discovered breaches of its R&Ws, which were also breaches of the loan originators' R&Ws to EMC. EMC then secretly made R&W breach claims against the loan originators and settled with them for millions of dollars, which EMC then pocketed without informing anyone and without forwarding the settlement money to the RMBS trusts as it was required to do.* The foregoing business practices by EMC confirmed that EMC's R&Ws were systematically false.

# APPENDIX 3

- **June 2010**: *The United States Trustee Program ("USTP"), a component of the U.S. Department of Justice, announced that it had conducted an investigation (with the FTC) of CHLS/BACHLS, a Master Servicer and/or Servicer for the ECR 2005-2, GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts.* The USTP revealed that it had started its investigation of CHLS/BACHLS "after receiving *complaints of chronic . . . irregularities by mortgage servicing companies*." CHLS/BACHLS was charged with "*improper business practices" and "improper accounting and billing practices," including the filing of false and improper claims in bankruptcy proceedings against borrowers, inflating its mortgage claims, failing to credit borrowers for payments made, and failing to notify borrowers of extra and/or improper charges added to their bills*.[1] CHLS/BACHLS entered into a consent order to reform its loan servicing practices, compensate wronged borrowers, and establish internal controls to ensure that CHLS/BACHLS's bills and claims in bankruptcy were accurate and provided accurate and useful information to borrowers. *CHLS/BACHLS paid $108 million to settle these charges*.[2]

- **October 4, 2010**: California state assemblyman Ted Lieu, in discussing the rash of improper loan servicing and foreclosure issues, stated: "*[W]at we have here is massive fraud being perpetrated on the courts. . . . We're talking about hundreds of thousands of foreclosures that are now at risk because of what these robo-signers are doing. . . . [Credit rating agency] Fitch . . . has come out and stated that they believe that this is an <u>industry wide practice</u>. . . . [Y]ou just had [a] basic level failure to follow existing laws. And you have people that are falsifying documents in front of judges. . . . [Just] [y]ou imagine what is going on in [the] 27 other [non-judicial foreclosure] states where you don't have <u>any</u> judicial oversight*."

- **October 2010**: *The Ohio Attorney General began scrutinizing CHLS/BACHLS (through its parent Bank of America) and Wells Fargo, sending them letters seeking information about their robo-signing practices. CHLS/BACHLS and*

---

[1]  The USTP also noted that, in 2009, U.S. bankruptcy trustees *had taken "more than 9,000 formal and informal consumer protection actions, including <u>a large number of actions against mortgage servicing companies</u>*." This demonstrated the enormity and reach of the improper loan servicing practices engaged in by some in the loan servicing industry and the fact that such misconduct was being committed by some of the Covered Trusts' Master Servicers and Servicers. *The USTP also stated in its 2010 Annual Report that there were "<u>pervasive and longstanding problems regarding mortgage loan servicing</u>*," again revealing that these improper loan servicing practices were widespread.

[2]  In 2012, the FTC found that CHLS/BACHLS had violated the consent order by overcharging borrowers by millions of dollars. *As a result, the recalcitrant CHLS/BACHLS was required to refund or reverse $36 million in improper charges to borrowers*.

*Wells Fargo were Master Servicers and/or Servicers for the ECR 2005-2, GSCC 2006-1 and SAMI 2006-AR4 Covered Trusts.*

- **October 2010**: *The U.S. House Judiciary Committee sent similar letters to* most of the major loan servicers demanding the production of documents relating to their robo-signing and foreclosure practices. *The Master Servicers and Servicers to the Covered Trusts receiving letters from the House Judiciary Committee included EMC (through its parent company JPMorgan Chase), Wells Fargo, and CHLS/BACHLS (through its parent company Bank of America)*.

- **October 2010**: The *Miami Daily Business Review* reported on a Florida attorney who had 150 deposition transcripts from people who robo-signed foreclosure affidavits for loan servicers.  The attorney was quoted as saying that the 150 depositions "***prove flawed foreclosure documents are part of a fraudulent system***, not sloppy procedures" by loan servicers.  The attorney stated: "'***We are not talking about a mistake. We are talking about perjury, crime . . . . <u>This is system-wide</u> . . . .***'" *The news article reported that the deposition transcripts included testimony from employees of JPMorgan Chase (and thus its wholly-owned and controlled Servicer EMC), CHLS/BACHLS and Wells Fargo*.  The *Miami Daily Business Review* article reported the following information concerning Wells Fargo, the Master Servicer for the SAMI 2006-AR4 Covered Trust:

  > In one of the depositions provided by [attorney] Tiktin, a Wells Fargo employee, Xee Moua, admitted signing 300 to 500 documents including affidavits, substitutions of plaintiff, deeds and judgment affidavits in a two hour period on any given day.

  > Moua said she only attended six months of college before dropping out.  She then worked as an office clerk and customer service representative at a medical supplies firm and a blinds and shades company in North Carolina before she was hired by Wells Fargo as a document processor. *According to the transcript of the deposition, asked if she checked the information on the documents she was signing, Moua said, "I do not. That's not part of my job*."

  > She said she only checked to see if her own information, such as her title, was correct.

  > Her understanding, she said, was that either the law firm handling the foreclosure or a Wells Fargo processor assigned to the loan had checked the information.  Yet, she was the person authorized by the bank to sign the documentation.

  > *The documents she signed identified her as vice president of loan documentation, according to the transcript, but that wasn't her actual title*.

- 2 -

*She said she was given that title to sign documents. She said other employees were given the same title for signing court documents.*

- **October 2010**: It was reported that *U.S. regulators were "conducting an intensive probe of reportedly false foreclosure affidavits used by major U.S. financial institutions to evict thousands of American homeowners."*

- **October 2010**: Multiple news reports surfaced about many of the Master Servicers or Servicers to the Covered Trusts, reporting that they were widely and routinely engaged in robo-signing and other improper loan servicing practices. For example, *it was reported that Covered Trust Master Servicer Wells Fargo admitted that its employees signed hundreds of foreclosure documents daily without reading them.*

- **October 2010**: *Covered Trust Master Servicers/Servicers CHLS/BACHLS (through its parent company Bank of America) and EMC (through its parent company JP Morgan Chase) were collectively forced to halt their foreclosures on hundreds of thousands of mortgage loans. Similarly, Covered Trust Master Servicer Wells Fargo submitted revised documents for approximately 55,000 of its foreclosures.*

- **October 2010**: The *Mortgage Daily* reported that *Covered Trust Master Servicer/Servicer CHLS/BACHLS's parent company, Bank of America, had released statistics indicating that "80 percent of its borrowers who faced foreclosure had not even made a payment in more than a year, while the average foreclosed loan was 560 days past due,"* or over 18 months past due, graphically illustrating the long delays caused by CHLS/BACHLS's servicing misconduct. Similarly, *Covered Trust Master Servicer Wells Fargo reported that its average foreclosed loan as of September 2010 was 16 months past due, obviously due to its servicing misconduct which caused long delays*.[3]

  **Late October 2010**: It was reported that *the Attorney Generals of all 50 states were investigating "whether mortgage lenders falsified affidavits attesting to their review and verification of foreclosure documents, as well as whether they failed to sign the affidavits in the presence of a notary public."* Illinois Attorney General Lisa Madigan stated: *"The same mortgage giants and big banks that fraudulently put people into unfair loans are now fraudulently throwing people out of their*

---

[3]     Subsequently, a report by Amherst Securities Group LP ("Amherst") in February 2012 noted that the average delinquency time for liquidated loans grew from 21 months in September 2010 to 26 months by February 2012, an increase in delays of nearly 25%. In addition, Amherst reported that the average delinquency time for non-performing (*i.e.*, non-liquidated) loans increased from 19 months in September 2010 to 24 months by February 2012, an increase in delays of over 26%. Amherst reported that these statistics *demonstrated "the delay created by the [loan servicers'] robo-signing actions."* The report further stated that "*we believe the remaining loans will stay in the [delinquency] pipeline for another 12-15 months*," further demonstrating the compounding effect of the delays caused by the Master Servicers'/Servicers' ongoing robo-signing.

*homes. They should not be above the law. Illinois homeowners are legally entitled to a foreclosure process that is transparent, accurate and fair*."

# APPENDIX 4

- **November 2010**: U.S. Treasury Department Assistant Secretary Michael Barr provided an update on the investigation of loan servicers by U.S. banking regulators. Barr announced that they were uncovering "***widespread" and "inexcusable" breakdowns in loan servicing practices***. Barr stated: "***These problems must be fixed***."

- **November 2010**: Legal Services of New Jersey provided a report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation. The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents and falsified and back-dated documents, and other evidence of fraud, ***concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings***."[1] ***The report specifically implicated many of the Master Servicers and Servicers to the Covered Trusts in the misconduct, including CHLS/BACHLS, EMC, and Wells Fargo***.

- **December 20, 2010**: New Jersey Administrative Director of the Courts, Judge Grant, issued an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings. The order was directed at, among others, ***Nationstar, the Servicer for the NSTR 2007-C Covered Trust, and also at defendant BNY Mellon***, because it had been involved in numerous questionable foreclosures. ***Judge Grant's order also cited specific instances of improper foreclosures by Covered Trust Master Servicers/Servicers CHLS/BACHLS (through Bank of America), EMC (through JPMorgan Chase),and Wells Fargo, and also cited several cases in which BNY Mellon was a plaintiff involving improper foreclosure conduct***.

- **December 20, 2010**: Judge Jacobson of the Superior Court of New Jersey in Mercer County ***issued an order to show cause directed at, inter alia, Covered Trust Master Servicers/Servicers CHLS/BACHLS, EMC (through JPMorgan Chase), and Wells Fargo. The order to show cause held that these Master Servicers and Servicers were selected for scrutiny because of their "public record of questionable practices," "deposition testimony provided by employees" of these Master Servicers and Servicers that "raised serious questions about the accuracy and reliability of***

---

[1]  The report noted that the "***[c]ommon practices and characteristics***" that Legal Services of New Jersey found in its nationwide investigation included: (a) affiants claiming personal knowledge of facts that the affiant had no personal knowledge of; (b) failure to review documents and evidence on which certifications were based; (c) actual false statements about when and how a loan was transferred; (d) false identification of signatories (*e.g.*, an employee of a servicer will be identified as a vice president, or similar title, of the foreclosing mortgagee); (e) forged signatures; and (f) improperly notarized documents.

