USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 02/15/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                 :

ROYAL PARK INVESTMENTS SA/NV            :
*Individually and on Behalf of All Others Similarly Situated*,  :
                                                 :           1:14-cv-6502-GHW
                             Plaintiff,  :
                                                 :          MEMORANDUM OPINION
                -v -                          :          AND ORDER
                                                 :
THE BANK OF NEW YORK MELLON         :
*as Trustee*,  :
                                                 :
                            Defendant.  :
------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

Royal Park Investments SA/NV ("Plaintiff" or "Royal Park") filed this action on behalf of itself and similarly-situated investors against The Bank of New York Mellon ("Defendant" or "BNYM"), the trustee of five residential mortgage-backed securities ("RMBS") in which Royal Park is an investor. Royal Park seeks to certify a class of investors to pursue claims against BNYM for breach of contract, breach of the duty of trust, and violations of sections 315(b) and 315(c) of the Trust Indenture Act. Because the Court agrees with the reasoning of the judges in this district who have denied class certification in similar actions brought by Royal Park against other RMBS trustees, *see, e.g.*, *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018) (Nathan, J.), Royal Park's motion for class certification is DENIED. Royal Park has failed to demonstrate that questions of law or fact common to class members predominate over individualized questions such that a class action under Fed. R. Civ. P. 23(b)(3) is an appropriate vehicle to pursue its claims against BNYM.

    **I.**       **INTRODUCTION**

The Court assumes familiarity with the facts alleged in the complaint and the background of this matter set forth in the Court's March 2, 2016 and August 30, 2017 opinions. *See Royal Park Invs.*

*SA/NV v. Bank of New York Mellon*, No. 1:14-CV-6502-GHW, 2017 WL 3835339, at *1-2 (S.D.N.Y. Aug. 30, 2017); *Royal Park Invs. SA/NV v. Bank of New York Mellon*, No. 1:14-CV-6502-GHW, 2016 WL 899320, at *1-2 (S.D.N.Y. Mar. 2, 2016). To recap briefly, Royal Park is an investor in five RMBS trusts (the "Covered Trusts") for which BNYM served as trustee. Am. Compl. (Dkt. No. 46) ¶¶ 29, 37. Three of the Covered Trusts are New York common law trusts, which are governed by "Pooling and Servicing Agreements" ("PSAs"). *Id.* at ¶¶ 5, 48. The other two Covered Trusts are qualified indenture trusts under the Trust Indenture Act ("TIA") and are governed by trust indentures. *Id.* at ¶¶ 5, 67. BNYM's purported failure to perform its duties as outlined in the PSAs and trust indentures forms the basis of Royal Park's breach of contract claims, which can be divided into two broad categories of allegations. *Id.* at ¶¶ 10, 15.

First, Royal Park asserts that BNYM failed to fulfill certain contractual duties triggered by BNYM's discovery of breaches of "representations and warranties." *Id.* at ¶ 10. When the mortgage loans which were held by the Covered Trusts were pooled and transferred to the trusts, the loan sellers, sponsors, and other parties involved in the origination and securitization of the loans made certain representations and warranties ("R&Ws") concerning the "credit quality and characteristics" of the mortgage loans. *Id.* at ¶¶ 41, 42. For example, a securitization sponsor might warrant that all the loans transferred to a specific Covered Trust were originated in accordance with the lender's underwriting guidelines. *Id.* at ¶ 51; Ex. A § 3.03(i). Additionally, the agreements which govern the securitizations state that, in the event a loan is found to be in breach of an R&W, the party which provided the R&W—also known as a "warranting party"—must cure the breach, substitute a conforming loan into the trust in place of the breaching loan, or repurchase the breaching loan from the trust. *Id.* at ¶ 42; Ex. A § 3.04(a).

Under the PSAs and trust indentures, if the trustee discovers a breach of an R&W, it is obligated to provide prompt notice to the parties to the agreement. *Id.* at ¶ 53. Furthermore, if the

2

warranting party fails to cure the breach, the trustee is empowered to enforce that party's obligation to cure, substitute, or repurchase. *Id.* Royal Park alleges that BNYM had knowledge of breaches of R&Ws in each of the Covered Trusts and failed to abide by its contractual duties to notify the parties to the contracts and to enforce the warranting parties' obligation to cure, substitute, or repurchase the breaching loans. *Id.* at ¶¶ 10, 168.