- 1 -

***documents submitted to courts,"*** and ***"the execution of affidavits, certifications, assignments, and other documents in numerous residential mortgage foreclosure actions in New Jersey and elsewhere [that] may not have been based on personal knowledge in violation of the Rules of Court and may thus be unreliable***."

- **December 2010**: Before the U.S. House Judiciary Committee, Thomas Cox, an attorney for the Maine Attorneys Saving Homes Project, testified to instances of blatant foreclosure fraud by JPMorgan Chase (which included Covered Trust Servicer EMC). Cox recounted several cases where "***JPMorgan Chase used 'fraudulently created facts' and attempted to commit 'fraud upon the court' in connection with its foreclosures***." Cox recounted a case where the U.S. Trustee was required to intervene into a bankruptcy case in New York to file a motion for sanctions against JPMorgan Chase, whereupon it admitted to submitting false facts to the court. Based on his observations of JPMorgan Chase's foreclosure practices, ***Cox testified that "JPMorgan Chase has engaged in a pattern of filings in the Bankruptcy Court for the Southern District of New York that is simply breathtaking in the scope of dishonest and deceptive practices it reveals***." This information established that EMC (as a part of JPMorgan Chase) engaged in a pattern and practice of fraudulent loan servicing which amounted to Events of Default under the Governing Agreements. Cox also testified to the prevalence of foreclosure fraud by the loan servicing industry in general: "***I know from my personal experience over the past two and one half years that this kind of servicer fraud-on-the-court activity is not isolated to [any one loan servicer]. It has been the norm across the entire foreclosure industry, including the other servicers represented here today, JPMorgan Chase [and thus Covered Trust Servicer EMC] and Bank of America [and thus Covered Trust Master Servicer/Servicer CHLS/BACHLS]***." Cox's testimony expressly stated that fraudulent foreclosure practices amounting to Events of Default were occurring "***across the entire foreclosure industry***" and were thus not isolated or infrequent. Indeed, over two years later, after the massive scope of this misconduct finally became known to those outside of the loan servicing and RMBS trustee industries, Yale Law School Professor Raymond Brescia stated: "'***I think it's difficult to find a fraud of this size on the U.S. court system in U.S. history . . . . I can't think of one where you have literally tens of thousands of fraudulent documents filed in tens of thousands of cases***.'"

- **December 2010**: An article published in the *Yale Journal on Regulation* and written by law professor Adam Levitin and attorney Tara Twomey concluded:

    > *[T]he residential mortgage servicing business . . . suffers from an endemic principal-agent conflict between investors and servicers. Securitization separates the ownership interest in a mortgage loan and the management of the loan. Securitization structures incentivize servicers to act in ways that do not track investors' interests, and these structures limit investors' ability to monitor servicer behavior.*

*     *     *

*As a result, servicers are frequently incentivized to foreclose on defaulted loans rather than restructure the loan, even when the restructuring would be in the investors' interest*.

- **December 2010**: In a U.S. Senate Banking, Housing and Urban Affairs Committee hearing, law professor Kurt Eggert testified that ***loan servicers were incentivized to initiate foreclosures and then extend them for long periods of time since it allowed the servicers to add improper and excessive "junk fees" to the amounts owed by borrowers***. Then, when the mortgages were finally foreclosed and the properties sold, the loan servicers' improper "junk fees" would be paid first, before the remaining amounts, if any, were remitted to the RMBS trusts, thus generating substantial fees for the servicers but taking money away from RMBS investors like plaintiff and the class.

- **December 2010**: Professor Eggert also testified that ***loan servicers were often also the originators and warrantors of the mortgage loans in the trusts, and therefore would have firsthand knowledge of any breaches of their R&Ws (similarly, many of the Warrantors to the Covered Trusts were also the Master Servicers or Servicers of the very same Mortgage Loans they warranted)***. Under RMBS trust agreements, master servicers and servicers were required to notify the trustee whenever they discovered breaches of even their own (or their related companies') R&Ws. *See, e.g.*, NSTR 2007-C PSA §3.04(a) (Warrantor and Servicer Nationstar required to inform BNY Mellon of its own R&W breaches). Eggert testified that ***master servicers and servicers of RMBS did not notify anyone of their own breaches, because they would basically be turning themselves in and, therefore, would have to pay for their breaches*** by curing, substituting or repurchasing defective loans. ***At one time, all of the Covered Trusts had at least one Warrantor that was also a Master Servicer or Servicer to the Covered Trusts at the same time***.

- **December 2010**: Professor Eggert further testified that loan servicers owned large numbers of second lien loans while the RMBS trusts owned the majority of first lien loans. ***This incentivized loan servicers to refuse to modify first lien loans in ways that benefitted RMBS investors because it would harm the servicers' interests in their second lien loans***, which second liens were typically extinguished in a modification of a first lien loan, causing losses to the loan servicers. Thus, ***loan servicers would encourage borrowers of second lien loans owned by the servicers to make payments due on such second lien loans instead of the RMBS trusts' first lien loans***. These perverse incentives, which caused loan servicers to service the mortgage loans in ways which hurt RMBS investors, instead of benefitting them as required by the Governing Agreements, were yet additional Events of Default under the Governing Agreements.

- **January 2011**: ***The FCIC Report further confirmed the existence of loan servicers' conflicts of interests with RMBS investors which led to Events of Default by the Covered Trusts' Master Servicers/Servicers***. The FCIC reported that loan servicers

- 3 -

were improperly denying borrowers' loan modifications under the U.S. Government's "HAMP" program, a program which was created to assist borrowers with obtaining mortgage loan modifications to avoid foreclosures. FCIC Report at 405. Most of the Master Servicers and Servicers had joined the HAMP program and had agreed to modify qualifying loans and borrowers in exchange for monetary incentives from the government. The FCIC Report noted that Diane Thompson of the National Consumer Law Center testified before the U.S. Senate's Banking, Housing, and Urban Affairs Committee, stating that "'[o]nly a very few of the potentially eligible borrowers have been able to obtain permanent modifications. ***Advocates continue to report that borrowers are denied improperly for HAMP . . . and that some servicers persistently disregard HAMP applications.***'" *Id.* The FCIC Report also noted that a Moody's Investors Service managing director "***learned that a survey of servicers indicated that very few troubled mortgages were being modified.***" *Id.* at 223.

- **January 2011**: ***The FCIC Report confirmed that loan servicers had incentives to push loans into foreclosure rather than to modify them in a manner that would benefit RMBS investors because the servicers collected large fees from foreclosures***. Loan modifications in many cases were beneficial to RMBS investors because a borrower which continued to make loan payments – even reduced modified payments – could be much more profitable to RMBS investors over time than a borrower who had ceased making payments and who was foreclosed on in a depressed real estate market with excessive loan servicing fees being deducted from the proceeds going to the RMBS trusts.

- **January 2011**: ***The FCIC Report further re-confirmed the robo-signing scandal***, noting testimony given by New York State Supreme Court Justice F. Dana Winslow to the U.S. House Judiciary Committee. Justice Winslow testified that the loan servicing issues had become so prevalent in New York that an RMBS trustee's standing to foreclose had "'become . . . a pervasive issue.'" FCIC Report at 407. The FCIC Report further documented numerous other improper loan servicing practices that Justice Winslow had observed in foreclosure cases, such as:

  > [T]he failure to produce the correct promissory notes in court during foreclosure proceedings; gaps in the chain of title, including printouts of the title that have differed substantially from information provided previously; retroactive assignments of notes and mortgages in an effort to clean up the paperwork problems from earlier years; questionable signatures on assignments and affidavits attesting to the ownership of the note and mortgage; and questionable notary stamps on assignments.

  *Id.* at 407-08.

- **January 26, 2011**: ***The U.S. Inspector General released a report*** in which the following observations were made about the loan servicing industry:

- 4 -

> *Anecdotal evidence of [loan servicers'] failures [have] been well chronicled. From the repeated loss of borrower paperwork, to blatant failure to follow program standards, to unnecessary delays that severely harm borrowers while benefiting servicers themselves, stories of servicer negligence and misconduct are legion, and . . . they too often have financial interests that don't align with those of either borrowers or investors*.

- **February 2011**: ***Covered Trust Servicer Nationstar was sued in a class action by borrowers*** in West Virginia whose loans were serviced by Nationstar. Nationstar was the Servicer for the NSTR 2007-C Covered Trust. ***Discovery in the case revealed thousands of violations of West Virginia law by Nationstar***. Nationstar subsequently settled the case.

- **May 2011**: Just one month after the April 2011 consent orders, ***Covered Trust Master Servicers/Servicers CHLS/BACHLS and Saxon entered into additional consent orders*** with the U.S. Department of Justice for additional loan servicing misconduct. CHLS/BACHLS and Saxon were Master Servicers and/or Servicers for four of the five Covered Trusts at that time. CHLS/BACHLS and Saxon were charged by the Department of Justice with wrongfully and ***intentionally foreclosing on active duty servicemembers in violation of federal law***, clear Events of Default. CHLS/BACHLS paid $20 million to compensate and resolve claims that it illegally foreclosed on approximately 160 servicemembers between January 2006 and May 2009. It also agreed to extensive loan servicing reforms and to pay additional compensation to any other servicemembers it illegally foreclosed on between June 2009 through 2010. Saxon also agreed to compensate servicemembers on which it had ***intentionally foreclosed in violation of law between 2006 and 2009, including many servicemembers "who . . . served honorably in Iraq, some of whom were severely injured in the line of duty or suffer[ing] from post-traumatic stress disorder***," according to the Department of Justice's press release. Saxon agreed to pay $2.35 million to aggrieved servicemembers for its misconduct, agreed to numerous corrective measures, and further agreed to provide additional compensation to additional servicemembers on which it illegally foreclosed between July 2009 and December 2010.[1]

- **June 2011**: Bank of America entered into an ***$8.5 billion settlement concerning 530 RMBS trusts – of which BNY Mellon was trustee – for loan servicing abuses amounting to Events of Default by CHLS/BACHLS***. (A portion of the settlement was also for massive breaches of Countrywide's R&Ws.)