Royal Park also claims that BNYM breached its contractual duties with respect to loan servicer or master servicer "Events of Default." *Id.* at ¶ 15. Under the securitization agreements, a master servicer or servicer commits an Event of Default in certain circumstances where it has failed to perform its contractual duties—including, for instance, its primary duty to service the mortgage loans "with prudent and reasonable care." *Id.* at ¶¶ 58, 59. If the trustee has knowledge of an Event of Default, it is then obligated to act with a heightened duty of care, exercising its rights and powers under the PSA or trust indenture with the "same degree of care and skill . . . as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." *Id.* at ¶ 64, Ex. A § 10.01(a). Royal Park alleges that BNYM knew of pervasive servicer and master servicer Events of Default—and that BNYM even participated in some of the servicer misconduct. *Id.* at ¶¶ 165, 170-71. Thus, according to Royal Park, BNYM's refusal to take any action regarding Events of Default, such as providing notice to certificate holders or terminating and replacing defaulting servicers and master servicers, breached BNYM's contractual obligations. *Id.* at ¶¶ 170-71.

Royal Park also asserts claims for breach of the duty of trust and, with respect to the two qualified indenture trusts, for violations of sections 315(b) and 315(c) of the Trust Indenture Act ("TIA"). *Id.* at ¶¶ 10, 15, 19. Royal Park alleges that BNYM's ongoing business relationships with loan originators, sellers, sponsors, servicers, and master servicers created conflicts of interest because BNYM did not want to risk losing those entities' repeat business by enforcing remedies for R&W

3

breaches or Events of Default. *Id.* at ¶¶ 19-20, 174. It also asserts that under the TIA, the trustee is obligated to give notice to the certificate holders when it becomes aware of *any* defaults under the agreement, including servicer defaults (not limited to Events of Default), breaches of R&Ws, or even defaults by the trustee itself and to exercise a fiduciary-like duty of care towards the trust beneficiaries whenever it becomes aware of any default. *Id.* at ¶¶ 70-71, 155.

Royal Park now seeks to certify the following class to further pursue its breach of contract, breach of duty of trust, and TIA claims:

> All persons and entities who held Certificates in the Covered Trusts at any time between the date of issuance to no later than 60 days after notice of class certification and opportunity to opt out is issued and were damaged as a result of The Bank of New York Mellon's conduct alleged in the Complaint. Excluded from the Class are defendant, the loan originators, the Warrantors, the Master Servicers and the Servicers to the Covered Trusts, and their officers and directors, their legal representatives, successors or assigns, and any entity in which they have or had a controlling interest.

Plaintiff's Memorandum of Law in Support of its Renewed Motion for Class Certification and Appointment of Class Representative and Class Counsel (Dkt. No. 151) ("Pl. Mem.") at 1.

## II. LEGAL STANDARD

"A plaintiff seeking certification of a Rule 23(b)(3) class action bears the burden of satisfying the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as Rule 23(b)(3)'s requirements: (1) that 'the questions of law or fact common to class members predominate over any questions affecting only individual members' (the 'predominance' requirement); and (2) that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy' (the 'superiority' requirement)." *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting Fed. R. Civ. P. 23(a) and (b)(3)); *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "The party seeking class certification bears the burden of establishing by a

4

preponderance of the evidence that each of Rule 23's requirements have been met." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *see also In re Am. Int'l. Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237-38 (2d Cir. 2012) ("The party seeking class certification must affirmatively demonstrate . . . compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met.") (citation and internal quotation marks omitted).

### III. DISCUSSION

Because the Court concludes that Royal Park has failed to demonstrate that questions of law or fact common to class members predominate over individualized questions, it need not consider whether the other requirements of Rule 23 have been established. However, because certain arguments raised by counsel in the context of the Rule 23(a) analysis inform the Court's predominance inquiry, the Court pauses momentarily to provide clarification on two issues before proceeding.