- **July 2011**: The *Associated Press* reported that "***[m]ortgage industry employees are still signing documents they haven't read and using fake signatures more than eight months after big banks and mortgage companies promised to stop the illegal practices that led to a nationwide halt of home foreclosures***." The *Associated Press* article further reported:

---

[1] The Justice Department's press release summed up the egregiousness of these Servicers' misconduct with the following quote from the U.S. Attorney for the Northern District of Texas, who filed the action against Saxon Mortgage Services:

> With the numerous sacrifices our servicemembers make while they are serving our country, the last thing they need to worry about is whether or not their families will be forced from their homes," said James T. Jacks, U.S. Attorney for the Northern District of Texas. "***These lenders' callous disregard for the SCRA, a law which was designed to insulate these patriots from unlawful foreclosures and other civil and financial obligations while they are on active duty, is deplorable and I applaud the Department's Civil Rights Division's efforts in identifying and seeking remedies for these wronged service members***."

*County officials in at least three states say they have received thousands of mortgage documents with questionable signatures since last fall, suggesting that the practices, known collectively as "robo-signing," remain widespread in the industry.*

\*      \*      \*

*Lenders say they are working with regulators to fix the problem but cannot explain why it has persisted.*

*Last fall, the nation's largest banks and mortgage lenders, including JPMorgan Chase, Wells Fargo, Bank of America and an arm of Goldman Sachs, suspended foreclosures as they investigated how corners were cut to keep pace with the crush of foreclosure paperwork.*

*Critics say the new findings point to a systemic problem with the paperwork involved in home mortgages and titles. And they say it shows that banks and mortgage processors haven't acted aggressively enough to put an end to widespread document fraud in the mortgage industry.*

*"Robo-signing is not even close to over," says Curtis Hertel, the recorder of deeds in Ingham County, Mich., which includes Lansing. "It's still an epidemic."*

- **July 2011**: Michael Calhoun, President of the Center for Responsible Lending, told the U.S. Senate Banking, Housing and Urban Affairs Committee that "***[a]busive [loan servicing] practices have become so ingrained in the servicing culture that they are now endemic to the industry***." He then testified concerning multiple ongoing servicing abuses he had observed, such as:

    - "dual track[ing]," an improper servicing practice where the borrower is foreclosed on in the middle of ongoing loan modification negotiations or after a trial modification was agreed to and being performed by the borrower;
    - "[f]oreclosing even when [RMBS] investors would receive more from a sustainable modification";
    - "[i]mproper denial and delay of loan modification requests . . . because fees, which eventually flow directly to servicers . . . continue to accrue";
    - "[f]orcing homeowners into multiple temporary modifications [which is] a best-of-both-worlds situation for servicers, who continue to charge fees";
    - "[f]orce-placed insurance [which is] very expensive . . . often driving an otherwise current borrower into delinquency and even foreclosure";
    - "[i]mproper fees";
    - "[m]isapplication of borrower payments";
    - "[m]ismanaged escrow accounts";
    - "[f]ailing or refusing to provide payoff quotations to borrowers";
    - "[a]buses in the default and delinquency process"; and

- *"fail[ure] to adhere to loss mitigation requirements of [RMBS] investors,"* i.e., failure to abide by the Governing Agreements.

- **July 18, 2011**: *Reuters reported that Master Servicers and Servicers to the Covered Trusts were continuing to engage in Events of Default on a grand scale*. *Reuters'* investigation found that loan servicers "*continue[d] to file questionable foreclosure documents with courts and county clerks*," and that "*servicers have filed thousands of documents that appear to have been fabricated or improperly altered, or have sworn to false facts*." *Reuters* also reported that "*[o]ne of the industry's top representatives admits that the federal settlements [in April 2011] haven't put a stop to questionable practices," and that "many [servicers] are still taking the same shortcuts they promised to shun, from sketchy paperwork to the use of 'robo-signers.'*" The *Reuters* investigative report cited multiple examples of continuing improper loan servicing by many of the Master Servicers and Servicers to the Covered Trusts, including **Bank of America (CHLS/BACHLS), Wells Fargo and Ocwen**. *Reuters* reported that Master Servicer Wells Fargo had assigned mortgages on behalf of lender New Century to others in 2011, four years *after* New Century ceased to exist, and that in "*court files of Florida foreclosure cases by Wells Fargo . . . none of the promissory notes filed as exhibits in 10 cases found by Reuters had any endorsements on them*." Bank of America (which includes Covered Trust Master Servicer/Servicer CHLS/BACHLS) was also singled out by the *Reuters* article:

> *Bank of America, meanwhile, is coming under fire from a New York federal bankruptcy judge.*
>
> *Last Tuesday, Judge Robert Drain ordered an investigation involving a foreclosure case brought by the bank. Two earlier copies of a promissory note filed in court had lacked any endorsement, but then one appeared on the note when bank lawyers produced the original.*
>
> *The judge said the sudden appearance of an endorsement, and his own close look at it, raised questions about whether it had been added illegally to make the note look legitimate.*
>
> *It "raises a sufficiently serious issue as to when and more importantly by whom this note was endorsed," the judge said.*

The *Reuters* article confirmed ongoing, rampant Events of Default:

> Reuters reviewed records of individual county clerk offices in five states – Florida, Massachusetts, New York, and North and South Carolina – with searchable online databases. Reuters also examined hundreds of documents from court case files, some obtained online and others provided by attorneys.

- 3 -

*The searches found more than 1,000 mortgage assignments that for multiple reasons appear questionable: promissory notes missing required endorsements or bearing faulty ones; and "complaints" (the legal documents that launch foreclosure suits) that appear to contain multiple incorrect facts*.

- **August 4, 2011**: *Covered Trust Master Servicer/Servicer CHLS/BACHLS was again caught engaging in Events of Default*. In states providing for non-judicial foreclosures, Bank of America (and thus CHLS/BACHLS) utilized a subsidiary of Bank of America called ReconTrust Company, N.A. ("ReconTrust"), to foreclose on homeowners. On August 4, 2011, *the Attorney General for the State of Washington filed an action against ReconTrust alleging that the company has "failed to comply with the procedures of [Washington state foreclosure laws] <u>in each and every foreclosure it has conducted since at least June 12, 2008</u>" and "systematically conceals, misrepresents or inaccurately divulges the true parties to the mortgage transaction," including misrepresenting the ownership of mortgage notes*.

- **August 2011**: *American Banker* reported that "*the largest mortgage servicers are still fabricating documents*" filed in foreclosure proceedings. The article reported the following:

  > *Several dozen documents reviewed by American Banker show that as recently as August some of the largest U.S. banks, including Bank of America Corp. [CHLS/BACHLS], [and] Wells Fargo . . . were essentially backdating paperwork necessary to support their right to foreclose*.

  > *Some of documents reviewed by American Banker included signatures by current bank employees claiming to represent lenders that no longer exist*.

  > \*       \*       \*

  > "*It's one thing to not have the documents you're supposed to have even though you told investors and the SEC you had them,*" says Lynn E. Szymoniak, a plaintiff's lawyer in West Palm Beach, Fla. "*But they're making up new documents*."

  > \*       \*       \*

  > *North Carolina consumer bankruptcy lawyer O. Max Gardner III says servicers and trustees often submit promissory notes in court without proper endorsements, which show the chain of title from one lender to another. Then, after the fact, there will be "a magically appearing note with a stamped endorsement," Gardner said*.

  > *When plaintiff's lawyers then try to depose the person whose name is stamped on the endorsement, "we're being told the person is no longer*

*employed by the servicer or by the party for whom they signed," Gardner says.*

       *Linda Tirelli, a New York bankruptcy lawyer, calls such mortgage documents "Ta-Da!" assignments because they seem to appear out of nowhere.*

       *"Why are they creating their own assignments to begin with?" asks Tirelli, who represents borrowers. "Why is this even an issue?"*

- **October 6, 2011**: Neil Barofsky, former Special Inspector General for the Troubled Asset Relief Program, or TARP, testified before a U.S. House Financial Services Subcommittee and stated that the Government Accountability Office ("GAO") "*confirmed . . . widespread anecdotal evidence of [loan] servicers' failures*" to properly service mortgage loans. Barofsky also confirmed that "*the widespread abuse suffered . . . at the hands of the mortgage servicers . . . has gone largely unaddressed . . . even though [the Government] has been aware of servicer misconduct since 2009,*" and further confirmed that "*rampant mortgage servicer abuse that has so strongly characterized the [financial] crisis . . . continues to go unpunished*."

- **November 11, 2011**: *New York's Department of Financial Services came to an agreement with Covered Trust Servicer Saxon to drastically reform its loan servicing practices*. Benjamin Lawsky, the Department's Superintendent of Financial Services stated: "*Today's agreements are an important step forward in cleaning up some of the mortgage industry's most troubling practices*," including robo-signing, the filing of false documents, improper refusals to modify loans, and the charging of improper fees.

- **December 2011**: It was reported that *an Alabama bankruptcy court judge ruled that Wells Fargo, a Master Servicer for the SAMI 2006-AR4 Covered Trust, had filed at least 630 sworn foreclosure affidavits containing false facts*, including claims that borrowers were in arrears for amounts not actually due. Judge Margaret A. Mahoney had declared that "*Wells Fargo 'took the law into its own hands'" and disregarded perjury laws*.