**a. The proposed class consists of those persons and entities who held certificates in the Covered Trusts during the specified time frame and who have standing to assert the claims alleged in Royal Park's Amended Complaint.**

As a preliminary issue, the parties' briefing reveals some confusion about the scope of Royal Park's proposed class definition. BNYM argues that Royal Park's proposed class definition creates a fail-safe class because it "exclude[s] from the class any investor who is found not to have any damages at all." BNYM's Opposition to Plaintiff's Renewed Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. No. 158) ("Def. Opp.") at 13. Thus, according to BNYM, if Royal Park's proposed class is certified, a class member who proceeds through the litigation and is eventually found not to have suffered damages will be automatically and retrospectively removed from the class by virtue of the class definition and will not be bound by the Court's findings in this case. *Id.* at 14-15. In response, Royal Park provides contradictory and muddled assertions about the scope of its proposed class definition. Regarding BNYM's fail-safe

5

class argument, Royal Park insists that its proposed class is not a fail-safe class because the proposed class definition "excludes any language presupposing liability." Plaintiff's Reply in Support of its Renewed Motion for Class Certification and Appointment of Class Representative and Class Counsel (Dkt. No. 160) ("Pl. Rep.") at 5. But later in its briefing, Royal Park argues that "[t]o the extent any Certificateholders actually 'have not experienced any losses' from the alleged misconduct, there would be no conflict [between class members who recover and those who do not] because [the class members who do not recover] would not be Class members by definition." Pl. Rep. at 8 (internal citation omitted). Both parties misapprehend the import of the language in Plaintiff's proposed class definition.

As Judge Nathan correctly noted in another case brought by Royal Park against a different RMBS trustee, the reference in Plaintiff's proposed class definition to certificate holders who "were damaged as a result of The Bank of New York Mellon's conduct alleged in the Complaint" does not require that, in order to be a member of the class, a potential plaintiff must be found to have actually suffered legally compensable damages. Instead, it simply conveys the requirement that all members of the class have standing to assert their claims.[1] *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2017 WL 1331288, at *11 (S.D.N.Y. Apr. 4, 2017). This distinction is critical, because a class member who has standing to assert its claims, but is later found not to have suffered any legally compensable damages—for example, as the result of an individualized defense

---

[1] This clarification about the scope of the proposed class definition raises potential issues for the numerosity analysis required by Rule 23(a)(1). Contrary to Royal Park's assertion that its expert identified "326 potential class members," Pl. Mem. at 6, Mr. Dalrymple's conclusions about the number of *unique investors* in the Covered Trusts does not provide clear insight into the number of potential *class members*—that is, unique investors who maintained their litigation rights and thus have standing to assert the claims raised in Royal Park's Amended Complaint. While it is true that Plaintiff is not required to provide "evidence of exact class size" in order to satisfy the numerosity requirement, *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993), without even a preliminary estimate of the fraction of investors who retained their litigation rights, the Court is left with little to no information to aid it in evaluating the likely size of the class. Instead, the Court must rely solely on its "common sense" to determine whether or not the proposed class includes greater than 40 members. *See German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 552 (S.D.N.Y. 1995). Because the Court finds that Royal Park's motion for class certification fails on predominance grounds, it need not decide whether such a question is amenable to a common sense resolution

that applies only to certain class members—is still bound by the judgment in the absence of an argument that it was not adequately represented. *See, e.g.*, *Spano v. The Boeing Co.*, 633 F.3d 574, 584 (7th Cir. 2011) ("If the unnamed members of the class have received constitutionally adequate representation, then the judgment in the class action will resolve their claims, win or lose."). Furthermore, because—if the class is certified—the Court will eventually make individualized determinations that alleged members of the class do in fact have standing to bring their claims, the Court must consider the extent to which those individual questions weigh against a finding of predominance. *Petrobras*, 862 F.3d at 273-74.

### b. Not all of Royal Park's asserted "common questions" satisfy the commonality requirement.

It is clear law in this Circuit that in order for Royal Park to prove its breach of contract claims against BNYM, it must demonstrate that BNYM actually discovered breaches of R&Ws for individual loans or Events of Default affecting specific trusts. *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 162 (2d Cir. 2014). Indeed, Royal Park essentially conceded this point in prior briefing to the Court. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss (Dkt. No. 59) at 3. Similarly, Royal Park's breach of duty of trust claims—which involve allegations that BNYM experienced conflicts of interest with the Covered Trust investors because of its desire to maintain business relationships with various loan sellers and originators, RMBS sponsors, master servicers and servicers, Am. Compl. ¶¶ 19-20, 174—must be proven with evidence of BNYM's relationships with many different entities, not all of which were associated with each of the Covered Trusts. *See* Rebuttal Expert Report of Faten Sabry, Ph.D., December 1, 2017 (Dkt. No. 159-1) ("Sabry Report") at Ex. 4.