- **January 2012**: The *Chicago Tribune* reported:

       *Foreclosure-related case files in just one New York federal bankruptcy court, for example, hold at least a dozen mortgage documents known as promissory notes bearing evidence of recently forged signatures and illegal alterations, according to a judge's rulings and records reviewed by Reuters. Similarly altered notes have appeared in courts around the country.*

       *Banks in the past two years have foreclosed on the houses of thousands of active-duty U.S. soldiers who are legally eligible to have*

*foreclosures halted. Refusing to grant foreclosure stays is a misdemeanor under federal law.*

*The U.S. Treasury confirmed in November that it is conducting a civil investigation of 4,500 such foreclosures. Attorneys representing service members estimate banks have foreclosed on up to 30,000 military personnel in potential violation of the law.*

\* \* \*

*And in thousands of cases, documents required to transfer ownership of mortgages have been falsified. Lacking originals needed to foreclose, mortgage servicers drew up new ones, falsely signed by their own staff as employees of the original lenders – many of which no longer exist.*

- **February 9, 2012**: The U.S. Department of Justice and 49 states obtained "***a landmark $25 billion settlement," "the largest federal-state civil settlement ever obtained***," against the nation's five largest loan servicers for continuing "***mortgage loan servicing and foreclosure abuses***" (hereafter the "National Mortgage Settlement"). U.S. Attorney General Eric Holder called the servicers' misconduct "***reckless and abusive mortgage practices." The five loan servicers charged by the U.S. and 49 states were repeat offenders – they had previously entered into the April 2011 consent orders. Three of the five serial offenders were Bank of America (which includes Master Servicer/Servicer CHLS/BACHLS), JPMorgan Chase (which includes Servicer EMC) and Wells Fargo*** – Master Servicers or Servicers for ***three of the five Covered Trusts***. These repeat offenders were charged with

    *violations of state and federal law[;] . . . [the] use of "robo-signed" affidavits in foreclosure proceedings; deceptive practices in the offering of loan modifications; failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages; and filing improper documentation in federal bankruptcy court.*

- **February 2012**: *The New York Attorney General sued many of the Master Servicers and Servicers to the Covered Trusts – Wells Fargo, Bank of America (and therefore CHLS/BACHLS) and JPMorgan Chase (and therefore EMC)*. The New York Attorney General also sued MERSCORP Inc. and its subsidiary Mortgage Electronic Registration Systems, Inc. (collectively, "MERS"). The lawsuit alleged that these Master Servicers and Servicers and MERS repeatedly submitted documents to courts in foreclosure proceedings that contained misleading and false information. The New York Attorney General stated: "'***Once the mortgages went sour, these same banks brought foreclosure proceedings en masse based on deceptive and fraudulent court submissions, seeking to take homes away from people with little regard for basic legal requirements or the rule of law***.'"

- 6 -

- **March 5, 2012**: U.S. Secretary of Housing and Urban Development, Shaun Donovan, stated in televised comments that "***as high as 60 percent of foreclosures were [still] being done wrong***."

- **March 30, 2012**: ***Jamie Dimon, CEO of JPMorgan Chase & Co., which owned and controlled Covered Trust Servicer EMC, sent a letter to JPMorgan Chase's shareholders admitting that EMC had engaged in robo-signing***:

  > ***Our servicing operations left a lot to be desired: There were too many paperwork errors, including affidavits that were improperly signed because the signers did not have personal knowledge about what was in the affidavits but, instead, relied on the company's processes***.

- **April 2, 2012**: ***Morgan Stanley entered into a "Consent Order to Cease and Desist" with the Federal Reserve that was substantially identical to the April 2011 consent orders, regarding its subsidiary, Saxon, a Servicer for the NHEL 2006-3 Covered Trust***. Like the April 2011 consent orders, Morgan Stanley/Saxon consented to the entry of an order charging them with "***unsafe and unsound***" loan servicing practices, which included the ***filing of false affidavits in foreclosure proceedings that were also falsely sworn to be based on the personal knowledge of the affiants when in fact they were not, filing false affidavits that were not properly notarized or signed in the presence of a notary, filing defective or false documents such as endorsed or assigned notes and mortgages, failing to properly staff, manage and supervise foreclosures, failing to properly communicate with borrowers prior to foreclosing, and failing to have adequate internal controls, policies, procedures, compliance risk management, audit, training and oversight of their foreclosure processes, including failing to properly oversee third-party vendors and outside counsel prosecuting the foreclosures***. In February 2013, Morgan Stanley/Saxon agreed to an amendment to their consent order, whereby they paid $97 million to borrowers who were improperly foreclosed on by them.

- **June 7, 2012**: Law professor Adam Levitin testified before a U.S. House Subcommittee, stating that ***the National Mortgage Settlement would "not deter future consumer fraud by too-big-to-fail" master servicers/servicers***, calling their conduct "***one of the most pervasive violations of procedural rights in history," supported by "evidence of widespread fraud [that] was too great to ignore***." Regarding the National Mortgage Settlement, Professor Levitin stated: "Critically for the purposes of this hearing, ***the settlement permits the banks to receive credit under the settlement by reducing principal or refinancing on mortgages that they service, but <u>do not own</u>," and therefore "servicers have strong incentives not to engage in principal write-downs on loans they own"; instead, "it appears likely that most of the principal reductions will come from <u>investor-owned mortgages</u>," i.e., Mortgage Loans like those in the Covered Trusts***. Professor Levitin concluded: "***I would expect servicers to perform some [principal reductions] that violate PSAs in order to get . . . settlement credit***."

- 7 -

- **December 2012**: *An Ohio appeals court rendered a decision against Nationstar that revealed that Nationstar was engaging in the same Events of Default as the Covered Trusts' other Master Servicers and Servicers*. In *Nationstar Mortg., LLC v. Van Cott*, No. L-12-1002, 2012 Ohio App. LEXIS 4999, at *1 (App. Ct. Ohio Dec. 7, 2012), the appeals court reversed a summary judgment of foreclosure in favor of Nationstar, holding that while Nationstar alleged in its complaint that it was "'entitled to enforce the Note pursuant to Section 1303.31 of the Ohio Revised Code, and the Mortgage was given to secure the Note' . . . Nationstar did not attach a copy of either the note or mortgage to its complaint and alleged that the note had been misplaced and could not be located." But, miraculously, a note and mortgage magically appeared at the time Nationstar filed its summary judgment motion. However, the appeals court noted that the note "*show[ed] no evidence of an assignment to Nationstar" and in fact "do[es] not show an assignment of . . . the note to anyone," contrary to Nationstar's allegations and affidavits. Id. at *15, *18. The court also noted that "an assignment of the mortgage . . . to Nationstar . . . was executed on September 3, 2010," but that "[t]he complaint was filed on August 23, 2010." Id. at *18. This clearly indicated that Nationstar had misrepresented the fact that it owned the note and mortgage at the time it filed suit, as required by Ohio law*.

- **January 2013**: *Bank of America (and therefore CHLS/BACHLS) was reported to still be committing Events of Default, as it had to pay Fannie Mae $1.3 billion "to make up for dropping the ball on servicing mortgages . . . by delaying contacts with delinquent borrowers or failing to process foreclosures properly."*

- **February 2013**: In a lawsuit to approve an $8.5 billion settlement between Bank of America and BNY Mellon concerning, *inter alia*, improper loan servicing by Covered Trust Master Servicer/Servicer CHLS/BACHLS in 530 RMBS trusts, *objectors to the settlement provided evidence to the court establishing that CHLS/BACHLS breached the PSAs for 468 of the 530 trusts by improperly modifying first lien loans owned by the trusts, and thus causing losses to the investors, while simultaneously refusing to modify second lien loans it or Bank of America owned in order to avoid losses to themselves*.

- **March 4, 2013**: *A class of nationwide borrowers sued Nationstar for improper loan servicing practices*, alleging that Nationstar violated state and federal laws by making "*repeated misrepresentations*" and *engaging in "deceptive*" business practices in connection with improperly denying loan modifications required by it under the HAMP program. *The borrowers alleged that Nationstar operated "a system designed to wrongfully" deny borrowers loan modifications*.

- **March 7, 2013**: *Nationstar was sued again, this time by an RMBS investor. The RMBS investor alleged that Nationstar was "not fulfill[ing] its duties as Master Servicer, but rather ha[d] engaged in practices to enrich itself at the expense of the . . . certificate holders." The investor alleged that Nationstar was breaching its master servicing agreement with the RMBS trust and engaging in a "blatant*

*abdication of its servicing duties under the governing contracts" by "auctioning off the trusts' mortgage loans in bulk . . . for amounts that are a fraction of the loans' unpaid balances or the value of the properties securing the loans*." The investor alleged these actions profited Nationstar, which recouped the fees it advanced, but injured investors. ***The court immediately issued a temporary restraining order against Nationstar and ordered it to stop selling the loans***. Nationstar thereafter quickly settled the case.

- **June 2013**: The *Charlotte Business Journal* reported that the monitor overseeing the administration of the National Mortgage Settlement found that ***Bank of America (and thus Covered Trust Servicer CHLS/BACHLS) was not complying with the required servicing standards***. The article stated: "***These aren't new allegations***."[2] *The New York Times* reported that, in addition to Bank of America, ***Master Servicers/Servicers EMC (through JPMorgan Chase) and Wells Fargo were also not complying with the settlement***. *The New York Times* reported that the servicers had received "***almost 60,000 complaints***" from borrowers about their servicing misconduct, while

> *state officials have expressed deep disappointment with the banks' performance in other areas. Last month, lawyers in the office of Martha Coakley, the attorney general of Massachusetts, detailed what they said were hundreds of violations of the settlement, including a failure to adhere to the required timetable or provide reasons for the denial of an application.*

> *They also pointed to cases where they said banks had improperly inflated the value of a loan before writing it down so as to claim a greater amount of relief, or where they had reverted to a higher interest rate while delaying, for months, the decision to make a trial loan modification permanent.*

> *Soon after, Eric T. Schneiderman, the attorney general of New York, announced plans to sue Bank of America [and therefore CHLS/BACHLS] and Wells Fargo, saying they were repeatedly violating the terms of the settlement.*

> *Lisa Madigan, the attorney general of Illinois, said there was an "alarming pattern" of violations of the servicing standards. In a review of servicer handling of loan modification requests in Illinois, she found that in 60 percent, servicers failed to comply with the time frame for notifying borrowers of missing documents and in 45 percent they made multiple requests for the same documents.*

---

[2]   In fact, Bank of America/CHLS/BACHLS would subsequently be found to not be in compliance by the monitor several additional times.