But in its Memorandum in Support of its Renewed Motion for Class Certification, Royal Park asserts that the following questions are common to its proposed class: "(i) whether BNYM discovered that the Loans breached R&Ws; (ii) whether BNYM had knowledge of Events of

7

Default; (iii) whether BNYM violated its duties by failing to declare Events of Default and enforce the R&Ws rights; and (iv) whether Class members were damaged as a result of BNYM's conduct." Pl. Mem. at 7-8. These "common questions" are little more than a restatement of the basic elements of Royal Park's claims. At best, there may be a common answer *as to each trust* regarding each of these questions, but the Court doubts that there is proof that Royal Park can offer that is capable of generating common answers to these questions across the entire proposed class.

Perhaps recognizing that these questions—although crucial to the litigation—do not satisfy Rule 23(a)(2)'s commonality requirement, Royal Park offers a revised list of common questions in its Reply in Support of its Renewed Motion for Class Certification There, Royal Park identifies the following common questions: (i) "the evidentiary threshold to prove that BNYM 'discovered' breaches of representations and warranties, and had 'actual knowledge' of events of default;" (ii) "the duties triggered by BNYM's discovery of representations and warranty breaches;" (iii) "the duties triggered by BNYM's actual knowledge of events of default;" (iv) "whether BNYM acted as a 'prudent person' after gaining actual knowledge of an events of default;" and (iv) "whether BNYM's common course of behavior violated the Governing Agreements." Pl. Rep. at 2. Royal Park also reiterates its earlier contention that because BNYM applied uniform practices and policies across all of the Covered Trusts, whether those policies and practices breached BNYM's duties is a common question across the class. Pl. Mem. at 7, 13-14; Pl. Rep. at 2. It further argues that because each class member's damages can be measured using a common methodology, the issue of damages is a class-wide question. Pl. Mem. at 15. Plaintiff is correct that at least some of these questions—in particular, those that relate to the interpretation of similar contractual provisions across the five trusts, *see, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, No. 11 CIV. 8405 (CM), 2013 WL 12224042, at *3 (S.D.N.Y. July 12, 2013)—are susceptible to class-wide common answers and thus represent common questions that should be considered by the Court as part of its predominance analysis.

8

### c. Royal Park has failed to demonstrate that questions of law or fact common to class members predominate over individualized questions.

The predominance inquiry asks whether "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *U.S. Foodservice Inc.*, 729 F.3d at 118 (internal citation omitted). When deciding whether to certify a class under Rule 23(b)(3), a court must "take a close look at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (internal quotation marks omitted). Analyzing predominance requires more than simply counting the number of common and individualized issues; the Court must consider the relative complexity of those issues. *See Petrobras*, 862 F.3d at 271 (the predominance analysis is "more qualitative than quantitative and must account for the nature and significance of the material common and individual issues in the case" (internal citations and quotation marks omitted)).

Here, many of the legal and factual issues which must be established for class members to prove their claims cannot be resolved through class-wide proof. Because those individualized questions involve relatively complex legal and factual inquiries—requiring considerable resources in comparison to those questions which are capable of class-wide resolution—Royal Park has not established that questions of law or fact common to class members predominate over individualized questions.

### i. Establishing the liability elements of Royal Park's claims requires substantial consideration of individualized questions.

To determine whether questions of law or fact common to class members predominate, the Court must first look to the elements of Royal Park's claims. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). As discussed above, one of the core requirements of Royal Park's breach of contract claims is BNYM's actual discovery of individual breaches of R&Ws and Events

9

of Default. *Ret. Bd.*, 775 F.3d at 162. Similarly, Royal Park's breach of duty of trust claims require evidence of the relationship between BNYM and the various entities involved in the securitization and servicing of the loans in the Covered Trusts.