*Pam Bondi, the attorney general of Florida, has written letters to Bank of America and Wells Fargo detailing similar complaints that are resolved only by the intervention of her office*.

- **June 2013**: *CBC News* reported that *former employees of Bank of America (which included CHLS/BACHLS) had filed sworn affidavits in cases against the bank revealing conduct amounting to Events of Default*:

  *Former Bank of America employees say in court documents that the bank routinely lies to customers about their mortgages, and denies their requests for modifications without even looking at the paperwork*.

  *In sworn affidavits, four former employees, for example, describe policies in place at the bank that they say are designed to subvert the Home Affordable Modification Program (HAMP), 2009 government-sponsored initiative that was designed to keep distressed homeowners above water during the depths of the housing crises*.

  *The affidavits are part of multiple court cases against the bank brought by homeowners who say they were unfairly foreclosed upon*.

  \*     \*     \*

  *The former workers allege there's a bank-wide policy that encourages mortgage officers to delay and avoid that process as much as possible, to foreclose on customers who shouldn't have been, and to generally lie and mislead*.

  *According to one affidavit, a mortgage processor who put 10 or more houses into foreclosure in any given month was eligible for a $500 cash bonus, or gift cards at a major retailer*.

  *The sworn affidavits were made public recently on the website of ProPublica, an independent, non-profit news service that produces investigative journalism in the public interest*.

  *The employees say the bank also went out of its way to mislead, stall and delay paperwork so that customers would be denied changes to their mortgages, and forced into arrangements that were more profitable to the bank than HAMP arrangements were*.

  *"We were told to lie to customers and claim that Bank of America had not received documents it had requested, and that it had not received trial payments [when in fact it had]," said Simone Gordon, a senior collector of loss mitigation at the bank for five years until early 2012*.

*Another ex-worker, Theresa Terrelonge, agreed that subverting HAMP to the bank's benefit was an overarching goal for the bank.*

*"Based on what I observed, Bank of America was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications while leading the public and the government to believe that it was making efforts to comply with HAMP," she said.*

\*     \*     \*

*"It was well known among managers and many employees that the overriding goal was to extend as few HAMP loan modifications to homeowners as possible."*

*She also said that Bank of America "collectors" who failed to meet their quotas were fired for not putting enough customers into foreclosure. "Several of my colleagues were terminated on that basis," she said.*

*Another former employee, William Wilson, said the bank would routinely delay filing appropriate paperwork after receiving it, in order to have certain penalties kick in. After waiting 60 days, the bank would automatically reject them all.*

*"During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than the documents were more than 60 days old," Wilson said.*

*"Once an applicant was finally rejected after a long delay, the bank would offer them an alternative. Bank of America would charge a higher interest rate . . . ."*

*Wilson alleges he was fired in August 2012 for refusing to go along with the scheme any longer.*

\*     \*     \*

*The employees allege the bank would routinely file false paperwork to [the] government suggesting it had far more HAMP-backed loans on its books than was the reality.*

*"It was well known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true," Steven Cupples said. Cupples worked at the bank until June 2012. He previously worked at Countrywide, the lender at the center of America's subprime mortgage crisis that was subsequently taken over by Bank of America.*

- 11 -

- **September 2013**: *Salon.com reported that Covered Trust Servicer Nationstar was engaging in an "appalling new way to cheat homeowners*." The article stated:

> *A few months ago, Ceith and Louise Sinclair of Altadena, California, were told that their home had been sold. It was the first time they'd heard that it was for sale.*
>
> *Their mortgage servicer, Nationstar, foreclosed on them without their knowledge, and sold the house to an investment company. If it wasn't for the Sinclairs going to a local ABC affiliate and describing their horror story, they would have been thrown out on the street, despite never missing a mortgage payment. It's impossible to know how many homeowners who didn't get the media to pick up their tale have dealt with a similar catastrophe, and eventually lost their home.*
>
> \* \* \*
>
> *Nationstar has racked up an impressively horrible customer service record in its short life, failing to honor prior agreements with borrowers and pursuing illegal foreclosures. The fact that Nationstar and other corrupt companies like it are beginning to corner the market for mortgage servicing should trouble not only homeowners, but the regulators tasked with looking out for them. It didn't seem possible that a broken mortgage servicing industry could get worse, but it has.*
>
> \* \* \*
>
> *[But] Nationstar is no different. . . . While the company promised California that it would adhere to all settlement obligations on the servicing rights it purchases, the Sinclairs were subjected to familiar abuse. The family paid their mortgage on time since purchasing their home in 2003. Last year, they received a loan modification. But their servicer sold the rights to Nationstar, and Nationstar didn't honor the modification. In June, the Sinclairs sent in their mortgage payment, and Nationstar sent it back in full. Then it sold the home. When questioned, Nationstar claimed the Sinclairs didn't notarize one page of their modification, which turned out to be untrue.*
>
> *It was a clear attempt to find an excuse to deny the modification and push the Sinclairs into foreclosure. Mortgage servicers actually make more money with foreclosures than with loan modifications, because of how their compensation structure works. Servicers load up various foreclosure fees on homeowners that they get to keep, and they get paid off first in a foreclosure sale. A loan modification simply cuts their percentage balance on the loan.*

- 12 -

- **November 2013**: *JPMorgan Chase (owner of Covered Trust Servicer EMC) announced that it had entered into a tentative settlement whereby it would pay $4.5 billion* to settle R&W *and loan servicing claims for tens of thousands of loans in 330 RMBS trusts, including the SAMI 2006-AR4 Covered Trust*.

- **November 2013**: Standard & Poor's estimated that the largest loan servicers' exposure for improper loan servicing was approximately *$30 billion*.

- **December 2, 2013**: *Covered Trust Servicer Nationstar had its foreclosure action dismissed because it engaged in numerous instances of misconduct amounting to Events of Default*, as the court held:

   > *[Nationstar] counsel conceded that there was no properly filed verified amended complaint and that they had been proceeding for more than a year as if there was. It was further conceded that [the borrower's] counsel had inexplicably been left off the service list and did not receive notice of prior hearings and filings. . . . Instead, many of the pleadings were directed to the client and [borrower], Jennie Cassady without notice to her attorney. No plausible explanation was provided*.

   > . . . [Nationstar] now seeks once again for permission to properly file an Amended Verified Complaint, almost two years from the date leave to amend was initially granted. Further, [Nationstar] was on notice since December of 2010 that it was delinquent in posting a non-resident cost bond in accordance with § 57.011, Fla. Stat. No bond has yet to be filed and the 20 day grace period under the statute has long since expired. . . . *[Nationstar] [has engaged in] years of delay and willful and deliberate inaction and inattention to court orders, as well as the questionable behavior of counsel in failing to ensure timely service of notices and pleadings to [the borrower's] attorney and not the client. [Nationstar's] repeated failure to file the cost bond even when put on notice to do so nearly three years ago in and of itself is a sufficient basis for dismissal of this action.[fn]*

   > \*   \*   \*

   > *[fn] [Nationstar] was not just "tardy" but deliberately obstinate and recalcitrant in ignoring the "safe harbor" warning given in 2010 and other later notices by the [borrower].*

   *Nationstar Mortgage LLC v. Cassady, et al.*, No. 502010CA28180AXXXXMB, slip op. at 2-3 & n.2 (Fla. Cir. Ct., Palm Beach Cnty. Dec. 2, 2013).

- **January 2014**: *A class action was filed against Covered Trust Servicer Nationstar in Nevada, alleging, as a similar class action filed in February 2011 had, that Nationstar improperly refused to honor loan modification agreements, as well as "assessed unwarranted penalties and costs."*

- **February 2014**: Steven Antonakes, Deputy Director of the CFPB, confirmed that the loan servicing industry as a whole was continuing its servicing abuses and Events of Default. At the Mortgage Bankers Association's National Mortgage Servicing Conference in February 2014, Antonakes gave a speech which took the industry to task, stating: "***Nearly eight years have passed and I remain deeply disappointed by the lack of progress the mortgage servicing industry has made***." Antonakes stated that ***the CFPB was still receiving "around 4,900 complaints per month" concerning mortgage servicing, and "too many [borrowers] continue to receive erratic and unacceptable treatment. . . . This kind of continued sloppiness is difficult to comprehend and not acceptable. It is time for the paper chase to end. . . . It has felt like 'Groundhog Day' with mortgage servicing for far too long***." Antonakes also said the pervasive practice of successor servicers failing to honor loan modification agreements with prior servicers "would not be tolerated," and that the servicing industry's continuing deceptive practices would not be allowed: "***There will be no more shell games where the first servicer says the transfer ended all of its responsibility . . . and the second servicer***" claims ***ignorance about the modification***. Antonakes summed up his speech as follows, which clearly indicated that the industry still had not stopped committing Events of Default:

  > *My message to you today is a tough one. I don't expect a standing ovation when I leave. But I do want you to understand our perspective. I would be remiss if I did not share it with you.*
  >
  > *In our view, the intense human suffering inflicted on American consumers by an all-too-frequently indifferent mortgage servicing system has required us to change the paradigm in mortgage servicing forever. Frankly, the notion that government intervention has been required to get the mortgage industry to perform basic functions correctly – like customer service and record keeping – is bizarre to me but, regrettably, necessary. . . .*
  >
  > *But please understand: if you choose to operate in this space, the fundamental rules have changed forever. It's not just about collecting payments. It's about recognizing that you must treat Americans who are struggling to pay their mortgages fairly before exercising your right to foreclose. We have raised the bar in favor of American consumers and we are ready, willing and able to vigorously enforce that bar.*
  >
  > *Ultimately, these profound changes will be good for all Americans, including industry. But please understand, business as usual has ended in mortgage servicing. Groundhog Day is over. Thank you.*

- **March 2014**: *The Washington Post reported on a foreclosure lawsuit filed in federal court in New York in which an internal Wells Fargo "foreclosure manual" was filed. The borrower's attorney asserted that the internal manual instructed attorneys working for Covered Trust Master Servicer Wells Fargo on how to essentially perform robo-signing and create false foreclosure documents.* The

borrower's attorney was reported to have stated: "'***This is a blueprint for fraud. . . . The idea that this bank is instructing people how to produce these documents is appalling***.'" *The Washington Post* further reported that **the borrower's attorney "has long suspected Wells Fargo of manufacturing documents. A number of her past cases involving the bank featured mortgage notes that were not endorsed by anyone, but when she brought it to Wells Fargo's attention the bank would 'magically' produce[] the document." It happened so frequently to this attorney and her colleagues "that they started to call paperwork 'ta-da' documents**." This revealed unequivocal evidence that Wells Fargo had an established, uniform **and written practice manual** that directed the company-wide manufacture of falsified, robo-signed documents, a clear Event of Default.