The five Covered Trusts contained, at the time of securitization, a total of almost 20,000 loans, originated by at least 27 different entities. Sabry Report at Ex. 4. With one exception, no two trusts share the same master servicer or servicer, and two of the trusts have had multiple servicers since the time the securitizations closed. *Id.* To prove, for instance, that BNYM was contractually liable for failing to act after discovering a breach of an R&W on an individual loan, Royal Park must demonstrate, first, that there was in fact a breach of an R&W for that specific loan and, second, that BNYM had knowledge of the breach. Neither of those inquiries is susceptible to simple, class-wide proof. *See Fed. Hous. Fin. Agency v. UBS Americas Inc.*, No. 11 CIV. 5201 DLC, 2013 WL 3284118, at *15 (S.D.N.Y. June 28, 2013) ("[T]here is no authority for the proposition that evidence of generalized knowledge necessarily qualifies as circumstantial evidence of particularized, actual knowledge."). Nor is any evidence of BNYM's discovery of a breach of an R&W for a specific loan in a specific trust relevant to the claims of the potential class members who held certificates in one of the other Covered Trusts.[2] Any potential efficiencies to be gained from class-wide adjudication of common liability issues such as the meaning of certain contractual terms are vastly offset by the waste involved in forcing members of the potential class to litigate factual issues of breach and discovery for thousands of loans that are wholly unrelated to their claims.

---

[2] Nor is it clear to the Court that evidence of BNYM's discovery of a breach of an R&W for a specific loan in a specific trust is even necessarily relevant to the claims of all potential class members who did hold certificates in that trust. As Defendant correctly notes, and Plaintiff's expert appears to admit, an investor in a specific trust who sold its certificates prior to the date that BNYM allegedly discovered the breach of the R&W has no claim relating to that particular discovery. Def. Opp. at 8. Although such a solution was not proposed by Royal Park, this factual reality also forecloses the possibility of segregating various investors' claims by creating subclasses under Rule 23(c)(5), because the relevant cutoff date which determines which investors can and cannot recover damages fluctuates on a loan-by-loan basis.

Plaintiff's argument that "BNYM's discovery that a vast number of underlying Loans violated R&Ws made in the Governing Agreements will also be subject to common proof," Mem. at 14, misinterprets the relevant law. Each of the cases cited by Royal Park to support this proposition involve claims under the securities laws, which do not require the same type of granular proof as do Royal Park's claims here. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 151–54 (2d Cir. 2012); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 CIV. 5653 PAC, 2014 WL 1013835, at *2–3 (S.D.N.Y. Mar. 17, 2014); *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 124 (S.D.N.Y. 2014). And Royal Park's insistence that BNYM's general policy of inaction when faced with breaches of R&Ws or Events of Defaults satisfies commonality and predominance, Pl. Mem. at 13-14, Pl. Rep. at 2, is entirely at odds with the law in this Circuit. *See Ret. Bd.*, 775 F.3d at 162 ("Plaintiffs claim that evidence of BNYM's policy of 'inaction' in the face of widespread defaults will be applicable to all of the trusts at issue. But as Plaintiffs recognize, even proof that BNYM *always* failed to act when it was required to do so would not prove their case, because they would still have to show which trusts actually had deficiencies that required BNYM to act in the first place.").

Because BNYM's liability for Royal Park's breach of contract and breach of duty of trust claims cannot be established without extensive individualized proof that can at best be offered on a trust-by-trust basis, the Court finds that the common issues of liability in this case do not predominate.

### ii. Individualized questions of standing weigh against a finding of predominance.

Royal Park's predominance showing also flounders on the preliminary question of standing. As discussed above, the Court must consider the effect of necessary individualized determinations of standing on the predominance analysis. *Petrobras*, 862 F.3d at 273-74. To establish standing to pursue specific claims, an individual class member must demonstrate that it holds the litigation rights

associated with certain certificates for the time periods in which BNYM is alleged to have committed specific breaches. As several other judges in this district have noted, the analysis of which entities maintained the right to sue for damages sustained by certificate holders is no easy task. *See Royal Park v. Deutsche Bank*, 2018 WL 1750595, at *15–16; *Royal Park Invs. SA/NV v. Wells Fargo Bank*, N.A., No. 14CIV9764KPFSN, 2018 WL 1831850, at *6–7 (S.D.N.Y. Apr. 17, 2018) (Failla, J.); *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, No. 14 CIV. 8175 (LGS), 2018 WL 679495, at *3–6 (S.D.N.Y. Feb. 1, 2018) (Schofield, J.); *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 397–98 (S.D.N.Y. 2018) (Marrero, J.).