- **March 5, 2014**: *New York State's Department of Financial Services Superintendent Benjamin Lawsky sent a letter to Nationstar stating: "We have received hundreds of complaints from New York consumers about your company's mortgage modifications, including problems related to mortgage modifications, improper fees, lost paperwork, and numerous other issues*."

- **May 23, 2014:** *Wells Fargo settled a derivative action by its shareholders* against Wells Fargo executives *alleging they allowed foreclosure abuses to occur, including improper robo-signing and the filing of false affidavits not based on personal knowledge. Wells Fargo paid $67 million to settle the case*.

- **July 1, 2014:** *The Wall Street Journal* reported that in 2013 *Nationstar was temporarily prevented from buying additional mortgage loan servicing rights by Fannie Mae and Freddie Mac because the Covered Trust Servicer was having liquidity problems and "'operational risks related to weak infrastructure such as poor practices for handling borrower complaints*.'"

- 15 -

# APPENDIX 6

- **April 2004**: The OTS instituted an enforcement action against Ocwen Federal Bank. The OTS found that Ocwen had ***engaged in illegal, unsafe and unsound collection practices***. As a result, Ocwen entered into a written "supervisory agreement" with the OTS, in which it agreed to improve its compliance with numerous federal laws, including the Real Estate Settlement Procedures Act, the Fair Debt Collection Practices Act and the Fair Credit Reporting Act. The *Palm Beach Post* reported that Ocwen entered into the agreement with the OTS after being "[f]looded" with "hundreds" of complaints by borrowers, consumer advocates and class-action attorneys, and "several proposed class-action suits against Ocwen." [1]

- **November 29, 2005**: In a lawsuit in which an RMBS trustee, Ocwen and others were co-defendants, a jury rendered ***an $11.5 million verdict in favor of a borrower and against Ocwen arising out of Ocwen's mis-servicing of the loan***. *See Davis v. Ocwen Loan Servicing LLC, et al.*, No. 2004 CV 1469 (Tex. Dist. Ct. Galveston Cnty. Nov. 29, 2005) (Criss, J.). The jury award included $10 million in punitive damages because of the egregious misconduct engaged in by Ocwen (the jury award was later reduced to $1.8 million by agreement of the parties). According to borrower Davis's attorney, in February 2002, Davis, 64, took out a $31,000 home equity loan on the Texas City residence where she had lived since 1942. In 2003, Davis became ill and spent four days in the hospital, which forced her to miss one loan payment. Ocwen told her it would put her on a payment plan, but never did. Ocwen also failed to credit Davis for the money she paid and began to foreclose on her house while continuing to falsely assure her she was on a payment plan. Ocwen eventually foreclosed on Davis's home, and she filed for bankruptcy in the hopes of ending Ocwen's harassment. During the bankruptcy, however, Ocwen requested an additional $390 to cover its costs and fees related to a default she had already cured. At trial, a former Ocwen employee provided uncontradicted testimony concerning Ocwen's unfair business practices, including ***paying incentives to its loan collectors for moving properties with equity into foreclosure. The former employee testified that Ocwen employees would review their records to identify loans on properties in which the borrowers had equity, and then prey on the borrowers by improperly manufacturing ways to falsely foreclose on them***. The former employee testified that they selected homes with equity because it ensured that there was money to pay the Ocwen employees their incentive payments once they wrongfully foreclosed. The evidence also showed that ***Ocwen engaged in predatory servicing by not informing borrowers of how to make their loans current, and failing to give credit for payments when they were made in order to artificially manufacture the foreclosures***. The jury found

---

[1] In order to escape further scrutiny from the OTS, and to avoid being held accountable under the supervisory agreement, Ocwen then quickly dissolved Ocwen Federal Bank and created non-bank loan servicer Ocwen Loan Servicing LLC, taking itself outside of the OTS's jurisdiction. In this way, Ocwen could continue to operate its fraudulent business model without OTS interference.

that Ocwen made fraudulent, deceptive and misleading representations to Davis when she missed her loan payment while hospitalized in 2003.  Davis's attorney, Robert Hilliard of Corpus Christi, said: "***The jury believed that Ocwen has a scheme of stealing homes" by classifying timely payments as late and then beginning foreclosure proceedings***.

- **January 23, 2006**: The *South Florida Business Journal* reported:

  > *The Business Journal's review of court filings shows Ocwen and affiliates are defendants in more than 500 civil suits filed in federal courts since 2002.  Many of the cases have more than one customer among plaintiffs. About 100 of the cases are still pending*.

  > \*       \*       \*

  > *Plaintiff lawyers are currently seeking class action status for 57 federal cases being consolidated in Chicago and the West Palm Beach company says it is facing 331 lawsuits altogether. . . .  The allegations are sometimes harsh - one plaintiff describes the company's actions as "naked fraud[.]"*

  > \*       \*       \*

  > *Ocwen probably isn't done with [Attorney] Hilliard.  The attorney said he is preparing to file about 100 suits for Texas residents who claim Ocwen falsified mortgage payments and began foreclosure proceedings*.

- **March 2009**: *ProPublica* published an article examining Ocwen, which stated:

  > *[Ocwen's] business practices have also drawn a wide array of criticism from customers, consumer advocates and the federal government itself*.

  > \*       \*       \*

  > Ocwen got a lucrative contract in 2003 to manage and sell thousands of foreclosed properties owned by the Department of Veterans Affairs, but a report from the Government Accountability Office in 2007 panned Ocwen's performance and said the "***VA also has not been satisfied with Ocwen's performance***":  Ocwen racked up $1.3 million in penalties from the VA in the last three quarters of 2005 (at the height of the housing boom) for failing to meet sales targets.

  > There were other problems too: ***Ocwen charged the VA for home-upkeep repairs that were never made, the GAO reported. Houses fell into disrepair and were covered in "trash and debris," which the GAO suspects might have lowered property values***.

  > \*       \*       \*

- 2 -

But that wasn't Ocwen's only run-in with the federal government.

*In 2000, Ocwen Federal Bank, a now-defunct subsidiary, paid $50,000 to settle . . . charges from HUD concerning various rule violations on its loan servicing. Four years later, the Office of Thrift Supervision forced Ocwen Federal Bank to sign an agreement . . . promising to improve its compliance with fair-lending laws.*

*John Taylor, president of the National Community Reinvestment Coalition, cited those regulatory actions when criticizing the VA's choice of Ocwen in 2003. "Why would you want, when you have a repeated history of problems, to expose VA housing to a potential predator?" he asked in American Banker.*

\*        \*        \*

*Ocwen has ranked last in J.D. Power and Associates' survey of customer service at mortgage servicers for the last three years in a row. Frustrated customers point specifically to its tortuous and unhelpful phone services.*

\*        \*        \*

*Ocwen didn't fare much better with the Better Business Bureau of Central Florida, which has received 520 complaints about Ocwen in the last 36 months and slapped it with an F, its lowest rating.*

\*        \*        \*

*Ocwen has in fact been accused of predatory practices in a slew of lawsuits in the last few years. Frequent allegations include that Ocwen falsely classifies timely payments as late, charges unwarranted fees and improperly starts foreclosure proceedings.*

- **May 2009**: A Louisiana bankruptcy court judge blasted Ocwen after being subjected to its repeated violations of the bankruptcy code for which the court had repeatedly sanctioned it. *See In re McKain*, No. 08-10411, 2009 Bankr. LEXIS 2519, at \*5-\*8, \*10-\*11 (Bankr. E.D. La. May 1, 2009), *rev'd on other grounds*, *Ocwen Loan Servicing, LLC v. McKain*, No. 09-3662, slip op. (E.D. La. Aug. 15, 2011). The court held:

  <u>*Ocwen's History*</u>

  *This is not the first time Ocwen has appeared before the Court for improperly administering a loan or attempting to collect fees and costs to which it was not entitled. The Court has been involved with six other cases [fn] in the last four years where Ocwen either included improper fees in its claim; attempted to collect, post-discharge, fees and costs that were*

*undisclosed but assessed during a bankruptcy; or attempted to foreclose on disallowed or discharged debt.*

\* \* \*

*Ocwen has consistently shown an inability or refusal to comply with the[] basic statutory tenets [of the bankruptcy code]. As a result, discharged debtors have continued to incur the threat of foreclosure and collection of debts that have been discharged or disallowed. Ocwen has failed to disclose the assessment of postpetition charges to others, misleading them into a false sense that a fresh start was theirs to enjoy.*

\* \* \*

*Ocwen has repeatedly abused the claims process and failed to honor the discharge injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts. The Court finds that this practice is in bad faith. . . . The record reflects that this is an ongoing pattern . . . . The Court has repeatedly struck improper charges and has issued monetary sanctions against Ocwen. Ocwen's continuing disregard for bankruptcy law and procedure is a clear indication that monetary sanctions are simply ineffective.*

\* \* \*

*[fn]It is likely that there are many additional cases where this activity has occurred, but not all debtors' counsel carefully monitor creditors' proof of claims.*

- **August 2009**: The *Southeast Texas Record* reported on a lawsuit filed against Ocwen for wrongfully foreclosing on a borrower even though she was current on her mortgage loan payments. The complaint alleged that Ocwen did not properly apply loan payments that were made in order to improperly manufacture a foreclosure, fraudulently assessed improper fees, costs, interest and charges, and violated state laws.