To determine whether a class member holds the litigation rights for a specific claim, the Court must first trace the chain of title for a specific certificate and identify the operative assignments which transferred the certificate from beneficial owner to beneficial owner. Because state law varies on the question of whether litigation rights are assigned by default when beneficial ownership of a certificate is transferred—*compare* Restatement (Second) of Contracts § 324 (1981) (describing the majority rule that assignments must manifest an intention to convey litigation rights) *with* N.Y. Gen. Oblig. § 13-107(1) (stating that litigation rights follow the assignment of a bond unless expressly reserved in writing)—the Court must apply New York's fact-intensive "center of gravity" choice of law framework to determine which state's law governs each assignment of beneficial ownership. *See Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999); *In re Liquidation of Midland Ins. Co.*, 16 N.Y.3d 536, 543 (2011). The Court must then apply the relevant state's law to each assignment of beneficial interest to determine who holds the litigation rights associated with certain certificates for specific time periods.

The significant number of individualized legal issues involved in this inquiry is obvious: The Court must engage in a multi-step analysis for every single assignment of beneficial interest in a certificate's chain of title to determine whether an alleged class member has standing to assert its

12

claims.  The factual issues associated with such an analysis are complicated by the reality that identifying the relevant assignments and constructing the chain of title for the beneficial interest in an individual certificate is extraordinarily difficult.  *See Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14CV09764KPFSN, 2018 WL 739580, at *12 (S.D.N.Y. Jan. 10, 2018) ("[T]he Certificates do not have unique identifiers, they are actively traded on the secondary market without a central clearinghouse to record trades, and many Certificate holders are not the actual beneficiaries.").  While Royal Park's expert claims to be able to identify significant numbers of individual beneficial holders of certificates in the Covered Trusts, Expert Report of W. Scott Dalrymple, CFA, October 16, 2017 (Dkt No. 152-7) at 10-12, his report does not dispute the reality that recreating chains of title of beneficial ownership of the certificates in the Covered Trusts is an onerous task.

In arguing that this Court should not follow the guidance of other courts in this district which have denied Royal Park's motions for class certification in part based on individualized standing issues, Royal Park repeatedly argues that those courts failed to "qualitatively assess the nature of the common issues in relation to the hypothetical 'individualized' issues raised by defendants."  Letter from Royal Park to the Court, dated March 23, 2018 (Dkt. No. 170) ("3/23/2018 Letter") at 2; *see also* Letter from Royal Park to the Court, dated May 4, 2018 (Dkt. No. 173) ("5/4/18 Letter") at 2; Letter from Royal Park to the Court, dated August 27, 2018 (Dkt. No. 177) at 1.  But this argument does not deny that resolving the preliminary standing inquiry for each potential class member involves significant individual legal and factual analysis.  In light of these and other substantial individual issues, the Court is unconvinced that the class-wide issues identified by Royal Park are sufficient to predominate over the individual issues in this case.[3]

---

[3] Royal Park also suggests that the Court cannot consider whether standing or statute of limitations issues defeat its showing of predominance because those issues were not raised by BNYM in its briefing.  5/4/18 Letter at 2.  That is incorrect.  This Court has the discretion to consider arguments which were not raised by the parties.  *See Ruggiero v.*

13

### iii. Individualized statute of limitations defenses similarly weigh against a finding of predominance.

Individualized statute of limitations defenses present yet another obstacle to Royal Park's showing of predominance. Four of the trust agreements at issue in this case are governed by New York law. ECR 2005-2 Indenture (Dkt. No. 152-22) at § 10.11; NHEL 2006-3 PSA (Dkt. No. 152-24) at § 12.05; NSTR 2007-C PSA (Dkt. No. 152-25) at § 11.11; SAMI 2006-AR4 Amended and Restated PSA (Dkt. No. 106-8) at § 11.06. But because New York law incorporates the statutes of limitations of other states when claims for economic damages accrue to non-New York residents, N.Y. C.P.L.R. § 202; *see also Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529–30 (1999), the determination of which state's statute of limitations applies to each potential class member is an individualized inquiry that turns on the potential class member's state of residence. Contrary to Royal Park's assertion that such analysis is "formulaic," 3/23/2018 Letter at 3, determining an individual plaintiff's residence and then analyzing the law of the plaintiff's residence can quickly become an involved inquiry. *See, e.g., Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462 (S.D.N.Y. 2017). While Royal Park is correct that "the existence of even a meritorious statute of limitations defense does not necessarily defeat certification," *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 303 (S.D.N.Y. 2003), it fails to acknowledge that a statute of limitations defense "may be considered as one factor in the class certification calculus." *Id. See also Johnson*, 780 F.3d at 138 (2d Cir. 2015) (individualized defenses are factors the Court "must" consider as part of the predominance analysis). The existence of individualized statute of limitations defenses—in