- **December 2010**: The Florida Attorney General's office compiled a presentation titled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases." The Attorney General's presentation contained "copies of allegedly forged signatures, false notarizations, bogus witnesses and improper mortgage assignments," including *documents signed by Ocwen employee "Scott Anderson." Anderson's signature had been signed by at least four different persons, an obvious act of robo-signing*.

- **January 2011**: The United States District Court for the Eastern District of North Carolina entered an order affirming a bankruptcy court order *holding Ocwen in contempt of court for violating a discharge injunction and a bankruptcy court order*. *See In Re Adams*, No. 5:10-CV-340-BR, 2011 U.S. Dist. LEXIS 158090, at

*13 (E.D.N.C. Jan. 24, 2011). The District Court held that "***Ocwen's conduct was . . . reprehensible***" and that Ocwen "transmitted an inaccurate payoff quote and loan history; . . . assessed discharged principal, fees, and costs; reported inaccurate information to credit reporting agencies; ***and, most importantly, after the inaccurate information had been brought to its attention a number of times, failed to correct the information." The District Court found that the foregoing misconduct by Ocwen was "willful and intentional," id. at \*21, and thus merited punitive damages***.

- **March 2011**: The FTC began investigating Ocwen's foreclosure practices and demanded the production of documents relating to Ocwen's loan servicing activities.

- **June 2011**: The U.S. Treasury Department found that Ocwen's loan servicing practices were in need of "substantial improvement."

- **July 2011**: A foreclosure action by an RMBS trustee was dismissed with prejudice by a New York State court judge in large part because ***three Ocwen employees had improperly "robo-signed" foreclosure documents in the case***. *See HSBC Bank USA, N.A. v. Taher*, 932 N.Y.S.2d 760 (N.Y. Sup. Ct., Kings Cnty. 2011). ***The court specifically singled out the aforementioned Ocwen robo-signer, Scott Anderson, and noted that it too had observed that there were at least four different variations of his signature in the cases before the court***.

- **July 2011**: *Reuters* reported that Ocwen was still engaging in widespread robo-signing:

    > ***Reuters . . . identified at least six "robo-signers," individuals who in recent months have each signed thousands of mortgage assignments – legal documents which pinpoint ownership of a property. These same individuals have been identified – in depositions, court testimony or court rulings – as previously having signed vast numbers of foreclosure documents that they never read or checked***.

    > ***Among them: Christina Carter, an employee of Ocwen. . . . Her signature – just two "C"s – has appeared on thousands of mortgage assignments and other documents this year***.

    > ***In a case involving a foreclosure [the HSBC action discussed above], a New York state court judge called Carter a "known robo-signer" and said he'd found multiple variations of her two-letter signature on documents, raising questions about whether others were using her name***.

    *Reuters* also reported that it had found that "in recent months," Ocwen "filed foreclosure documents of questionable validity."

- **September 1, 2011**: The New York Department of Financial Services required Ocwen to enter into an agreement to reform its robo-signing practices by, among other things, ensuring that foreclosure affidavits were true, accurate and correct, were based

on personal knowledge and were properly notarized, and by withdrawing any of its pending foreclosure proceedings that used false affidavits, as well as agreeing to a host of other reforms designed to stop its improper loan servicing activities.

- **September 2011**: Ocwen was held in contempt by the court in *In re Phillips*, No. 02-66299, 2011 Bankr. LEXIS 3780 (Bankr. N.D. Ohio Sept. 29, 2011) (Ocwen and an RMBS trustee both held in contempt for Ocwen's violations of bankruptcy discharge injunction). *See also In re Englert*, 495 B.R. 266, 269 (Bankr. W.D. Pa. 2013) ("[T]he Court . . . found Ocwen in further contempt for which further sanctions would be addressed at the Rule to Show Cause hearing.").

- **April 30, 2012**: The Sixth Circuit Court of Appeals reversed an order dismissing a borrowers' complaint alleging that an RMBS trustee and Ocwen were violating the Fair Debt Collection Practices Act. *See Bridge v. Ocwen Fed. Bank*, 681 F.3d 355, 356-57 (6th Cir. 2012). The Court of Appeals held:

    > *The Fair Debt Collection Practices Act was passed to protect consumers against both abusive and mistaken collection activity. This case reveals why. It began with seemingly innocuous accounting errors on the part of a bank that were corrected. Despite repeated proof of that correction, unremitting collection activity was undertaken, foreclosure proceedings were instituted, and the credit of two consumers was seriously impaired.*

    > \*       \*       \*

    > *Ocwen . . . began dunning Bridge and her husband, who is not a co-borrower on the mortgage loan, for the May payment claimed to be overdue, despite proof [that is was not overdue because] of the double payment submitted by Bridge to Ocwen and Aames. Since then Ocwen has: made endless collection calls by phone to Mr. and Mrs. Bridge, despite cease and desist requests and registry on the federal "Do Not Call" directory; threatened foreclosure; assessed monthly late fees; and reported derogatory information to the credit reporting agencies. Additionally, the law firm . . . allegedly retained by Ocwen, sent a collection letter to Bridge threatening foreclosure.*

- **July 19, 2012**: A bankruptcy court in Kentucky issued its decision, findings of fact and conclusions of law after a trial in an adversary proceeding involving Ocwen and a borrower. *See In re Tolliver*, No. 09-21742, 2012 Bankr. LEXIS 3333, at \*3, \*6-\*7 (Bankr. E.D. Ky. July 19, 2012). The court blasted Ocwen for its misconduct:

    > *Defendants [Ocwen and the co-defendant RMBS trustee] breached the terms of the Note and Mortgage by applying unauthorized late charges, costs and fees to [the Plaintiff borrower's] account and breached an implied contractual duty of good faith and fair dealing. . . . Ocwen misrepresented the status of the Plaintiff's Loan to fraudulently induce her*

*to enter into [improper forbearance] agreements when, but for Ocwen's unauthorized acts, the Plaintiff had paid her Loan in full. The Plaintiff, having overpaid her Loan, is entitled to compensatory and punitive damages for the Defendants' breach of contract and implied covenant of good faith and fair dealing, fraud, and conversion.*

*\*      \*      \**

*Ocwen proceeded to mishandle the servicing of the Plaintiff's Loan by misapplying her payments contrary to the terms of the Note and Mortgage and assessing unauthorized fees and charges. This forced the Plaintiff into a constant state of default, allowing Ocwen to profit by continuing to assess more fees and charges based on her default status. Ocwen knew or should have known that it could not charge these fees and charges, yet Ocwen misrepresented to the Plaintiff that her Loan was in default thereby forcing the Plaintiff to enter into a series of meaningless oral and written forbearance agreements, none of which allowed her to cure her alleged default and two of which contained provisions that Ocwen ultimately argues excuses its misbehavior. These provisions, found in the 2004 and 2005 written forbearance agreements, allowed Ocwen to charge these unauthorized fees to the Plaintiff's account and required the Plaintiff to waive any claims it had against Ocwen. But for Ocwen's misapplication of her payments, and contrary to Ocwen's representations, the Plaintiff had actually paid her Loan in full by October 2004. As a result of Ocwen's actions, the Plaintiff has overpaid her Loan by thousands of dollars.*

- **December 5, 2012**: The New York Department of Financial Services announced that Ocwen was violating its prior agreement with the Department to refrain from engaging in loan servicing misconduct. The Department's press release stated:

  *"[W]e conducted a targeted exam of Ocwen's performance and discovered gaps in the company's compliance. The Department is requiring the company to hire a monitor so that we can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure."*

  *\*      \*      \**

  *The Department's examination of Ocwen's mortgage servicing practices found that, in some instances, the company failed to demonstrate that it had sent out required 90-day notices before commending foreclosure proceedings or even that it had standing to bring the foreclosure actions. The exam also revealed gaps in Ocwen's Servicing Practices, including indications that in some instances it failed to provide the single point of contact for borrowers; pursued foreclosure against borrowers seeking a loan modification; failed to conduct an independent review of denials of loan modifications; and failed to ensure that borrower and loan information was accurate and up-to-date.*

- 7 -

- **February 2014**: Large institutional investors Pimco and BlackRock were considering legal action against Ocwen concerning its misconduct relating to loan modifications.

- **February 12, 2014**: *National Mortgage News* reported that New York banking Superintendent Benjamin Lawsky "unleashed a verbal assault on nonbank servicer Ocwen" in a speech to the New York Bankers Association. The article reported:

  > *Lawsky said Ocwen's public documents make "for startling reading." He sees "corners being cut," by nonbank servicers that have touted their ability to help distressed borrowers.*
  >
  > *"We have serious concerns that some of these nonbank mortgage servicers are getting too big, too fast," Lawsky told New York bankers…. "We see far too many struggling homeowners getting caught in a vortex of lost paperwork, unexplained fees and avoidable foreclosures."*

  > \*       \*       \*

  > *But he took particular umbrage by Ocwen's assertions that it can service delinquent loans at a cost that is 70% lower than the rest of the industry, calling into question its entire servicing model.*
  >
  > *"Those kinds of cost-saving claims bear special scrutiny," Lawsky said. "Regulators have to ask whether the purported efficiencies at nonbank mortgage servicers are too good to be true."*

  > \*       \*       \*

  > Lawsky made specific references to servicers' difficulty in handling the transfer of documents and dealing with distressed borrowers.

  > *"We see electronic loan files strewn around the globe with no one who knows how to pull them together," Lawsky said. "We see a virtual potpourri of computer systems containing critical borrower information, but no one who knows how to extract that information at the right time and for the right purpose*."

- **February 26, 2014**: Lawsky's office then sent a letter to Ocwen. As reported by *HousingWire*, Lawsky was very concerned about a

  > "*number of potential conflicts of interest" [Ocwen had] with other public companies it's dealing with, and he wants his questions answered.*

  > \*       \*       \*

Lawsky's letter demands that Ocwen more specifically detail the relationship and financial connection between the companies' executives and employees, and for information regarding any other agreements between Ocwen and other companies.

"Presently, Ocwen's management owns stock or stock options in the affiliated companies. This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."

In addition to information on Ocwen's officers, directors and employees, Lawsky's office wants all documents sufficient to show the nature and extent of services provided to Ocwen by each of the affiliated companies, including all agreements for such services, and copies of all agreements between Ocwen and the affiliated companies concerning procurement of third party services. Ocwen is also being probed about its agreements concerning the outsourcing of information management to the affiliated companies.

- **February 27, 2014**: *Bloomberg BusinessWeek* reported:

  *As of mid-February, American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen – the highest number of any non-bank servicer, according to data from the Consumer Financial Protection Bureau in Washington.*

  \*     \*     \*

  *"Ocwen is one of the most complained about servicers when we ask housing counselors and lawyers what they are seeing," said Kevin Stein, associate director of the California Reinvestment Coalition, a San Francisco-based consumer advocacy group. "We're hearing a lot about foreclosing because of bad servicing practices.*"

- **March 2014**: A New York federal court denied Ocwen's motion to dismiss and allowed a class action to proceed against it and others alleging that Ocwen misled borrowers about loan modifications. *See Dumont v. Litton Loan Servicing, LP*, No. 12-cv-2677-ER-LMS, 2014 U.S. Dist. LEXIS 26880 (S.D.N.Y. Mar. 3, 2014).

- **April 2014**: *Reuters* reported that New York Banking Superintendent Lawsky was going after Ocwen again and demanding information. The *Reuters* article stated:

  *New York's banking regulator is probing Ocwen Financial Corp, which collects mortgage payments, for potentially over charging borrowers and investors to auction off foreclosed properties it services.*

- 2 -

Benjamin Lawsky, superintendent of New York's Department of Financial Services, sent a letter to Ocwen saying he was concerned the company and an affiliate, Altisource Portfolio Solutions SA, were engaged in so-called self-dealing through an online auction site called Hubzu.

Self-dealing is when a company represents its own interests in a transaction, rather than those of a client.

Ocwen uses Hubzu, an Altisource Portfolio subsidiary, to auction off borrower homes facing foreclosure and foreclosed investor-owned properties. When Ocwen selects Hubzu to host foreclosure or short sale auctions, the letter said, the Hubzu auction fee is 4.5 percent; when Hubzu is competing for business on the open market, its fee is as low as 1.5 percent.

*"The relationship between Ocwen, Altisource Portfolio and Hubzu raises significant concerns regarding self-dealing," the letter said, adding that it raises questions about whether the companies are charging inflated fees through conflicted business relationships that may hurt homeowners and investors*.

- **May 2014**: Superintendent Lawsky spoke at the Mortgage Bankers Association Secondary Market Conference on May 20, 2014. *HousingWire* reported the following:

   *Lawsky says that part of the DFS's focus on Ocwen is because his office's review of nonbank servicers has also turned up another enormous profit center associated with these MSRs that could put homeowners and mortgage investors at risk: the provision of what they call ancillary services.*

   *"Now, in most circumstances, there's nothing inherently wrong with companies and their affiliates providing a range of ancillary services," Lawsky said. "This is the extraordinary circumstance where there effectively is no customer to select its vendor for ancillary services. Nonbank servicers have a captive and often confused consumer in the homeowner*.

   *"So who makes the decision about where to procure these ancillary services, and how much of the investor's or the borrower's money to pay for them? It's usually the servicer, seemingly with no oversight whatsoever. The very same servicer that benefits – either directly or indirectly – from the profitability of the affiliated companies that provide these services," Lawsky said*.

   *Specifically, Lawsky is referring to the latest move DFS made against Ocwen, when it sent a letter to Ocwen's general counsel demanding*

- 3 -

*answers to questions about Ocwen and how it operates in relation to its subsidiaries, Hubzu and Altisource*.

*"The potential for conflicts of interest and self-dealing here are perfectly clear. Servicers have every incentive to use these affiliated companies exclusively for their ancillary services, and they often do. The affiliated companies have every incentive to provide low-quality services for high fees, and they appear in some cases to be doing so," Lawsky said. "In the context of the nonbank mortgage servicing market, homeowners and investors are at risk of becoming fee factories*."

- **May 2014**: Ocwen was sued by a class of borrowers alleging Ocwen failed to timely file notices of satisfaction of loans the borrowers had paid off in violation of federal and state laws. Complaint, *Dempsey v. Ocwen Loan Servicing LLC*, No. 14-CV-2824 (E.D. Pa. May 15, 2014).

- **June 2014**: Ocwen was sued again by another class of borrowers alleging that Ocwen was inaccurately reporting to tax authorities the amount of interest paid by borrowers. Complaint, *Camberis v. Ocwen Fin. Corp.*, No. 3:14-cv-02970 (N.D. Cal. June 26, 2014).

- **August 4, 2014**: *Bloomberg* news service reported that New York banking Superintendent Lawsky asked Ocwen "about an insurance agreement" between Ocwen and one of its affiliates. *The report stated that Lawsky "says [the agreement is] designed to funnel [inflated] fees to [the] affiliate for minimal work*." The report also indicated that Ocwen's chairman, William Erbey, owns 27% of the affiliate and that *Lawsky's department had "'serious concerns about the apparently conflicted role' played by Erbey and potentially other officers and directors [of Ocwen] in directing profits to" the affiliate. The news report also indicated that such conduct violated state laws. These conflicts of interest and inflated fees indicated yet another situation where Servicers such as Ocwen were improperly and illegally profiting at the expense of plaintiff and the class*.

- **October 21, 2014**: *Lawsky sent a letter to Ocwen in which he reported that his Department had uncovered "serious issues" with Ocwen's loan servicing, "including Ocwen's backdating of potentially hundreds of thousands of letters to borrowers*." These letters consisted of letters sent to borrowers that were *backdated more than 30 days from the time they were actually sent* informing them that they had 30 days to appeal their loan modification denials, *preventing the borrowers from timely appealing*. The letters also included letters sent to borrowers with a date by which to cure their loan defaults and avoid foreclosures, *but the cure dates in the letters were "months prior to receipt of the letter[s]," thus preventing the borrowers from timely bringing their loans current and avoiding foreclosure*. Lawsky's letter also revealed that his Department also discovered that even though these problems were brought to the attention of Ocwen's management, Ocwen ignored the problem and initially lied to Lawsky's Department. *These actions by Ocwen violated the law*

*and the settlement agreement between Ocwen and the CFPB, and were clearEvents of Default*.

- **October 23, 2014**: *Bloomberg News* reported that the **Attorneys General from Illinois, Florida and Iowa were investigating Ocwen for backdated letters**.

- **October 30, 2014**: Various news outlets reported that **Ocwen took a massive $100 million reserve for a potential settlement with Lawsky's Department over Ocwen's backdating of letters to borrowers**, although such settlement could ultimately cost more according to Ocwen's Executive Chairman, William Erbey. *USA Today* also reported that Ocwen had **13,520 complaints filed against it with the CFPB by borrowers complaining of loan servicing and foreclosure misconduct**.

- **December 22, 2014**: *Reuters* reported that Ocwen had entered into a $150 million settlement with Lawsky's Department of Financial Services wherein Ocwen acknowledged that it did not properly deal with borrowers, may have charged excessive fees and failed to maintain adequate loan servicing systems. Ocwen's Chairman, William Erbey, was required to resign and Ocwen was required to install a new independent monitor of its business and appoint two new independent directors to its board as part of the settlement.

- **January 2015**: Investors in numerous RMBS trusts serviced by Ocwen accused Ocwen of engaging in numerous Events of Default, including self-dealing and paying the costs of Ocwen's settlements with the federal government with investor-owned funds.

- **January 2015**: The California Department of Business Oversight sought to suspend Ocwen's license to operate in the state, which eventually resulted in Ocwen's entering into a consent order whereby Ocwen agreed to cease acquiring any additional loan servicing rights until certain conditions were satisfied, agreed to the appointment of an auditor to review Ocwen's servicing business and legal compliance, and Ocwen's payment of $2.5 million.

1011938_1

## VERIFICATION

I, Thierry Buytaert, hereby declare as follows:

I am a Member of the Board of Directors of Royal Park Investments sa/nv ("RPI"), plaintiff in the within entitled action. RPI owns the RMBS in the Covered Trusts alleged herein and owned such RMBS at the time of most of the wrongdoing complained of herein. RPI further understands that it has acquired the rights and claims of the previous holders of the RMBS that held during the time of the wrongdoing complained of herein either contractually or by operation of New York General Obligations Law §13-107. RPI has continuously held such RMBS since acquiring them. RPI has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of the Covered Trusts. I have read the Amended Class Action Complaint and Alternative Verified Derivative Action for Breach of the Trust Indenture Act, Breach of Contract, Breach of Trust and Violation of the Streit Act. Based upon discussion with, and reliance upon, my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed and accepted:

DATED: __13 March 2015__

ROYAL PARK INVESTMENTS SA/NV

By:_____
Thierry Buytaert
Board Member

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 20, 2015.

s/ Arthur C. Leahy
ARTHUR C. LEAHY

ROBBINS GELLER RUDMAN
     & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: artl@rgrdlaw.com

# Mailing Information for a Case 1:14-cv-06502-GHW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lisa Robyn Blank**
  lplush@mayerbrown.com,jmarsala@mayerbrown.com

- **Jennifer Nunez Caringal**
  jcaringal@rgrdlaw.com

- **Christopher James Houpt**
  choupt@mayerbrown.com,jmarsala@mayerbrown.com

- **Matthew D. Ingber**
  mingber@mayerbrown.com,jmarsala@mayerbrown.com

- **Arthur C. Leahy**
  artl@rgrdlaw.com,jillk@rgrdlaw.com

- **Steven W. Pepich**
  stevep@rgrdlaw.com

- **Michael Evan Rayfield**
  mrayfield@mayerbrown.com

- **Ashley M Robinson**
  ashleyr@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,HDeshmukh@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`