---

*Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005). Nor would such a limitation on the Court's authority be consistent with its obligation "to assess all of the relevant evidence admitted at the class certification stage when determining whether to grant a Rule 23 motion." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

14

conjunction with the Court's evaluation of the relative weight of the other individualized issues in this case—mitigates against a finding of predominance.

> **iv. Even if individual damages can be computed based on Royal Park's proposed class-wide model, determining the inputs to that model involves substantial individualized questions.**

Royal Park asserts that "each class member's damages will be measured by a common methodology based on published data with respect to the performance of the Loans and a re-underwriting analysis of the loans." Pl. Mem. at 15. Royal Park is certainly correct that the existence of a class-wide methodology for calculating damages weighs in favor of predominance. *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 271 (S.D.N.Y. 2014); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 181 (S.D.N.Y. 2008). What Royal Park fails to note, however, is that determining the appropriate values to input into its expert's model involves hundreds, if not thousands, of fact-intensive inquiries which cannot be answered on a class-wide basis because they relate to individual loans, trusts, originators, sponsors, and servicers.

For instance, Defendant's expert identifies five inputs that are necessary to determine damages under Plaintiff's proposed model for R&W-based breach of contract damages: (i) the dates when the trustee discovered R&W breaches or Events of Default; (ii) the time it would have taken the trustee to initiate the repurchase process, submit repurchase demands and resolve such repurchase demands for each breached loan; (iii) the financial condition of the warranting parties at the time the trustee discovered the breach of an R&W and its impact on the warranting parties' willingness or ability to repurchase a loan; and (iv) whether the allegedly breached loans, subject to a repurchase demand, would have been rejected, repurchased or cured by the warrantor. Sabry Report at 21-22. For the same reasons that basic questions about BNYM's discovery of a breach of an R&W cannot be resolved on a class-wide basis, the model inputs that are relevant to determining any individual investor's damages will vary depending on the Covered Trusts in which the investor

owned certificates and when the investor held those certificates. Even for R&W claims against the same warranting party for loans in the same trust, the warranting party's financial ability to repurchase loans may have deteriorated as the financial crisis worsened, resulting in vastly different damages model inputs even for investors who owned the same tranche of certificates in the same trust, but at different periods of time. Sabry Report at 24-25.

Similar issues exist for breach of contract damages based on BNYM's knowledge of Events of Default. BNYM's expert makes clear that, even if Royal Park could prove that BNYM was aware of Events of Default and should have taken action to terminate and replace the servicer for a specific trust, damages must still be calculated on a loan-by-loan basis by taking into consideration the likely recovery a different servicer could have obtained for any individual loan. *See* Sabry Report at 29 (discussing as an example the circumstances which affect a servicer's recovery from foreclosure on an individual loan). These types of determinations are simply not common to the entire class— the likely recovery in foreclosure for a loan in one Covered Trust has no bearing on the damages sustained by investors in the other four Covered Trusts or by investors who owned certificates in that Covered Trust, but during a different period of time than when the foreclosure should have taken place. Because Royal Park's common damages model still requires the resolution of many individualized inquiries in order to compute a potential class member's damages, it cannot support a finding of predominance. *See, e.g.*, *Royal Park v. Wells Fargo*, 2018 WL 1831850, at *8 ("[H]ere, the individualized inquiries necessary to distribute damages among investors . . . would dwarf the only common question identified in the case.").

## IV. CONCLUSION

Because the common questions of law and fact in this case do not predominate over the substantial individualized issues noted above, Royal Park's motion for class certification is denied. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 150.

SO ORDERED.

Dated: February 15, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge